## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICAN COUNCIL OF LIFE INSURERS, NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-FORT WORTH, NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-DALLAS, NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-PINEYWOODS OF EAST TEXAS, NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-TEXAS, NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS, NATIONAL ASSOCIATION FOR FIXED ANNUITIES, INSURED RETIREMENT INSTITUTE, and FINSECA, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, and JULIE SU, in her official capacity as Acting Secretary, United States Department of Labor, <br><br> Defendants. | Civil Action No. 4:24-cv-00482 |

## COMPLAINT

Plaintiffs the AMERICAN COUNCIL OF LIFE INSURERS ("ACLI"), the NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-FORT WORTH ("NAIFA-Fort Worth"), the NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-DALLAS ("NAIFA-Dallas"), the NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-PINEYWOODS OF EAST TEXAS ("NAIFA-POET"), the

NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS-TEXAS

("NAIFA-Texas"), the NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL

ADVISORS ("NAIFA"), the NATIONAL ASSOCIATION FOR FIXED ANNUITIES

("NAFA"), the INSURED RETIREMENT INSTITUTE ("IRI"), and FINSECA, each

association on behalf of its members allege, by and through their attorneys, as follows:

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of their members under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 551-706, and the First Amendment to the U.S. Constitution,

to declare a Fiduciary Rule (the "Rule") recently promulgated by the Department of Labor (the

"Department" or "DOL") as contrary to law, arbitrary and capricious, and unconstitutional.[1]

2.      In 2018, the Fifth Circuit set aside as contrary to law a Department regulation that

sought to impose fiduciary obligations on virtually all insurance agents or broker-dealers, among

others, who do business in the retirement savings marketplace with employer-sponsored

retirement plans and individual retirement accounts ("IRAs").  Consistent with established

principles of statutory interpretation, the Fifth Circuit held that the governing law—the

Employee Retirement Income Security Act ("ERISA")—codified common-law fiduciary

standards, and that the Department's efforts to expand the statutory definition of an ERISA

"fiduciary" beyond the common law exceeded the agency's statutory authority.  *Chamber of*

*Commerce v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018).  Undeterred by the Fifth

---

[1] The "Rule," for purposes of this complaint, including relief sought, is a collection of several substantively intertwined rules that the Department proposed simultaneously and adopted simultaneously.  *See* Retirement Security Rule: Definition of an Investment Advice Fiduciary, 89 Fed. Reg. 32,122 (Apr. 25, 2024); Amendment to Prohibited Transaction Exemption 2020-02, 89 Fed. Reg. 32,260 (Apr. 25, 2024); Amendment to Prohibited Transaction Exemption 84-24, 89 Fed. Reg. 32,302 (Apr. 25, 2024); Amendment to Prohibited Transaction Exemptions 75-1, 77-4, 80-83, 83-1, and 86-128, 89 Fed. Reg. 32,346 (Apr. 25, 2024).

Circuit's decision, the Department now attempts to once again impose fiduciary obligations across the retirement savings marketplace.  This 2024 Rule is invalid for the very same reasons the 2016 rule failed.

3.     Plaintiffs are Texas-based and national associations that represent life insurance companies, insurance agents, brokers, and distributors who issue, market, and sell insurance and securities products, including annuities, to retirement savers.  Plaintiffs and their members have long supported, and continue to support, reasonable and balanced regulation of the retirement savings marketplace, including recently enhanced consumer protections enacted by Texas and other state governments across the country, and regulations promulgated by the Securities and Exchange Commission ("SEC") designed to further the best interests of retirement savers.

4.     Ignoring the impact of those recent reforms, and without meaningfully engaging with the regulatory agencies responsible for implementing and enforcing those reforms, the Department has peremptorily attempted a radical intervention in the retirement savings marketplace.  In the Rule challenged here, the Department would transform the retirement savings marketplace by imposing an ERISA "fiduciary" obligation—the highest duty known to the law—on effectively every insurance agent or broker (among others) who sells retirement products to retirement savers.  Despite claiming to help consumers, the Rule, in fact, will be a catastrophe for retirement savers.  By imposing on sales recommendations substantial burdens deemed counterproductive by other regulators, and by redefining essentially all commercial relationships in the retirement savings marketplace as fiduciary, the Rule will drastically and unreasonably raise the costs of assisting consumers; it will deprive many consumers of access to beneficial products (such as annuities); and it will impair consumer access to useful information about retirement products.

5.      Like the Department's prior effort to transform all agents and brokers (among others) who sell retirement products into ERISA fiduciaries, the Rule is contrary to law.  In vacating the Department's 2016 regulation, the Fifth Circuit explained, "[a]ll relevant sources indicate" that ERISA "codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence."  *Chamber*, 885 F.3d at 369.  The prior rule exceeded the Department's authority because it imposed fiduciary status on non-fiduciary sales recommendations and it eradicated, rather than respected, the common law's core distinction between sales activity (to which fiduciary status did not attach) and paid-for investment advice (to which fiduciary status did apply).  As the Fifth Circuit concluded in terms directly relevant now, the Department lacks the statutory authority to impose fiduciary status on transactions for which it "is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers."  *Id.* at 380.  Like the 2016 rule, the current Rule seeks to achieve the Department's policy preference of "fiduciary-only" regulation by jettisoning the Department's own nearly-half-century old regulatory test for determining fiduciary status—a test that the Fifth Circuit explained "captured the essence of a fiduciary relationship known to the common law."  *Id.* at 365.

6.      Put simply, the Department's current Rule suffers from the same key legal defects as the 2016 rule.  It exceeds the agency's statutory authority.  It is the product of a rushed, outcome-oriented process.  It is arbitrary and capricious in multiple respects:  It fails to establish its necessity (particularly in light of existing regulations), arbitrarily targets annuities while ignoring their benefits, includes cost-benefit analysis that does not reflect reasoned decisionmaking, and fails to adequately address significant concerns.  And it violates the U.S. Constitution by heaping significant fiduciary burdens on garden-variety sales conversations,

violating the First Amendment rights of Plaintiffs' members to communicate truthful information to consumers about annuities and other retirement products and the rights of those consumers to receive such truthful information beneficial to their retirement futures.

7.      For those reasons and others, the Rule will result in harmful changes to the retirement savings marketplace and disserve American consumers.  The Rule is arbitrary and capricious, contrary to law, and unconstitutional, and must be set aside under the APA.

## PARTIES

8.      Plaintiff ACLI is a national trade association headquartered at 101 Constitution Avenue NW, Suite 700, Washington, D.C. 20001.  ACLI has approximately 275 member companies, which represent 93% of industry assets in the U.S.  ACLI member companies offer insurance contracts and other investment products and services both to employer-sponsored retirement plans and to individuals through tax-advantaged IRAs or on a non-qualified (that is, post-tax) basis.  ACLI's members are also employer sponsors of retirement plans for their own employees.

9.      Plaintiff NAIFA-Fort Worth is a NAIFA-member local chapter representing approximately 110 insurance agents in the Fort Worth metropolitan area.  NAIFA-Fort Worth was founded in 1926.  Members of NAIFA-Fort Worth are also members of NAIFA-Texas, but NAIFA-Fort Worth is a separately incorporated 501(c)(6) non-profit corporation with its own bylaws, policies, and board of directors.  The mission of NAIFA-Fort Worth is empowering financial professionals and consumers through world-class advocacy and education.  NAIFA-Fort Worth can be reached by mail at P.O. Box 33372, Fort Worth, Texas 76162.

10.     Plaintiff NAIFA-Dallas is a NAIFA-member local chapter representing approximately 275 insurance agents in the Dallas metropolitan area.  Members of NAIFA-Dallas

are also members of NAIFA-Texas, but NAIFA-Dallas is a separately incorporated 501(c)(6) non-profit corporation with its own bylaws, policies, and board of directors. The mission of NAIFA-Dallas is empowering financial professionals and consumers through world-class advocacy and education. NAIFA-Dallas was founded in 1913 and is currently headquartered at 40 E. McDermott Drive, Allen, Texas 75002.

11.     Plaintiff NAIFA-POET is a NAIFA-member local chapter representing approximately 100 insurance agents in the East Texas area. Members of NAIFA-POET are also members of NAIFA-Texas, but NAIFA-POET is a separately incorporated 501(c)(6) non-profit corporation with its own bylaws, policies, and board of directors. The mission of NAIFA-POET is empowering financial professionals and consumers through world-class advocacy and education. NAIFA-POET does not maintain a physical headquarters, but it can be reached by mail at 3775 Attucks Drive, Powell, Ohio 43065.[2]

12.     Plaintiff NAIFA-Texas is a NAIFA-member state association founded in 1925 that represents approximately 1,400 members, including insurance agents, throughout Texas. The mission of NAIFA-Texas is empowering financial professionals and consumers through world-class advocacy and education. NAIFA-Texas no longer maintains a physical headquarters, but it can be reached by mail at 3775 Attucks Drive, Powell, Ohio 43065.

---

[2] Like many non-profit associations, NAIFA-POET is managed by a remote association services firm, which in NAIFA-POET's case is based in Ohio. NAIFA-POET's principal place of business, however, is in Texas. Indeed, NAIFA-POET's members all live and work in Texas, and all of its activities (for example, professional development events and advocacy efforts) are conducted in or directed toward Texas. NAIFA-Texas, discussed below, is managed by the same Ohio-based remote association services firm. Like NAIFA-POET, NAIFA-Texas's principal place of business is in Texas. NAIFA-Texas's members all live and work in Texas, and all of its activities are conducted in or directed toward Texas.

13.      Plaintiff NAIFA is a national trade association headquartered at 1000 Wilson Boulevard, Suite 1890, Arlington, Virginia 22209.  Founded in 1890, NAIFA is one of the nation's oldest and largest associations representing the interests of insurance agents.  NAIFA's members—from every congressional district in the United States—assist consumers by focusing their practices on one or more of the following: life insurance and annuities, health insurance and employee benefits, multiline, and financial investments.  NAIFA members serve primarily middle-market clients, including individuals and small businesses.  In some cases, NAIFA members serve areas with only a single insurance agent for multiple counties.

14.      Plaintiff IRI is a national trade association representing members from across the supply chain of insured retirement strategies, including life insurers, asset managers, broker dealers, banks, marketing organizations, law firms, and solution providers.  IRI members account for 90% of annuity assets in the United States and are represented by financial professionals serving millions of Americans.  IRI is headquartered at 1100 Vermont Avenue NW, 10th Floor, Washington, D.C. 20005.

15.      Plaintiff Finseca is a national trade association comprised of more than 9,000 financial security professionals who serve clients in communities throughout the country, including in Texas.  Its members work with consumers to help provide financial and insurance products that protect against certain risks—such as death, injury, and outliving retirement incomes.  As an organization, its mission is to empower its members to help more American families achieve financial security.  One of its key goals is to preserve consumer choice by ensuring access to financial security professionals and products that families need to achieve financial security.  Finseca is headquartered at 600 13th Street NW, Suite 550, Washington, D.C. 20005.

16.     Plaintiff NAFA is a national trade association headquartered at 1717 Pennsylvania Avenue NW, Suite 1025, Washington, D.C. 20006.  NAFA's mission is to educate and inform regulators and the public about the value of fixed annuities and their benefits to Americans' retirement planning.  Its members include insurance carriers, independent marketing organizations, individual insurance agents, and industry organizations and firms that represent and support every sector of the fixed annuity marketplace.

17.     Defendant the United States Department of Labor is the federal agency that promulgated the final Rule challenged in this case.

18.     Defendant Julie Su is the Acting Secretary of the United States Department of Labor.

## JURISDICTION AND VENUE

19.     This action arises under the APA and the U.S. Constitution.  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.  The Court is authorized to issue the relief sought pursuant to the APA, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

20.     Plaintiffs have standing to bring this action on behalf of their members, many of whom will be directly regulated and adversely affected by the Rule, which imposes costly and burdensome fiduciary requirements on, among others, insurance companies, insurance agents, and broker-dealers.  Each Plaintiff has members who would have standing to sue in their own right; the interests that Plaintiffs seek to protect in this lawsuit are germane to their associational and organizational purposes, including ensuring reasonable and balanced regulation of insurance and securities products and protecting the interests of consumers; and neither the claims asserted

nor the relief requested requires the participation of individual members in the lawsuit.  Many of the Plaintiffs filed comments with the Department during the rulemaking.

21.  Venue is proper in this district under 28 U.S.C. § 1391(e) because this is an action against an agency and officer of the United States, no real property is involved, and Plaintiffs NAIFA-Dallas and NAIFA-Fort Worth reside in this judicial district.  NAIFA-Fort Worth resides in the Fort Worth division of this judicial district.  Many of the same Plaintiffs here litigated a previous challenge to a prior iteration of the Rule in the Northern District of Texas.

## FACTUAL ALLEGATIONS

### I. ANNUITIES PROVIDE SUBSTANTIAL BENEFITS TO RETIREMENT SAVERS

22.  Over the course of the last twenty-five years, as the use of pensions has declined, Americans have increasingly begun to bear primary responsibility for their retirement savings. With that fundamental shift, Americans now manage and balance numerous (and sometimes competing) retirement risks on their own.  Retirees may save too little.  They may outlive their assets.  They may see the value of their assets effectively eroded by inflation.  Or they may invest in assets that ultimately decline in value and provide no safety net.  The result is that retirement today requires more planning than in previous generations.

23.  In this changed retirement landscape, annuities play a vital role.  Annuities are insurance products that guarantee retirement investors consistent, wage-like payments during retirement, safeguarding against "longevity risk"—that is, the risk that a retiree outlives their retirement savings.  Under an annuity contract, a consumer contributes a principal sum, and in return the insurance company makes payments at regular intervals or (less commonly) at once.

24.  Annuities provide investors options about the timing of their payments. Consumers may purchase an annuity with one lump-sum principal contribution, or they may make contributions over time instead.  And they may choose an "immediate" annuity, which

entitles them to payments that begin immediately, or a "deferred" annuity, which begins payments at a later date (often upon retirement).

25.     There are two basic types of deferred annuities: "fixed" and "variable."  A fixed annuity provides payments to a consumer in a set amount based on either a specified rate of return or a specified formula tied to a market index, such as the S&P 500, with a guarantee that the interest credited will be no less than a specified minimum.  The former type of fixed annuity is referred to as a "fixed-rate annuity."  The latter type is referred to as a "fixed index annuity" (or "fixed indexed annuity").  With fixed index annuities, the change in a market index is used solely to calculate the interest the investor receives on his or her payments.  The annuity owner does not actually invest in the market itself.  In contrast, a variable annuity allows the owner to benefit from potential investment market growth.  The payment amount to the consumer depends on the performance of the underlying portfolio of assets (stocks, bonds, etc.) selected by the consumer from a menu of options and on the selection of guaranteed benefit options.

26.     The range of annuity options between fixed and variable enables retirement investors with different risk tolerances (and different portfolios of other assets) to select the annuity that best meets their personal preferences and circumstances.  A retirement saver most concerned about investment risks may opt for a fixed rate annuity, which sets a declared rate that does not vary based on market performance.  Fixed index annuities provide the same guarantee while also protecting against inflation, by tying the rate to a market-index (with a floor serving as the rate minimum).  Variable annuities protect against inflation while enabling consumers to take full advantage of the potential for positive market performance.

27.     Retirement savers may customize annuities in other ways as well, by purchasing additional features and riders to protect against other retirement risks.  For example, many

consumers may choose a death benefit, to be paid to a surviving spouse or other dependents when the consumer passes away.  Consumers may also choose hardship or disability provisions that permit early, penalty-free withdrawals in the case of a medical or other emergency.  And they may choose riders that guarantee a minimum level of lifetime income, or that protect against market downturns in other ways.

28.    Like other retirement products, annuities can be accessed through employer-sponsored retirement plans like 401(k)s or purchased through IRAs.  Depending on the type of IRA, contributions can be made pre- or post-tax with investment earnings treated as tax-deferred or tax-free.  IRAs play an increasingly important role in today's retirement savings marketplace because they are highly portable and independent from any given employer.  When individuals move jobs or retire, they can "rollover," or transfer, assets from an employer-sponsored plan to their own IRA.  In fact, most assets in IRAs are from rollovers from 401(k) accounts.

29.    A 401(k) is an employer-sponsored, defined-contribution plan that provides similar tax advantages to an IRA.  In some 401(k)s, the plan trustee manages the assets in which the plan is invested for all plan participants together.  More typically, the plan provides a menu of investment options among which participants allocate their individual account balances.

30.    Recognizing the important benefits and protections that annuities provide to many retirement savers, Congress has repeatedly sought to promote their availability and use through IRAs and 401(k)s.  In 2019, Congress passed the SECURE Act, which (among other things) made annuities more portable between 401(k)s by removing certain penalties, reduced the liability and burdens on the plan trustee when selecting an annuity provider, and required employer-sponsored plans to provide employees with information about the value of their accounts in the form of an annuity.  *See* Setting Every Community Up for Retirement

11

Enhancement Act of 2019, Pub. L. No. 116-94, div. O, tit. I, §§ 106, 109, 133 Stat. 3138; *id.* at tit. II, § 204.

31.     In 2022, Congress passed the SECURE Act 2.0, which took further steps to increase annuity availability and use.  *See* Pub. L. No. 117-328, div. T, 136 Stat. 5275 (2022). The statute allowed greater year-to-year benefit increases for lifetime annuities; increased the total dollar cap, and removed the 25% cap, on how much money from a retirement account can be used to purchase certain annuities; and eliminated a "partial annuitization penalty" on consumers who use part of their tax-advantaged account to invest in an annuity.  *Id.* §§ 201-202, 204.

## II.     THE MARKET FOR ANNUITY PRODUCTS

32.     Consumers making choices about their retirement savings need access to truthful information about the various products available.  Many consumers obtain the required information the same way they learn about other products—by speaking with a salesperson.

33.     With respect to the annuity products issued by insurance companies, that salesperson is usually an insurance agent or a broker.  Variable annuities are securities and therefore must be sold by a broker-dealer registered with the SEC and Financial Industry Regulatory Authority ("FINRA").  Fixed annuities may be sold by registered broker-dealers or insurance agents regulated by state insurance departments.[3]

34.     Some insurance agents are "captive" or "career" agents, meaning that they concentrate their sales efforts primarily (or sometimes exclusively) on the products of a single

---

[3] Fixed index annuities may sometimes be considered securities (and thus subject to SEC regulation), but only when the annuity contract lacks a minimum guarantee that limits or eliminates the potential for losses when the applicable market index goes down.  *Updated Investor Bulletin: Indexed Annuities*, U.S. Securities and Exchange Commission (July 31, 2020), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_indexedannuities.

insurance company.  Most annuities, however, are sold by independent insurance agents who are free to sell products offered by multiple carriers.  To provide independent insurance agents the necessary support and training to sell their products, many carriers engage intermediary "distributors," such as an independent marketing organization.

35.     To adhere to the applicable regulatory standards (discussed further below, ¶¶39-61) and to provide retirement savers with the necessary information to make an informed decision, agents and brokers must educate themselves about the many available products in the market and consumers' financial situations.  This takes time.  To help compensate for the time and effort required to provide useful information and complete an annuity transaction, the insurance company—not the retail customer—typically pays the agent or broker-dealer a sales commission.

36.     The principal alternative to this commission-based compensation structure is a fee-for-advice model.  In a fee-for-advice arrangement, a consumer (because of the cost, typically wealthier than the average) hires a professional who is registered with the SEC as an "investment adviser" to manage his or her money on an ongoing basis pursuant to an agreed-upon investment strategy, and the adviser is paid an ongoing (usually annual) fee calculated as a percent of the total "assets-under-management."  Under federal law, investment advisers are fiduciaries who are paid for advice.

37.     A fee-for-advice model does not always align with the individual circumstances, needs, and preferences of consumers seeking the benefits provided by annuities.  The key prerequisite in a fee-for-advice arrangement is ongoing advice, but annuities are usually sold through one-time transactions for which follow-on, continual advice or investment management is typically unnecessary.  Indeed, this is a key efficiency provided by the annuity model.  It

would not make sense (and would obviously disserve the consumer) for a one-time salesperson to receive a recurring fee from the consumer tied to the value of the consumer's assets.  A fee-for-advice model is relatively more expensive over time than a commission-based model.  For many middle- and lower-income consumers, a fee-for-advice model would effectively place the information needed for rational decision-making out of reach.  Fee-for-advice arrangements also usually come with account balance minimums (typically between $100,000 and $250,000) that less wealthy consumers often cannot satisfy.  And for those middle- and lower-income consumers who can meet the minimums, fee-for-advice would be cost-prohibitive:  Advisory firms' annual fees are usually 1%, so the management of $100,000 in assets over the course of multiple years would generate much higher fees than a one-time commission paid to an agent on a $100,000 fixed annuity.  The annual fee, moreover, is paid directly by the consumer, unlike commissions, which are paid by the insurance company.

38.    Against this backdrop, the use of sales commissions has long been an accepted practice in the insurance industry because they both fairly compensate agents and brokers and keep consumers' costs down.  Forcing a fee-for-advice model onto these transactions would be more expensive and deprive many less wealthy consumers of critical information about retirement products.  Yet those low-balance retirement investors are generally the consumers who most need the lifetime income guarantee that annuities provide.

## III.    ANNUITIES ARE EXTENSIVELY REGULATED BY STATE LAW AND THE SEC

39.    Annuity products have long been subject to substantial regulation.  As insurance products, all annuities are subject to state insurance laws and regulations.  Those state laws are often informed by model regulations adopted by the National Association of Insurance Commissioners ("NAIC"), a standard-setting organization made up of the chief insurance

regulators from the 50 states, the District of Columbia, and U.S. territories.  Variable annuities

are securities subject to additional regulation by the SEC, FINRA, and state securities regulators.

40.    This regulatory landscape has been endorsed by Congress.  The Dodd-Frank Act

of 2010 provided that fixed index annuities sold in states that adopt the NAIC's model

regulations are to be "treat[ed] as exempt securities" not subject to SEC regulation.  Pub. L. 111-

203 § 989J, 124 Stat. 1376, 1949-1950.  Dodd-Frank also authorized the SEC to issue heightened

standards for broker-dealers "providing personalized investment advice … to a retail customer"

about non-exempt securities, like variable annuities.  *Id.* § 913(g)(1), 124 Stat. at 1828.

41.    Consistent with Congress's design, both States and the SEC continue to actively

regulate annuity transactions.  Indeed, within the last five years, both States (with the assistance

of the NAIC) and the SEC have revised their standards to provide enhanced protections to

consumers purchasing annuities.

### A.    State Regulation

42.    It is well established that States are the principal regulators of the insurance

industry.  In 1945, Congress enacted the McCarran-Ferguson Act, which declares state

regulation of insurance to be "in the public interest," 15 U.S.C. § 1011, and provides that no

federal law can be "construed to invalidate, impair, or supersede" any state insurance law unless

the federal law "specifically relates to the business of insurance," *id.* § 1012(b).

43.    Consistent with their longstanding role with respect to the insurance industry,

States have regulated annuity transactions for decades, often pursuant to the NAIC's "Suitability

in Annuity Transactions Model Regulation," which provides standards that "apply to any sale or

recommendation of an annuity" to ensure consumers' financial interests are safeguarded.  Most

recently, in 2020, the NAIC's membership approved substantial revisions to the model regulation

to provide stronger protections for consumers.  Those revisions have thus far been adopted by 45

jurisdictions, and the remaining States are expected to adopt the model regulation by year end. Driven largely by these efforts, more than 90% of Americans now live in a state that has adopted a best interest standard for annuity sales.

44.    The cornerstone of the current version of the NAIC's model regulation is the "Best Interest Obligation," which requires insurance agents (sometimes called "producers"—a term that can also include certain broker-dealers) making annuity recommendations to "act in the best interest of the consumer under the circumstances known at the time the recommendation is made, without placing the producer's or the insurer's financial interest ahead of the consumer's interest."  NAIC 2020 Model Regulation § 6(A).  To satisfy that best interest standard, agents must meet a number of obligations:

45.    First, under the model regulation's "Care obligation" the producer must "[h]ave a reasonable basis to believe the recommended option effectively addresses the consumer's financial situation," based on consideration of "consumer profile" factors, including the consumer's "age," "annual income," "financial situation and needs," "financial experience," "financial objectives," "intended use of the annuity," "liquid net worth," "risk tolerance," and "tax status."  NAIC 2020 Model Regulation §§ 5(C), 6(A)(1)(a).  The producer must, moreover, make "reasonable efforts to obtain consumer profile information from the consumer prior to the recommendation of an annuity."  *Id.* § 6(A)(1)(b).  And the producer must both "mak[e] a reasonable inquiry" into all recommendation "options available to" them, and "[c]ommunicate the basis or bases of the recommendation" to the consumer.  *Id.* § 6(A)(1)(a).

46.    Second, under the model regulation's "Disclosure obligation," the producer must describe the insurance carriers whose products the agent sells, and list the types of products the agent is licensed to sell.  NAIC 2020 Model Regulation § 6(A)(2).  The producer must also

disclose "the sources and types of cash compensation and non-cash compensation to be received … , including whether [they are] to be compensated for the sale of a recommended annuity by commission … from the insurer, intermediary or other producer or by fee as a result of a contract for advice or consulting services." *Id.* In addition, the producer must provide "notice of the consumer's right to request additional information regarding cash compensation." *Id.* § 6(A)(2). And if the consumer makes such a request, the producer must provide "a reasonable estimate of the amount of cash compensation to be received" and disclose whether the money will be received via a one-time commission or multiple payments. *Id.* These state-law obligations ensure that investors receive fair and accurate information to inform their decisions.

47.    Third, the NAIC model regulation's "Documentation obligation" requires producers to "[m]ake a written record of any recommendation and the basis for the recommendation." NAIC 2020 Model Regulation § 6(A)(4). And it requires them to obtain a customer-signed statement when the customer refuses to provide relevant consumer profile information or "decides to enter into an annuity transaction that is not based on the [agent or broker-dealer]'s recommendation." *Id.*

48.    Fourth, the NAIC model regulation's "Conflict of interest obligation" requires producers to "identify and avoid or reasonably manage and disclose material conflicts of interest." NAIC 2020 Model Regulation § 6(A)(3). "Material conflict of interest" is defined as a "financial interest of the [agent or broker-dealer] … that a reasonable person would expect to influence the impartiality of a recommendation." *Id.* § 5(I)(1). The regulation provides, though, that the mere receipt of any "cash compensation or non-cash compensation," on its own, does not give rise to a material conflict of interest—in recognition that consumers are aware of and understand the use of reasonable sales commission and other incentives. By addressing conflicts

of interest but not prohibiting commissions, the NAIC preserved consumers' access to important financial information and their ability to choose between different models to receive that information and select a product.

49.     Under the NAIC model regulation, producers must also meet minimum training requirements.  "A producer shall not solicit the sale of an annuity product unless the producer has adequate knowledge of the product to recommend the annuity and the producer is in compliance with the insurer's standards for product training."  NAIC 2020 Model Regulation § 7(A).  The required training must cover both general information about annuity types and uses, sales practices, and disclosure requirements, but also information about "[h]ow product specific annuity contract features affect consumers."  *Id.* § 7(B)(3).

50.     Separate from the obligations imposed on agents and brokers who make recommendations about annuities, the NAIC model regulation imposes requirements on insurance companies when their annuities are recommended and sold to consumers.  The model rule provides that "an insurer may not issue an annuity recommended to a consumer unless there is a reasonable basis to believe the annuity would effectively address the particular consumer's financial situation, insurance needs and financial objectives based on the consumer's consumer profile information."  NAIC 2020 Model Regulation § 6(C)(1).  It also requires insurers to "establish and maintain a supervision system that is reasonably designed to achieve the insurer's and its [agents'] compliance with this regulation," including by crafting "procedures for the review of each recommendation prior to issuance of an annuity" and "procedures to detect recommendations that are not in compliance" with the regulation's terms.  *Id.* § 6(C)(2)(d)-(e).  Recognizing, though, the practical limitations insurers would face in reviewing the work of every agent who recommends one of their products, the NAIC model regulation explains that insurers'

review procedures may rely on "electronic" systems, and that insurers may use "sampling procedures" to detect improper recommendations.  *Id.*  Insurers must also "verify that a producer has completed the annuity training course required" by the NAIC regulation "before allowing the producer to sell an annuity product for that insurer." *Id.* § 7(B)(11).

51.     To address the risks of imposing duplicative and potentially inconsistent standards on agents and brokers, the NAIC model regulation provides a safe harbor under which "[r]ecommendations and sales of annuities made in compliance with comparable standards shall satisfy" the NAIC regulation as well.  NAIC 2020 Model Regulation § 6(E)(1). Recommendations and sales made "in compliance with business rules, controls and procedures that satisfy a comparable standard" therefore satisfy the NAIC regulation "even if such standard would not otherwise apply to the product or recommendation at issue." *Id.*  For broker-dealers, "comparable standards" means "applicable SEC and FINRA rules pertaining to best interest obligations and supervision of annuity recommendations and sales, including, but not limited to, Regulation Best Interest[.]" *Id.* § 6(E)(5)(a).

52.     Finally, the NAIC model regulation provides the relevant state insurance official with "authority to enforce compliance with [the] regulation," by ordering "corrective action" and seeking penalties.  NAIC 2020 Model Regulation § 8.

**B.     Federal Securities Laws And SEC Regulation**

53.     Because they are securities, variable annuities (as well as certain indexed annuities) are subject not only to state-law requirements, but also to regulation by the SEC under the federal securities laws.  Under the Securities and Exchange Act of 1934 and the Investment Company Act of 1940, the SEC has broad authority to regulate "transactions in securities," including by placing restrictions on the registration and availability of certain securities products. 15 U.S.C. §§ 78b, 78l.

54.    In addition, under federal securities laws, those who engage in securities-related transactions must register with the SEC either as (1) an investment adviser or (2) a broker-dealer. An investment adviser is statutorily defined as "any person who, for compensation, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11).  Under the Investment Advisers Act of 1940, registered investment advisers are fiduciaries.  They typically serve their clients through fee-for-advice arrangements.  As part of this ongoing advice-based relationship, investment advisers may sometimes assist clients with the purchase of an annuity, but annuities are more often purchased in one-time transactions with the assistance of a broker-dealer. Broker-dealers are salespeople who buy and sell securities, either for the account of customers or for their own account as part of their regular business.  15 U.S.C. § 78c(a)(4)-(5).  Broker-dealers are not investment advisers so long as any investment advice they provide is "solely incidental to the conduct of [their] business as a broker or dealer and [they] receive[] no special compensation" for the provision of investment advice.  15 U.S.C. § 80b-2(a)(11).

55.    In this way, federal securities laws have recognized two distinct types of relationships through which investors—including retirement investors—can obtain investment information to aid them in making investment decisions:  (1) a fiduciary advice relationship with an investment adviser and (2) a sales relationship with a broker-dealer.

56.    As noted, the 2010 Dodd-Frank Act authorized the SEC to issue new standards for broker-dealers "providing personalized investment advice about securities" (like variable annuities) "to a retail customer."  *Id.* § 913(g)(1), 124 Stat. at 1828.  Pursuant to that authority, in 2019, the SEC promulgated Regulation Best Interest (or "Reg BI").  *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318 (July 12, 2019).  As part

of that rulemaking, the SEC considered subjecting broker-dealers to the same heightened fiduciary standard as investment advisers, but the SEC deliberately elected not to impose a fiduciary standard. *Id.* at 33,322. As its name suggests (and similar to the NAIC model regulation adopted by most States), Reg BI requires broker-dealers to "act in the best interest of the retail customer at the time the recommendation is made, without placing" their own "financial or other interest … ahead of the interests of the retail customer." *Id.* at 33,328. And (also similar to the NAIC model rule), Reg BI imposes obligations that broker-dealers must satisfy in order to meet the overarching best-interest standard.

57.     Under Reg BI's "Care obligation," a broker-dealer must (among other things) "[h]ave a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation and does not place the financial or other interest" of the broker-dealer "ahead of the interest of the retail customer." 17 C.F.R. § 240.15l-1(a)(1)(ii)(B).

58.     To ensure consumers receive fair and accurate information, the "Disclosure obligation" requires (among other things) broker-dealers to provide, "in writing, full and fair disclosure of" (among other things) "[t]he type and scope of services provided to the retail customer, including any material limitations on the securities or investment strategies … that may be recommended to the retail customer." *Id.* § 240.15l-1(a)(1)(i).

59.     And under the "Conflict of interest obligation," the broker-dealer must "establish[], maintain[], and enforce[] written policies and procedures reasonably designed to" (among other things) "[i]dentify and mitigate any conflicts of interest associated with such recommendations that create an incentive … to place the interest of the" broker-dealer "ahead of

the interest of the retail customer." *Id.* § 240.15l-1(a)(1)(iii)(B). Those policies and procedures must also "[i]dentify and eliminate any sales contests, sales quotas, bonuses, and non-cash compensation that are based on the sales of specific securities or specific types of securities within a limited period of time." *Id.* § 240.15l-1(a)(1)(iii)(D).

60.     The SEC has made clear, however, that its Reg BI is compatible with sales commissions. The SEC has, in fact, acknowledged that where a consumer's "objective is to buy and hold a long-term investment" (like an annuity), "a one-time commission" may be preferable to "paying an ongoing advisory fee merely to hold the same investment."[4] Thus, rather than eliminating commissions, the SEC has advised that broker-dealers should mitigate the possibility of conflicts by taking measures like "minimizing compensation incentives for financial professionals … to favor one type of product over another"; "avoiding compensation thresholds that disproportionately increase compensation through incremental increases in sales of certain products"; and "providing training and guidance to financial professionals on evaluating, selecting, and, as required, monitoring investments in the best interests of retail investors."[5]

61.     The SEC has broad authority to enforce its regulations—including Reg BI—by seeking cease-and-desist orders, disgorgement, and civil penalties and by suspending or revoking broker-dealers' registration. 15 U.S.C. §§ 78o, 78u–3. Since Reg BI took effect, the SEC has

---

[4] *Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisors, Care Obligations*, U.S. Securities and Exchange Commission (Apr. 20, 2023), https://www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

[5] *Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers, Conflict of Interest*, U.S. Securities and Exchange Commission (Aug. 3, 2022), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

pursued numerous enforcement actions against broker-dealers for violating the standards.[6]
FINRA also has important enforcement responsibilities.

    **C.**    **Neither State Laws Nor the SEC Impose Fiduciary Obligations**

    62.    The NAIC's model regulation and the SEC's Reg BI are designed to apply harmoniously by imposing consistent and complementary obligations.  Indeed, the NAIC model expressly provides that annuity recommendations made in compliance with Reg BI also satisfy the model regulation.  NAIC 2020 Model Regulation § 6(E)(1), (5).

    63.    In addition, the NAIC's model regulation and Reg BI are both designed to provide regulated parties guidance and certainty about how to comply.  In particular, both regulations provide that the overarching best-interest standard "shall be satisfied" if the agent or broker-dealer meets the enumerated standards involving care, disclosure, and conflicts of interest. 17 C.F.R. § 240.15l-1(a)(1); *see also* NAIC 2020 Model Regulation § 6(A) ("[a] producer has acted in the best interest of the consumer if they have satisfied the following obligations").  These regulatory designs ensure that agents and broker-dealers act in their customers' best interest, while also limiting retrospective second-guessing of the agent's and broker-dealer's recommendations when they comply with numerous applicable regulatory requirements.

    64.    Critically, while the NAIC's model and Reg BI impose significant obligations on those who make annuity recommendations in order to mitigate conflicts of interest and protect consumers, they both deliberately declined to impose the costs and burdens of fiduciary status.

---

[6] *See e.g. In Re Laidlaw and Company (UK) Ltd.*, Securities Act Release No. 98983 (Nov. 20, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98983.pdf; *In Re Citigroup Global Markets, Inc.*, Securities Act Release No. 98609, Investment Advisers Act Release No. 6440 (Sept. 28, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98609.pdf; *In Re Carl M. Hennig, Inc.*, Securities Act Release No. 98478 (Sept. 22, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98478.pdf; *In Re Salomon Whitney LLC*, Securities Act Release No. 98619 (Sept. 28, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98619.pdf.

65.     That makes good sense.  Historically, fiduciary obligations have arisen only where there is an "intimate relationship[]" of "trust and confidence" between the parties, *Bogert's Trusts & Trustees* § 481, such as under the Advisers Act.  Where such an intimate relationship exists, the common law has held fiduciaries "to the highest amount of loyalty and good faith," required them to "exclude all selfish interest," and "prohibited" them "from putting themselves in positions where personal interest and representative interest will conflict."  *Id.*

66.     At common law, fiduciary relationships did not typically arise from arm's-length transactions.  For example, while "[a] customer of a food dealer relies on his grocer to furnish wholesome food, and to give honest measure for fair prices … this is not the trust and confidence necessary to create" a fiduciary relationship.  Bogert, *Confidential Relations and Unenforcible Express Trusts*, 13 Cornell L. Q. 237, 245 (1928) ("Bogert, *Confidential Relations*").

67.     In addition, under the common law, "the sale of insurance" was typically deemed "an arm's length commercial transaction" that "does not give rise to a fiduciary relationship." *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 508 (S.C. Ct. App. 2002); *see also, e.g.*, *Stockett v. Penn Mut. Life Ins. Co.*, 106 A.2d 741, 744 (R.I. 1954) ("Ordinarily an insurance company stands in no fiduciary relationship to a legally competent applicant for an annuity"); *see also Moses v. Mfrs. Life Ins. Co.*, 298 F. Supp. 321, 323 (D.S.C. 1968) *aff'd*, 407 F.2d 1142 (4th Cir. 1969) (A "claim of fiduciary relationship ... cannot rest upon the mere relationship of insurer and insured"); *Rishel v. Pacific Mut. Life Ins. Co. of Cal.*, 78 F.2d 881, 886 (10th Cir. 1935) ("The law does not cast upon insurance companies the affirmative burden cast upon trustees.").

68.     Over the years, Congress has occasionally codified fiduciary obligations in federal statutes, such as the Advisers Act, which establishes that *investment advisers* are fiduciaries.  *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-192 (1963).

The securities laws have not, however, held *broker-dealers* to the same fiduciary standards.  And (as noted, *supra* ¶64) when the SEC promulgated Reg BI, it expressly declined to "[a]pply[] the fiduciary standard under the Advisers Act to broker-dealers."  84 Fed. Reg. at 33,322.

69.     The SEC made the considered judgment that subjecting broker-dealers to fiduciary standards would likely "significantly reduce retail investor access to differing types of investment services and products, reduce retail investor choice in how to pay for those products and services, and increase costs for retail investors of obtaining investment recommendations." 84 Fed. Reg. at 33,322.  In addition, the SEC determined that a fiduciary standard was not "appropriately tailored to the structure and characteristics of the broker-dealer business model (i.e., transaction-specific recommendations and compensation)."  *Id.*  For example, investment advisers' fiduciary obligations "encompass[] the duty to provide advice and monitoring at a frequency that is in the best interest of the client," a difference that "reflects the generally ongoing nature of the advisory relationship" and the fact that the adviser's "fiduciary duty generally applies to the entire relationship."  *Id.* at 33,331.  "In contrast," the SEC reasoned, "the provision of recommendations in a broker-dealer relationship is generally transactional and episodic," so Reg BI was crafted to "require[] that broker-dealers act in the best interest of their retail customers at the time a recommendation is made" while "impos[ing] no duty to monitor a customer's account following a recommendation."  *Id.*

70.     Certain litigants subsequently challenged Reg BI in court based on the claim that the SEC was required to "adopt a rule holding broker-dealers to the same fiduciary standard as investment advisers."  *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020). The Second Circuit rejected that challenge, concluding that the SEC had reached a "'considered and carefully articulated' policy decision" to decline imposing fiduciary status.  *Id.* at 255.

71.     Prior to enhancing its model regulation, the NAIC reached the same conclusion as the SEC—explaining that a fiduciary standard "does not correspond with the transactional, sales relationship between the [salesperson] or insurer and the consumer."[7]  As Iowa's Insurance Commissioner (one of the leaders of the NAIC's model regulation working group) has subsequently elaborated, the NAIC rejected a uniform fiduciary standard because it "inherently restricts business models that many [consumers] rely on to gain cost-effective access to the financial security products they need."  Iowa Commissioner of Insurance Comments on 2024 Proposed Rule, at 6 (Jan. 2, 2024).  Consistent with these conclusions, the NAIC model regulation expressly provides that its requirements "do not create a fiduciary obligation or relationship."  NAIC 2020 Model Regulation § 6(A)(1)(d).

IV.     **FOR DECADES, THE DEPARTMENT OF LABOR DID NOT ASSERT REGULATORY AUTHORITY OVER THE SALE OF ANNUITIES**

72.     Similar to the Advisers Act, Congress also codified fiduciary obligations into ERISA, which is administered and enforced in large part by the Department.  Consistent with the common-law understanding of fiduciary relationships and the core distinction between investment advice and sales activities, the Department has long construed ERISA's fiduciary provisions to not typically reach insurance agents and brokers selling annuities.

A.      **The ERISA Statutory Scheme And The Department's Longstanding Interpretation Of "Fiduciary" Status**

73.     Enacted in 1974, ERISA is divided into two main parts.  Title I is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).

---

[7] NAIC Comment on Reg BI, at 4 (Aug. 3, 2018), https://content.naic.org/sites /default/files/legacy/documents/government_relations_180806_comments_sec_annuity_ suitability.pdf.

74.     In furtherance of that purpose, Title I imposes duties of loyalty and prudence on "fiduciar[ies]" of 401(k)s and other employer-provided plans.  *See* 29 U.S.C. § 1104.  "ERISA's duty of loyalty is 'the highest known to the law.'"  *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000).  It requires fiduciaries to act "solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A).  ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).

75.     In addition to these statutory duties, ERISA subjects fiduciaries to "prohibited transactions" provisions, which bar fiduciaries from (among other things) "receiv[ing] any consideration … from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).  Title I makes fiduciaries personally liable for any losses to the plan resulting from violations of the statutory requirements— including violations of the fiduciary duties and prohibited transaction provisions—and it provides both the Secretary of Labor and private parties a right of action to enforce fiduciaries' obligations.  *Id.* §§ 1109, 1132.  Violations of the prohibited transaction provisions are also subject to an excise tax penalty enforced by the IRS.  26 U.S.C. § 4975.

76.     Title II of ERISA creates tax-deferred personal IRAs and similar accounts within the Internal Revenue Code.  Title I does not cover these non-employer-sponsored plans, where individuals have more control over the benefits and underlying investments.  Title II, moreover, does not subject IRA fiduciaries to the same Title I duties of loyalty and prudence; it does not hold those fiduciaries personally liable for losses to IRA owners; and it does not provide the

Secretary of Labor or IRA holders any right of action. *See* 26 U.S.C. § 4975. But like Title I, Title II prohibits IRA fiduciaries from engaging in "prohibited transactions," including the "receipt of any consideration … from any party dealing with the plan in connection with a transaction involving the income or assets of the plan." *Id.* § 4975(c). And Title II provides that violations of those prohibited transaction provisions are subject to the same excise tax penalty as Title I, enforceable by the IRS. *Id.* §§ 4975(a)-(b).

77.     Title I and Title II of ERISA employ the same definition of "fiduciary." Fiduciary status attaches to those who exercise certain authority or control over plans and IRAs, as well as those who "render[] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of" an IRA or ERISA-covered employer-sponsored plan. 29 U.S.C. § 1002(21)(A); *accord* 26 U.S.C. § 4975(e)(3). That definition of an "investment advice fiduciary" is critical to the Rule here.

78.     In 1975, one year after ERISA was passed, the Department issued (through notice-and-comment rulemaking) a regulation establishing a five-part test to determine when a person "renders investment advice" for purposes of triggering fiduciary status. Under that longstanding five-part test, fiduciary obligations arise when the person (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing, in purchasing, or selling securities or other property, (2) to a covered plan on a regular basis, (3) pursuant to a mutual agreement, arrangement, or understanding with the plan or plan fiduciary that (4) the advice will serve as a primary basis for investment decisions with respect to plan assets, and (5) the advice is individualized based on the particular needs of the plan. 40 Fed. Reg. 50,842, 50,843 (Oct. 31, 1975) (codified at 29 C.F.R. § 2510.3-21(c)).

79.     Consistent with the longstanding common-law conception of fiduciary relationships, this five-part definition—particularly its requirement that advice be provided to a Title I or Title II plan on a regular basis—generally does not reach one-time sales recommendations, like the recommendation to purchase an annuity.

80.     For decades, the Department refined application of the five-part test through the issuance of prohibited transaction exemptions ("PTEs").  PTEs allow those who qualify as fiduciaries to engage in transactions that would otherwise be proscribed under the prohibited transaction rules under Title I or Title II of ERISA.  *See* 29 U.S.C. § 1108 (authorizing Labor Secretary to grant exemptions from Title I's prohibited transaction provisions); Reorganization Plan No. 4 of 1978, 92 Stat. 3790, 3790 (codified at 5 U.S.C. App.) (transferring authority from Treasury Secretary to Labor Secretary to grant exemptions from Title II's prohibited transaction provisions).

81.     Most relevant here, in 1977, the Department issued a PTE making clear that even where a broker-dealer or insurance agent happened to satisfy the five-part test for fiduciary status, they could still receive compensation in connection with the sale of an annuity without violating the prohibited transaction rules.  *See* Class Exemption for Certain Transactions Involving Insurance Agents and Brokers, 42 Fed. Reg. 32395 (June 24, 1977).  This exemption, now referred to as "PTE 84-24," provides an exemption from the prohibited transaction rules for the "receipt, directly or indirectly, by an insurance agent or broker … of a sales commission from an insurance company in connection with the purchase, with plan assets of an insurance or annuity contract."  Amendments to Class Exemption for Certain Transactions Involving Insurance Agents and Brokers, 49 Fed. Reg. 13,208, 13,211 (Apr. 3, 1984).  Without the relief made available under PTE 84-24, the receipt of a commission by a fiduciary would violate the

prohibited transaction rules, including the restrictions on fiduciary self-dealing and the receipt of third-party payments.

**B.      The Department's Failed 2016 Rulemaking**

82.      In 2016—after abandoning a 2010 attempt to drastically expand the scope of ERISA's investment advice fiduciary definition in the face of sustained, bipartisan opposition— the Department sought to jettison its longstanding five-part test and replace it with a standard that would apply fiduciary status broadly whenever an individual made any "recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property." Definition of the Term "Fiduciary": Conflict of Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20,946, 20,948 (Apr. 8, 2016). This new standard would have done away with the established requirements that investment advice be provided to a Title I or Title II plan on a "regular basis," "pursuant to a mutual agreement," and "as a primary basis for investment decisions." *See id.* As the Department acknowledged, even one-time sales recommendations would trigger ongoing fiduciary duties under the new standard. *See id.*

83.      The Department's 2016 rule would also have created a new PTE—the "Best Interest Contract Exemption"—that would have required fiduciaries to enter into enforceable contracts with their clients that included binding "Impartial Conduct Standards" incorporating the fiduciary duties of loyalty and prudence. Best Interest Contract Exemption, 81 Fed. Reg. 21,002, 21,007-21,008 (Apr. 8, 2016). This exemption would have been the only source of exemptive relief available to Title I or Title II fiduciaries for compensation paid in connection with recommendations of certain annuities, imposing contractually enforceable duties of loyalty and prudence even though Title II fiduciaries are not subject to statutory duties of loyalty and prudence or to a private right of action. *Id.*

84. The Fifth Circuit vacated the 2016 rule in its entirety—including the creation of the Best Interest Contract Exemption and significant amendments to PTE 84-24—concluding that it suffered from multiple fatal legal flaws. *Chamber*, 885 F.3d at 368-388. Most importantly, the Fifth Circuit concluded the rule's new, broader definition of "fiduciary" conflicted with ERISA's text. "All relevant sources," the court explained, "indicate that Congress codified the touchstone of common law fiduciary status"—that is, "the parties' underlying relationship of trust and confidence." *Id.* at 369. That common-law understanding, moreover, was reinforced by ERISA's use of the phrase "renders investment advice for a fee"; "the preposition 'for' … indicates that the purpose of the fee is not 'sales' but 'advice.'" *Id.* at 373. The Fifth Circuit emphasized that the 1975 regulation's five-part test "flowed directly from [the] contemporary understanding of 'investment advice for a fee'" because it "contemplated an intimate relationship between adviser and client beyond ordinary buyer-seller interactions." *Id.* at 374. The Department's new standard, though, "lack[ed] any requirement of a special relationship." *Id.* at 377. Rather, the rule "expressly include[d] one-time … annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380.

85. In addition to that fatal problem, the Fifth Circuit held that the 2016 rule clashed with congressional measures taken in the Dodd-Frank Act. *Chamber*, 885 F.3d at 385. As the court explained, Dodd-Frank (1) delegated to the SEC the power to promulgate enhanced regulations of securities recommendations to retail customers; and (2) expressly reserved for States the authority to regulate fixed index annuities (when a State has adopted the NAIC's model regulation). *Chamber*, 885 F.3d at 385. The 2016 rule "conflict[ed] with both of these efforts." *Id.* The Fifth Circuit also concluded that the 2016 rule "impermissibly conflat[ed] the

basic division drawn by ERISA" between "ERISA employer-sponsored plans" (governed by Title I) and "individual IRA accounts" (governed by Title II). *Id.* at 381. "ERISA plan fiduciaries," the court explained, "must adhere to the traditional common law duties of loyalty and prudence," but "IRA plan 'fiduciaries' … are not saddled with these duties" and are not subject to a private right of action for breach of those duties. *Id.* The 2016 rule, however, required Title II fiduciaries (through operation of the "Impartial Conduct Standards") to "assume obligations of loyalty and prudence only statutorily required of [Title I] fiduciaries." *Id.* at 382. And when those broker-dealers and insurance agents used the BIC Exemption, necessary to "preserve their commissions," they were "required to expose themselves to potential liability" in private suits for breach of contract "*beyond* the tax penalties provided for in ERISA Title II." *Id.*

86.     The Fifth Circuit also held that the BIC Exemption's "provisions regarding lawsuits ... violate[d] the separation of powers" because they "create[d] vehicles for private lawsuits indirectly through … contract provisions" the Department could not create "directly" under ERISA. *Chamber*, 885 F.3d at 384. This was true regardless of whether the Exemption's claims operated under federal or state law; even if the Exemption's effect was to "authorize new claims under the fifty states' different laws, they [were] no more than an end run around Congress's refusal to authorize private rights of action enforcing Title II fiduciary duties." *Id.*

## V.     THE DEPARTMENT'S RENEWED ATTEMPT TO EXPAND ERISA FIDUCIARY STATUS

### A.     Post-2016 Developments And The 2023 Proposed Rule

87.     In 2020, following the vacatur of the 2016 rule, the Department reinstated the 1975 regulation's five-part test. *See* Conflict of Interest Rule-Retirement Investment Advice: Notice of Court Vacatur, 85 Fed. Reg. 40,589 (July 7, 2020).

88.     That same year, the Department issued another rulemaking creating a new PTE—PTE 2020-02—intended to "allow[] investment advice fiduciaries to plans under both Title I and

[Title II] to receive compensation, including as a result of advice to roll over assets from a Plan

to an IRA, … that would otherwise violate the prohibited transaction provisions." Prohibited

Transaction Exemption 2020-02, Improving Investment Advice for Workers & Retirees, 85 Fed.

Reg. 82,798, 82,798 (Dec. 18, 2020). PTE 2020-02 conditioned receipt of compensation on

compliance with (among other things) modified "Impartial Conduct Standards," under which any

recommendation by a fiduciary was required to be in "the Best Interest of the Retirement

Investor"—meaning it (1) "reflects the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person … would use," and (2) "does not place the

financial or other interests of the Investment Professional … ahead of the interests of the

Retirement Investor." *Id.* at 82,863. According to the Department, these standards were

reflections of Title I's fiduciary duties of loyalty and prudence. *See id.* at 82,805, 82,823. In

addition, PTE 2020-02 required fiduciaries to provide "a written acknowledgment of fiduciary

status." *Id.* at 82,828. The Department explained, however, that "Financial Institutions that do

not want to act as fiduciaries can also make that clear and act accordingly." *Id.* The Department

likewise made clear that fiduciary recommendations about "insurance and annuity products"

could continue to be made "under the existing exemption for insurance transactions, PTE 84-24,"

rather than PTE 2020-02. *Id.* at 82,813.

89.     In the regulatory preamble of PTE 2020-02, the Department also provided its

interpretation of when rollover recommendations constituted fiduciary advice under the

Department's five-part test. Departing from agency precedent, the Department explained that

fiduciary status would be triggered when "advice to roll over plan assets … occurred as part of

an [existing] ongoing relationship" or at the "start" of "an intended ongoing relationship." 85

Fed. Reg. at 82,805. In those circumstances, an "advice relationship" would exist that satisfied

the "regular basis prong" of the 1975 test.  *Id.*  At the same time, the Department emphasized that "not all rollover recommendations can be considered fiduciary investment advice."  *Id.* at 82,804.  As the Department put it, "a single instance of advice to take a distribution from a Title I Plan and roll over the assets" or "sporadic interactions" on that subject would "not meet the regular basis prong."  *Id.* at 82,805.

90.     Just three years after these measures, in 2023, the Department reversed course and proposed a new rule that was substantially similar to the failed 2016 rule.  The 2023 proposed rule, like the vacated 2016 rule, sought to expand ERISA fiduciary status under both Title I and Title II by abandoning the 1975 regulation's requirements that fiduciary investment advice be given to a covered plan or IRA on a "regular basis," "pursuant to a mutual agreement or arrangement," and as a "primary basis for investment decisions."  *See* Retirement Security Rule: Definition of an Investment Advice Fiduciary, 88 Fed. Reg. 75,890, 75,892 (Nov. 3. 2023).  And as with the 2016 rule, the Department acknowledged that its new standard "would treat an insurance agent's recommendation to invest a retiree's retirement savings in an annuity as fiduciary advice."  *Id.* at 75,902.

91.     Similar to the vacated 2016 rule, the Department also again proposed PTE revisions to impose heightened affirmative obligations on agents and brokers who seek to receive sales commissions.  The Department proposed revisions to narrow PTE 84-24 so that it applied only in connection with "non-securities" annuities sales conducted by independent insurance agents who sell "annuities of two or more unrelated Insurers."  Proposed Amendment to Prohibited Transaction Exemption 84-24, 88 Fed. Reg. 76,004, 76,005-76,007 (Nov. 3, 2023).  The Department proposed channeling all recommendations by career insurance agents of their statutory employer's products into PTE 2020-02.  Proposed Amendment to Prohibited

Transaction Exemption 2020-02, 88 Fed. Reg. 75,979 (Nov. 3, 2023).  As part of this effort, the Department proposed amending five other PTEs to make them unavailable to providers of fiduciary investment advice.  *See* Proposed Amendment to Prohibited Transaction Exemptions 75-1, 77-4, 80-83, 83-1, and 86-128, 88 Fed. Reg. 76,032 (Nov. 3, 2023).

92.      In both PTE 84-24 and PTE 2020-02, the Department proposed subjecting all the newly deemed fiduciaries to the same "Impartial Conduct Standards."  Those proposed standards mirrored the standards introduced when PTE 2020-02 was adopted—providing (among other things) that fiduciaries may "not place the financial or other interests of the Investment Professional … ahead of the interests of the Retirement Investor."  88 Fed. Reg. at 76,000; 88 Fed. Reg. at 76,027.  Unlike in the original iteration of PTE 2020-02, though, the Department proposed applying the Impartial Conduct Standards to not only Title I fiduciaries but also fiduciaries under Title II, who are not subject to statutory duties of prudence and loyalty.  *Compare, e.g.*, 88 Fed. Reg. at 76,027 *with* 85 Fed. Reg. at 82,805.  Also unlike the 2020 rulemaking, the Department proposed requiring all fiduciaries—whether subject to PTE 2020-02 or PTE 84-24—to provide a written acknowledgement of fiduciary status.  88 Fed. Reg. at 76,000; *id.* at 76,027.  And, in another departure from the 2020 rulemaking, the Department made clear that it would no longer give legal effect to clear "written statements" providing that a financial sales professional would not be acting as a fiduciary.  *See id.* at 75,903.

B.      **Stakeholders Document Substantial Concerns With The 2023 Proposed Rule**

93.      Despite an exceptionally short comment period of only 60 days (spanning several holidays), the Department's proposed rule generated scores of comments from interested and regulated parties, trade and industry representatives, and state insurance commissioners.  Many of the Plaintiffs in this action were among those who submitted comments.

94.     ***Repeated legal errors from the 2016 rulemaking.***  To begin with, many commenters (including Plaintiffs) explained that the 2023 proposed rule suffered from the same fatal legal defects as the 2016 rule.  Like the 2016 rule, the Department's expansive standard substantially deviated from the ERISA-codified, common-law understanding of fiduciary advice by sweeping in one-time sales transactions where there is no ongoing relationship of trust and confidence.  *See, e.g.*, NAIFA Comments 3-5 (Jan 2, 2024); ACLI Comments 4-7 (Jan. 2, 2024); NAFA Comments 10-11 (Jan. 2, 2024).[8]  In doing so, commenters explained, the Department had once again ignored the "dichotomy between mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does." ACLI Comments 5 (quoting *Chamber*, 855 F.3d at 375); *see also* IRI Comments 27 (Jan. 2, 2024); Finseca Comments 7 (Jan. 2, 2024); NAFA Comments 9.  Indeed, as commenters pointed out, the proposed rule blatantly flouted the Fifth Circuit's decision by stating that "the Department rejects the purported dichotomy between a mere 'sales' recommendation to a counterparty, on the one hand, and advice, on the other, in the context of the retail market for investment products."  *Id.* at 75,907; *see* NAFA Comments 9.  Commenters also explained that the new proposal again ran afoul of the Dodd-Frank Act, and Congress's assignment of responsibilities under the statute.  *E.g.*, ACLI Comments 28.  And commenters argued that the proposed rule's "written acknowledgement" requirement—similar to the 2016 Best Interest Contract Exemption—had the purpose and effect of exposing new fiduciaries to state-law private

---

[8] *See also, e.g.,* Investment Company Institute ("ICI") Comments 65-70 (Jan. 2, 2024); Indexed Annuity Leadership Council ("IALC") Comments 9-13 (Jan. 2, 2024); Charles Schwab & Co. Comments 3-8 (Jan. 2, 2024); and Securities Industry and Financial Markets Association ("SIFMA") Comments 25-29 (Jan. 2, 2024).  All comments on the proposed rule will be included in the administrative record.  Comments are also available at https://www.regulations.gov/document/EBSA-2023-0014-0001/comment.

actions under breach-of-fiduciary or breach-of-contract theories.  NAFA Comments 30-31; ACLI Comments 29; IRI Comments 19.

95.     Beyond those significant problems, commenters explained that the breadth of the Department's new definition threatened unnecessarily to upend established industry practices and harm consumers.  Commenters explained, for example, that the 2023 proposed rule would restrict the ability to engage in routine "hire me" conversations and to provide responses to requests for proposal.  *See* American Bankers Association Comments 14-15 (Jan. 2, 2024); American Benefits Council Comments 9 (Jan. 2, 2024).  As commenters emphasized, the proposed rule swept more broadly than the 2016 rule by omitting any carve-out for transactions with sophisticated parties who are themselves fiduciaries—such as a pension risk transfer transaction, in which the pension fund already has a named fiduciary charged with and responsible for managing the fund.  ACLI Comments 27.  Commenters explained that subjecting insurance agents selling financial products to sophisticated fund managers to a redundant fiduciary obligation would serve no purpose other than restricting pension beneficiaries' access to important financial products.  *Id.*

96.     ***Harm to consumers.***  Critically, commenters also described the various ways in which the 2023 proposed rule would harm low- and middle-balance consumers.  *See, e.g.*, ACLI Comments 20-21; ICI Comments 72; Financial Services Institute ("FSI") Comments 23 (Jan. 2, 2024); NAIFA at 7-11.  As commenters explained, the proposal would require consumers to either forgo information about retirement products entirely or engage a far more expensive fiduciary investment adviser.  *E.g.*, ACLI Comments 20.  Commenters added that these low-balance and low-income consumers are also the most vulnerable to longevity risk—and thus, the consumers who tend to benefit most from access to products like annuities.  *Id.*

97.     Commenters introduced into the administrative record significant evidence of these concerns.  One 2018 study, for example, found that 10 million American workers' accounts, with $900 billion in savings, lost access to professional financial guidance as a result of the 2016 rulemaking before it was vacated by the Fifth Circuit.  *See* ACLI Comments 4; IRI Comments 20-21.  Likewise, a 2018 study found that the 2016 rule would have reduced the total retirement savings of 2.7 million individuals with incomes below $100,000 by approximately $140 billion over ten years.  Hispanic Leadership Fund, *Analysis of the Effects of the 2016 Department of Labor Fiduciary Regulation on Retirement Savings and Estimate of the Effects of Reinstatement* (Nov. 8, 2021) (cited by ACLI Comments 4).  Commenters observed that the SEC and the NAIC avoided causing similar consumer harm when adopting their best interest rules by rejecting a one-size-fits-all fiduciary approach—finding it "could reduce the availability and increase the cost of advice and services, particularly for those with relatively smaller accounts." SEC Chairman Jay Clayton, "Regulation Best Interest and the Investment Adviser Fiduciary Duty: Two Strong Standards that Protect and Provide Choice for Main Street Investors," Boston MA, July 19, 2018 (cited by ACLI Comments 3 & n.2).

98.     ***Failure to account for existing regulatory landscape.***  In addition, commenters explained that the proposed rule was unnecessary in light of the adoption of Reg BI and state laws and rules based on the NAIC's model regulation following vacatur of the 2016 rule.  *See, e.g.*, ACLI Comments 31-34; NAIFA Comments 14; IRI Comments 14-15.  The Department offered no reliable evidence that these new laws and rules were not effectively protecting consumers.  *See* ACLI Comments 32; NAIFA Comments 14; Prudential Comments 4; Indexed Annuity Leadership Council Comments 2-8 (Jan. 2, 2024).  Indeed, the NAIC itself submitted comments making clear that it "fundamentally disagree[d] with" the Department's

"characterization of state consumer protections around annuity sales as 'inadequate'" and was

"disappointed that DOL did not engage or coordinate substantively with NAIC members—the

chief insurance regulators from the 50 states, the District of Columbia, and the U.S. territories—

before promulgating the … Proposed Rule."  NAIC Comments 1 (Dec. 21, 2024).

99.     Commenters explained as well that the proposed rule would create confusion.  In

contrast to the SEC's and the NAIC's precise standards tailored to transaction-specific

relationships, the 2023 proposed rule's obligations were vague and unclear.  *See, e.g.*, SPARK

Institute Comments 11-12 (Jan. 2, 2024); SIFMA Comments 9-13, 30, 43-44, 46 (Jan. 2., 2024);

Fidelity Comments 3 (Jan. 2, 2024); NAFA Comments 18.  At the same time, the revised PTEs

would create extensive new burdens, obligations, and risks beyond those imposed by Reg BI or

the NAIC model regulation.  *See, e.g.*, Charles Schwab & Co., Inc. Comments 16-17.  The result

would be a complicated patchwork of regulations:  Although the Department claimed that the

proposed rule would establish uniformity, commenters explained that the Department's authority

under ERISA only reached "qualified" products sold through the tax-advantaged employer plans

and IRAs covered by Title I and II; in contrast, "state insurance regulations cover *all* annuity

products, not just those purchased within ERISA plans."  NAIC Comments 2.

100.     ***Flawed cost-benefit analysis.***  Commenters also identified multiple, serious flaws

in the Department's cost-benefit analysis.  To take just a handful of examples, commenters

pointed out that in evaluating the proposal, the Department relied largely on outdated research

predating the substantial regulatory changes since the 2016 final rule, including Reg BI and the

revised NAIC model regulation.  *See* Financial Services Institute Comments 17-19 (Jan. 2,

2024), Investment Company Institute ("ICI") Appendix (Jan. 2, 2024).  Others stressed that the

Department had overlooked the benefits of making annuities accessible, such as the lifetime

guarantees and other unique risk protections.  *See, e.g.*, ACLI Comments 16-18, 20-21, NAFA Comments 4-8, The Committee of Annuity Insurers Comments 24-26 (Jan. 2, 2024), IALC Comments 23-25.  As to compliance costs, commenters explained that the Department's compliance cost estimates were egregiously low, *see, e.g.*, NAFA Comments 27, FSI Comments 20-22, IALC Comments 16, and others observed that the Department had failed to account for key categories of costs (such as lost jobs and liability risks), *see, e.g.,* Charles Schwab Comments at 18-21.  The Small Business Administration's Office of Advocacy emphasized that many of these costs would be felt primarily by small firms and independent practitioners.  *See* U.S. Small Business Administration Comments 1-2, 5-7.

101.    ***Constitutional objections.***  Finally, commenters explained that the 2023 proposed rule would violate the First Amendment, given that the Rule would both substantially restrict truthful, non-misleading sales speech and compel a broad swath of regulated parties to acknowledge their supposed fiduciary status in writing.  *See* ACLI Comments 30-31.

**C.    2024 Final Rule**

102.    On April 25, 2024, despite sustained opposition to the Department's proposal, the Department issued the final Rule, which retains the central, problematic, and unlawful aspects of the proposed rule.  The Rule was the product of an unprecedentedly abbreviated rulemaking process, in which the Department took the rare step of holding public hearings while the comment period was ongoing and then transmitted the Rule for review by the Office of Management and Budget just 66 days after the comment period had closed, underscoring the rushed and outcome-oriented nature of the rulemaking process.

103.    Consistent with the proposed rule, the final Rule eliminates the 1975 test, particularly its requirements that fiduciary advice be given to a covered plan on a "regular basis," "pursuant to a mutual arrangement or agreement," and as "primary basis for investment

40

decisions."  In place of the five-part test, the Rule provides for fiduciary status to attach (in

relevant part) whenever a person

> either directly or indirectly … makes professional investment recommendations to investors on a regular basis as part of their business and the recommendation is made under circumstances that would indicate to a reasonable investor in like circumstances that the recommendation:
> - is based on review of the retirement investor's particular needs or individual circumstances,
> - reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances, and
> - may be relied upon by the retirement investor as intended to advance the retirement investor's best interest.

89 Fed. Reg. at 32,122.  As the Department acknowledged, this new standard (like the 2016 rule)

covers "recommendations with respect to many commonly purchased retirement annuities."  *Id.*

at 32,123.

104.    In response to concerns that this definition conflicted with the common-law

definition of fiduciary codified into ERISA, the Department claimed that the Rule establishes

fiduciary status only when an individual "makes professional investment recommendations to

investors on a regular basis as part of their business"—which the Department states is "an

important component of the test" because it "limits application of the fiduciary definition to

financial professionals who could reasonably be viewed as providing advice that can be relied

upon with trust and confidence."  89 Fed. Reg. at 32,151.  Thus, the Department explained, the

Rule's new test will not be satisfied "by the ordinary communications of a human resources

employee, who is not an investment professional," or by "the common activities of real estate

agents selling homes to prospective residents, life coaches, probation officers, and divorce

counselors."  *Id.* at 32,151-32,152.  The Department reiterated, however, that the Rule would not

"automatically exclud[e] one-time advice from treatment as fiduciary investment advice," and

that the Rule would treat an agent's recommendation to invest a retiree's retirement savings in an annuity as fiduciary advice. *See id.* at 32,150. The Department did not even acknowledge the Fifth Circuit's conclusion that in "one-time IRA rollover or annuity transactions," "it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Chamber*, 885 F.3d at 380.

105.    The Department claimed that a new paragraph, added in the final Rule, would limit the new fiduciary definition's impact on sales activities. 89 Fed. Reg. at 32,123. But in reality, the paragraph accomplishes nothing of the sort. Instead, it simply restates the elements of the new expansive new fiduciary definition in negative terms. The new paragraph provides: "A person does not provide [fiduciary] 'investment advice' if they make a recommendation but neither paragraph (c)(1)(i) nor (c)(1)(ii) of this section"—that is, neither of the paragraphs providing the new fiduciary definition—"is satisfied." *Id.* at 32,257. "For example," the new paragraph adds, "a salesperson's recommendation to purchase a particular investment or pursue a particular investment strategy is not investment advice … if the circumstances would not indicate to a reasonable investor in like circumstances that the recommendation is based on review of the retirement investor's particular needs or individual circumstances, reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances, and may be relied upon by the retirement investor as intended to advance the retirement investor's best interest." *Id.* Thus, the Department's claimed sales carve-out has no independent effect. It simply states the truism that when a recommendation is not covered by the Rule's definition, it will not be deemed to be fiduciary advice.

106.    Like the proposed rule, moreover, the final Rule provides no exclusions from the definition of fiduciary investment advice for sales activity or for recommendations made to

independent fiduciaries or other sophisticated parties.  Instead, the Department excluded
"investment advice fiduciaries" from the Rule's definition of "retirement investor," such that
recommendations made to independent "investment advice fiduciaries" do not trigger fiduciary
status for the salesperson making the recommendation.  89 Fed. Reg. at 32,123.  But the Rule's
definition of "retirement investor" expressly includes plan fiduciaries who exercise discretionary
control or authority over plan assets.  *See id.* at 32,258.  Accordingly, the burdens and risks
associated with ERISA fiduciary status will be needlessly triggered by the provision of
recommendations to sophisticated parties and independent fiduciaries.  The Department attempts
to justify its omission of broader carve-outs by claiming that its "use of carve-outs … in the 2016
Final Rule was criticized by the Fifth Circuit in *Chamber* as evidence of an overbroad rule,"
89 Fed. Reg. at 32,162, but the Department takes the wrong lesson from that decision in twisting
the court's decision as a justification for a broad, sweeping definition of fiduciary.

107.    The Rule's revised PTEs retain the proposed rule's distinction between
independent producers selling products of two or more insurance companies and all other
salespeople, including career agents who work primarily for one company.  Consistent with the
proposal, the revised PTE 84-24 is available only to non-securities annuities sold by independent
producers, while all other transactions, including most sales by career agents and all sales by
insurance companies, are funneled into PTE 2020-02.  *See* 89 Fed. Reg. at 32,303.

108.    Both final PTEs also retain in substance the "Impartial Conduct Standards" that
were included in the proposed rule, but they change (in the Department's words) the
"nomenclature" surrounding those standards.  89 Fed. Reg. at 32,266.  Under both final PTEs,
receipt of a commission is conditioned on compliance with a "Care Obligation" and a "Loyalty
Obligation."  *Id.*  Advice meets the Care Obligation if it "reflects the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent person … would use." *Id.* at 32,298, 32,343.  And it meets the Loyalty Obligation if it "does not place the financial or other interests of the Investment Professional … ahead of the interests of the Retirement Investor." *Id.* at 32,298, 32,344.  The Department's changes make clear that the Department is seeking to impose prudence and loyalty standards on Title I and Title II fiduciaries alike, despite the fact that Congress elected not to impose those enumerated duties under Title II.

109.    The final Rule retains the proposed rule's "written acknowledgement" requirement as a condition for both PTEs as well.  In response to comments, the Department maintained that the written acknowledgement would not establish enforceable new federal rights, but stated that "[f]iduciary investment advice providers to IRAs have always been subject to suit in State court on State-law theories of liability," and claimed that "this rulemaking does not alter this reality."  89 Fed. Reg. at 32,271.

110.    The Rule adopts the other principal components of the proposed PTEs as well. As under the proposed rule, insurance companies must assume fiduciary status for recommendations of their products by career salespersons, but are not required to assume fiduciary status with respect to sales of fixed (i.e., non-security) products by independent agents. 89 Fed. Reg. at 32,304.  Under PTE 84-24, however, insurance carriers must exercise supervisory authority over all independent agents who sell their fixed products.  In doing so, insurers must "enforce[] written policies and procedures for the review of each recommendation" regarding one of their products, "before an annuity is issued to a Retirement Investor pursuant to an Independent [agent's] recommendation." *Id.* at 32,341.  Unlike the NAIC model regulation, PTE 84-24 does not include language permitting insurers to use an electronic screening system as part of their review procedures.  *See id.*

44

111.    On May 22, 2024, counsel for Plaintiffs asked counsel for the Department to voluntarily stay the Rule under 5 U.S.C. § 705, as the SEC has done with another major rule subject to an APA challenge.[9]  The Department declined.

**COUNT ONE**
**(APA, 5 U.S.C. § 706)**

**THE RULE'S EXPANSION OF FIDUCIARY STATUS IS CONTRARY TO LAW AND IN EXCESS OF STATUTORY JURISDICTION**

112.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

113.    The Rule is contrary to law and "in excess of statutory jurisdiction, authority, or limitation," 5 U.S.C. § 706(2)(A), (C), because it imposes fiduciary duties on sales transactions that do not involve intimate relationships of trust and confidence.

114.    ERISA provides that a "person is a fiduciary with respect to a plan to the extent" that, as relevant, "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan."  29 U.S.C. § 1002(21)(A). This statutory language must be interpreted in accordance with the common-law definition of "fiduciary."  *Chamber*, 885 F.3d at 369.

115.    Under the common law, fiduciary status requires "a special relationship of trust and confidence" between fiduciary and client—an intimate relationship that is not formed in an arm's-length transaction between salesperson and customer.  *Chamber*, 885 F.3d at 365. ERISA's codification of the common law is reinforced by the statute's use of the phrase "advice for a fee."  29 U.S.C. § 1002(21)(A)(ii).  "[T]he preposition 'for' … indicates that the purpose of the fee is not 'sales' but 'advice.'"  *Chamber*, 885 F.3d at 373.  The statute thus distinguishes

---

[9] *See* Order Issuing Stay, *In the Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors*, Securities and Exchange Commission, File No. S7-10-22 (Apr. 4, 2024), https://www.sec.gov/files/rules/other/2024/33-11280.pdf.

between "[s]tockbrokers and insurance agents [who] are compensated only for completed sales," and "[i]nvestment advisers" who "are paid fees because they 'render advice.'" *Id.*

116.    The Rule is irreconcilable with ERISA and common-law principles.  Like the vacated 2016 rule, the Rule jettisons the Department's 1975 test for determining fiduciary status—which "flow[s] directly" from the common-law definition of "fiduciary," particularly its requirement of "an intimate relationship" of "trust and confidence between the adviser and client," "beyond ordinary buyer-seller interactions." *Chamber*, 885 F.3d at 373-374.  In doing so, it clashes with the common law and countermands the Fifth Circuit's controlling decision, in several ways.

117.    *First*, the Rule redefines all sales speech as fiduciary speech.  Under the common law, insurance salespeople are not fiduciaries absent a special relationship.  *See Chamber*, 885 F.3d at 373-376.  But under the Rule, the *sine qua non* of selling an insurance product—a recommendation by an agent to a consumer to purchase the product—triggers compulsory fiduciary status.  *See* 89 Fed. Reg. at 32,256.  Indeed, it is impossible to comply with existing requirements under Reg BI or the NAIC model regulation without triggering fiduciary status— because those existing regulations already require agents and brokers (among others) to exercise professional judgment and make individualized recommendations that are in the best interest of consumers.  *See supra* ¶¶42-61.  The Rule thus obliterates the distinction "between mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does." *Chamber*, 885 F.3d at 374.

118.    *Second*, the Rule transforms one-time commercial transactions into fiduciary relationships.  At common law, a fiduciary relationship generally presupposed a "preexisting confidential [or fiduciary] relation."  Bogert, *Confidential Relations*, at 246.  The Rule, however,

includes "one-time" transactions within its scope. 89 Fed. Reg. at 32,150. That defies both the common law and the Fifth Circuit's decision, which identified as a key defect that "[t]he Rule expressly includes one-time IRA rollover or annuity transactions." *Chamber*, 855 F.3d at 380.

119.    *Third*, the Rule precludes parties from structuring their own relationships as non-fiduciary through clear contractual language. Because the common law required that a fiduciary relationship involve "extraordinary reliance," Bogert, *Confidential Relations*, at 245, it followed that clear and conspicuous acknowledgements that a fiduciary relationship did not exist were often credited. The "mutual agreement" prong of the 1975 rule similarly reflected that parties could choose not to enter into a fiduciary relationship through expressing mutual intent. The Rule, however, replaces that flexibility with a regulatory straitjacket, providing that a clear "written disclaimer is insufficient to defeat fiduciary status" anytime that the elements of the Department's expansive fiduciary test are satisfied. 89 Fed. Reg. at 32,155.

120.    *Fourth*, the Rule's "objective[]"standard, 89 Fed. Reg. at 32,152, is an unlawful end-run around the Fifth Circuit's decision. For example, instead of building a factual record establishing that insurance agent-consumer sales interactions involve "intimate relationship[s]" of "trust and confidence"—which the Fifth Circuit held was "ordinarily inconceivable," *Chamber*, 885 F.3d at 380—the Department established effectively an irrebuttable presumption that fiduciary status attaches whenever the Rule's criteria are met because "parties should reasonably understand" that a relationship of trust and confidence exists, 89 Fed. Reg. at 32,152. That presumption is irrational because it purports to establish conclusively, based on the Department's policy preferences and with factual support, what parties "*should* reasonably understand" without any showing that is how parties *actually* "understand" their relationship.

47

121.    *Fifth*, the Rule conflicts with ERISA's "advice for a fee" requirement.  In tying fiduciary status to "advice for a fee," Congress intended to capture circumstances in which the "purpose" of a paid fee is for "advice," not "sales."  *Chamber*, 885 F.3d at 373 (quotation marks omitted).  Like the 2016 rule, the Rule overrides this "important distinction," *id.*, because the "advice for a fee" requirement is satisfied by any "link" between compensation and a "recommendation."  89 Fed. Reg. at 32,157.  And that link exists, the Department posits, every time there is a sales recommendation, a consumer purchase, and a payment of compensation.

122.    The Rule is unlawful in additional ways as well.  The Rule exceeds the Department's statutory authority because it contravenes the 2010 Dodd Frank Act.  That law (1) delegated to the SEC the power to promulgate enhanced regulations of securities recommendations to retail customers; and (2) expressly reserved for States the authority to regulate fixed index annuities (when a State has adopted the NAIC model regulation).  *Chamber*, 885 F.3d at 385.  Like the 2016 regulation, the Rule "conflicts with both of these efforts." *Chamber*, 885 F.3d at 385.  It expressly applies to variable annuities that (as securities) are already subject to the SEC's Regulation Best Interest (17 CFR § 240.15l-1), and to fixed annuities that are subject to the NAIC's enhanced standards.  89 Fed. Reg. at 32,129.

123.    Like the 2016 rule, the Rule also "ignores that ERISA Titles I and II distinguish between DOL's authority over ERISA employer-sponsored plans and individual IRA accounts." *Chamber*, 885 F.3d at 381.  Among other things, PTE 84-24 and PTE 2020-02 subject Title II fiduciaries to the same conduct standards as Title I fiduciaries—standards the Department claims are reflections of the duties of prudence and loyalty that Title II omits.  *See* 89 Fed. Reg. at 32,137.  And the Rule purports to channel as many fiduciaries as possible into Title I, where ERISA's obligations are privately enforceable.  Indeed, according to the Department, all

"recommendations on distributions" from Title I plans, "including rollovers or transfers into another plan or IRA," are now "covered by Title I of ERISA, including the enforcement provisions," "[e]ven if the assets would not continue to be covered by Title I … after they were moved outside the plan." 89 Fed. Reg. at 32,145. Thus, as with the 2016 rule, the Rule requires "brokers and insurance representatives … to expose themselves to potential liability beyond the tax penalties provided for in ERISA Title II." *Chamber*, 885 F.3d at 382. That contravenes the statute.

124.   For all of these reasons, the Rule must be set aside.

## COUNT TWO
## (APA, 5 U.S.C. § 706)

## THE RULE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS BECAUSE IT UNLAWFULLY CREATES PRIVATE RIGHTS OF ACTION UNDER STATE LAW

125.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.   The Rule is contrary to law and arbitrary and capricious because it unlawfully creates a private cause of action. 5 U.S.C. § 706(2)(A), (C).

127.   It is axiomatic that "[o]nly Congress may create privately enforceable rights, and agencies are empowered only to enforce the rights Congress creates." *Chamber*, 885 F.3d at 384. While the 2016 rule violated this foundational limit on administrative agency authority through its use of the Best Interest Contract Exemption requiring all fiduciaries to enter into enforceable contracts with consumers, *id.* at 384, the Rule accomplishes the same end by revising PTEs 84-24 and 2020-02 to require newly established fiduciaries to provide clients with a "written acknowledgement" pledging fiduciary status. 89 Fed. Reg. at 32,226.

128.   This written "fiduciary" acknowledgement has the effect, if not purpose, of exposing new fiduciaries to state-law private actions under breach-of-fiduciary or breach-of-

49

contract theories.  But ERISA does not authorize the Department to create new enforceable

rights—particularly with respect to plans covered only by Title II, for which Congress created an

administrative, not judicial, enforcement mechanism.  *Chamber*, 885 F.3d at 384.

129.    At minimum, the Rule is arbitrary and capricious because the Department failed

to "supply a reasoned basis" for requiring the written acknowledgement and "entirely failed to

consider" the state-law implications of the requirement.  *See Motor Vehicle Mfrs. Ass'n of U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Indeed, after the Department

issued its proposed rule in 2023, Plaintiffs explained that the requirement risked exposing new

fiduciaries to state-law private actions.  *See* NAFA Comments 30-31; ACLI Comments 29; IRI

Comments 19.  The Department's only response was that Title II "[f]iduciary investment advice

providers have always been subject to suit in State courts on State-law theories of liability and

this rulemaking does not alter this reality."  89 Fed. Reg. at 32,271.  But this misses the point:

The Rule vastly expands the universe of persons subject to fiduciary status and then forces all

newly minted fiduciaries to pledge that status in writing in order to satisfy an exemption,

exposing them to state-law liability and depriving them of the opportunity to challenge the

imposition of that status.  The Department's "paucity of reasoning" on this important subject

reflects arbitrary and capricious decisionmaking.  *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th

905, 911 (5th Cir. 2023).  The Rule should accordingly be set aside.

## COUNT THREE
## (APA, 5 U.S.C. § 706)

## THE RULE IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS THE PRODUCT OF UNREASONED DECISIONMAKING

130.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

131.    For numerous reasons, the Rule is not the product of reasoned decisionmaking and is "arbitrary, capricious, [and] an abuse of discretion."  5 U.S.C. § 706(2)(A).

**A.    The Department Failed To Establish Why The Rule Is Necessary, Particularly In Light Of Existing Regulations**

132.    Under the APA, a regulation is arbitrary and capricious when the agency fails to demonstrate why a regulation is necessary.  *See, e.g.*, *State Farm*, 463 U.S. at 42-43; *National Fuel Gas Supply Co. v. FERC*, 468 F.3d 831, 843-844 (D.C. Cir. 2006) (Kavanaugh, J.).  And in providing its justification, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43.  The Department failed that standard here.

133.    The Department claims that the Rule's expansion of fiduciary status is necessary to "ensure that retirement investors' reasonable expectations are honored," 89 Fed. Reg. at 32,122.  But the Department has made no meaningful attempt to show that consumers actually perceive the transactions covered by the Rule as involving fiduciary relationships of trust and confidence.  *See, e.g.*, ACLI Comments 27.  To the contrary, in the proposed rule, the Department claimed that a broad fiduciary standard would "*instill* trust."  88 Fed. Reg. at 75,942 (emphasis added).  The final Rule echoes that reasoning—explaining that the new standard will "facilitate efficient, trust-based relationships between Retirement Investors and investment advice providers."  89 Fed. Reg. at 32,217.  The Department's unsupported claims about consumer expectations do not provide an adequate justification for the Rule.

134.    Beyond that, the Department has failed to reasonably "determine whether, under the existing [regulatory] regime, sufficient protections" for consumers "exist[]" already.  *Am. Equity Inv. Life Ins. Co v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2009).  Since the 2016 rule was vacated, the principal regulators of insurance products (the States) and securities (the SEC), have

undertaken significant efforts to strengthen consumer protections for investors, including in the retirement space, to address the very same issue of perceived conflicts of interest that the Department purports to address through the Rule.  Against that backdrop, prudence would have dictated waiting to study the effects of these significant reforms.

135.    Instead, unsupported by any reliable evidence, the Department claims that "the current patchwork regulatory structure is neither uniform nor sufficiently protective of retirement investors."  89 Fed. Reg. at 32,139.  But uniformity in and of itself is not a sufficient basis for regulation.  Indeed, in this context, the Dodd-Frank Act provided that variable and fixed index annuities should be subject to differing standards:  The statute (1) delegated to the SEC the power to promulgate standards of conduct for broker-dealers and investment advisers who render personalized investment advice about securities to retail customers; and (2) reserved for the States the authority to regulate fixed index annuities (so long as the States adopted the NAIC's model regulation).

136.    Uniformity is an especially hollow justification, moreover, because the Department's decision to impose a uniform fiduciary standard conflicts with the considered judgments of other regulators (that is, the NAIC and the SEC) not to establish such a standard.

137.    What is more, the Department has provided no reliable evidence that these existing State and SEC regulations are inadequately protecting consumers.  The limited empirical data that the Department cites is years-old, predates the regulatory enhancements that the SEC and the NAIC made in 2020, and is otherwise unreliable.  *See e.g.*, 89 Fed. Reg. at 32,182 & n.342 (citing study by Bhattacharya, et al., whose "main dataset consist[ed]" of "annuity transactions … between 2013 and 2015"); *id.* at 32,210 (citing study by Egan, et al. on the effects of the 2016 Rule in 2016-2017); *see also* FSI Comments 14; IRI Comments 15; NAIFA

Comments 14. Those studies thus demonstrate nothing about the effectiveness of Reg BI and the current iterations of state laws.

138.    The other studies and purported evidence on which the Department relied to demonstrate existing consumer harm were also wholly insufficient to establish that the newly enhanced State and SEC regulatory regimes would not adequately protect consumers.

139.    Nor did the Department provide reasonable evidence that the disclosures required by the SEC's Reg BI or the NAIC's model regulation are insufficient to protect retirement investors. The Department itself notes that "[e]nhanced disclosure requirements help make the industry more transparent and accessible." 89 Fed. Reg. at 32,238. But the Department never persuasively explains why the SEC's and the NAIC's disclosure requirements are insufficient. Indeed, in providing its supposed evidence about disclosures, the Department refers back to the "regulatory impact analysis for the 2016 Final Rule," *id.* at 32,238—which came before the SEC's and the NAIC's regulatory enhancements.

140.    In these circumstances, the prudent and reasoned approach would have been for the Department to wait until research was available about the adequacy of the SEC's and the NAIC's enhancements. For example, the NAIC is currently studying the implementation of the model regulation among "the top 25 annuity writers in the United States." NAIC Comments 3. And as the Department acknowledges, "the relative newness of Regulation Best Interest makes it challenging to measure its impact." 89 Fed. Reg. at 32,182. Still, the Department rushed to finalize the Rule without meaningful evidence that additional protections are needed.

141.    In any event, the Department's promise that the Final Rule provides much-needed "uniformity" fails on its own terms. The Department claims that it alone can provide a "uniform … standard," 89 Fed. Reg. at 32,186, but unlike state insurance regulators and the SEC, the

Department's regulatory authority is limited to investments under tax-advantaged (that is, "qualified") arrangements covered by Title I or Title II.  Any retirement investments that do not involve qualified dollars fall outside of the Rule's scope.  Thus, the Rule does not solve the "patchwork regulatory structure," *id.* at 32,139—it exacerbates it.

**B.     The Rule Arbitrarily Targets Annuities While Ignoring Annuities' Benefits**

142.    The Rule is arbitrary and capricious because it rests on a profound misunderstanding or unreasonable disregard of annuity products and their consumer benefits.

143.    As the Rule's preamble makes abundantly clear, annuities are one of the principal "problems" that the Rule is intended address.  The Rule "will be especially beneficial," the Department claims, due to its application to "recommendations with respect to many commonly purchased retirement annuities, such as fixed index annuities."  89 Fed. Reg. at 32,123.  Indeed, in a section of the preamble titled "Case Study: Indexed Annuities," the Department claims "particular[] concern[]" about consumers who may "lack a basic understanding of … the complexities associated with indexed annuities."  *Id.* at 32,215.  And the Department says that it expects benefits to accrue from a reduction in annuity sales once the Rule takes effect, like the one that followed issuance of the 2016 rule.  *See id.* at 32,210.  But the Department's targeted effort to undermine annuities sales is arbitrary and capricious in multiple respects.

144.    To start, the Department provides no reliable evidence that the supposed "complexity" of certain annuity products has resulted in widespread consumer confusion.  And the Department does not provide any compelling examples of an insurer or salesperson misleading or deceiving consumers about an annuity, much less explain why existing protections are not sufficient to address any such instances.  To the contrary, the Department acknowledges that "[i]ndexed annuity contracts describe both how the amount of return is calculated and what indexing method they use."  89 Fed. Reg. at 32,215.

54

145.    Instead, the Department simply assumes that consumers are confused because "additional features and enhancements" have become available in annuity contracts "[o]ver time." 89 Fed. Reg. at 32,215.  But additional features are not an indication of an inferior product (much less a deceptive one); the Department arbitrarily ignores that those features are designed to ensure lifetime income for a consumer while managing the consumer's particular risks.  To take one prominent example of the Department's superficial understanding, the Department expresses particular apprehension about fixed index annuity features that can cap a consumer's rate of return—which the Department claims may create "disappointment" for consumers expecting greater returns.  *See id.* at 32,216.  Yet, the Department ignores that those caps are typically accompanied by provisions providing a floor *guaranteeing* that the interest credited to the consumer will not fall below a specified minimum.  And the Department does not even contemplate the possibility that many risk averse consumers may prefer a product with both limited upside and limited downside.  Simply put, the Department's claims of meaningful consumer confusion about annuities do not reflect reasoned decisionmaking.

146.    Nor does the Department provide any substantial, reliable evidence to support its apparent belief that a decrease in annuity sales will benefit consumers.  On that issue, the Department relies entirely on one study purportedly showing that the decrease in annuity sales following the 2016 rule caused an increase in "risk-adjusted returns of investors." 89 Fed. Reg. at 32,210.  But that study is deeply flawed.  Among other things, it focuses on short-term investment returns.  Maximizing shorter-term returns is not the objective of an annuity and thus cannot serve as a reliable measure to determine whether consumers' interests are being furthered. *See* ACLI Comments 23.

147.    Moreover, the Department's desire to decrease annuity sales disregards the documented long-term benefits that annuities provide to consumers.  Annuities are the only financial products that guarantee income throughout retirement.  Unsurprisingly, consumers themselves highly value these guarantees.  For example, a Gallup survey of variable annuity holders found that 87% of them considered the guaranteed lifetime withdrawal benefit to be "valuable" or "very valuable."  ACLI Comments 18.  Similarly, a 2023 survey by EBRI/Greenwald Research found that 40% of survey respondents said adding "investment options that provide guaranteed lifetime income" would be "the most valuable improvement to their [retirement savings] plan."  IALC Comments 3.

148.    The peace of mind annuities provide also demonstrably improves retirees' overall well-being and mental health.  Retirees who benefit from lifelong-guaranteed income are, as a study commissioned by the Department itself put it, "more satisfied in retirement and suffer[] from fewer depression symptoms than those without such income."  Michael J. Brien & Constantijn W.A. Panis, *Annuities in the Context of Defined Contribution Plans: A Study for the U.S. Department of Labor, Employee Benefits Security Administration* 1 (Nov. 2011).  And those benefits "became stronger" the longer the person was retired.  *Id.*  That is "consistent with the notion that retirees who rely on finite savings and [defined-contribution] plan assets grow increasingly worried about funding retirement expenses as they grow older and deplete their assets."  *Id.*  Those who receive "lifelong-guaranteed income … are less concerned with outliving their resources" and are therefore "more satisfied in retirement."  *Id.*

149.    If the Department wishes to steer consumers away from annuity products, it was at least required to develop a complete understanding of those products and engage with the

benefits they provide.  Because the Department failed to do so, the Rule is arbitrary and capricious.

### C.   The Rule's Cost-Benefit Analysis Is Arbitrary And Capricious

150.    A rule is arbitrary and capricious if its cost-benefit analysis does not reflect reasoned decisionmaking.  *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 751 (2015); *Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023).  The Department's rushed, incomplete cost-benefit analysis fails this standard too in multiple respects.

151.    The Department's cost-benefit analysis is plainly insufficient for many reasons, as reflected in comments from Plaintiffs and others in the administrative record.  For example, the Department estimated only partial costs, cherry-picked data to ignore unfavorable findings, and inconsistently or improperly applied discount rates to inflate benefits and conceal costs.  In the proposed rule, the Department did not even attempt to quantify the benefits, leaving commenters unable to meaningfully scrutinize the Department's conclusory claims that the benefits to retirees would outweigh the corresponding extensive costs.  *See* 88 Fed. Reg. at 75,929.

152.    Perhaps most glaringly, the unprecedently fast rulemaking process left the Department without the data that it needed to properly analyze the effects of the Rule.  The Department repeatedly acknowledges that significant gaps in the evidentiary record undermine the conclusions that it sets forth in the final Rule.  For example, despite conceding "the limitations of using findings that precede the SEC's regulatory action to measure the impact of this rulemaking," 89 Fed. Reg. at 32,178, the Department relies extensively on the "2016 Regulatory impact analysis," *see, e.g.*, *id.* at 32,177, 32,180, 32,181, 32,208, and studies from "prior to 2016," *id.* at 32,181.  Although the Department claims to understand consumer demand for various annuity types, and to understand the effect the Rule will have on the composition of the annuities market, *see id.* at 32,188, the Department acknowledges that it "does not have data

on assets invested in annuities in pension accounts, … [or] a breakdown of how many assets are invested in fixed and variable annuities in IRA accounts," *id.* at 32,187.  And because the Department has only "limited data to assess the magnitude of savings that would result for Retirement Investors as a result of the rulemaking," it is ultimately "unable to quantify benefits and transfers of the rulemaking across all asset classes and investor types," *id.* at 32,195, and "unable to calculate a comprehensive estimate for the benefits and transfers across all asset classes and account types," *id.* at 32,198.  It was arbitrary and capricious for the Department to promulgate sweeping regulatory overhaul without securing data on critical issues.

153.    Instead of performing a comprehensive benefits analysis, the Department purports to provide estimates specific to two "market segments": the markets for workplace plan participants and fixed index annuities.  *See* 89 Fed. Reg. at 32,196.  But those estimates are dubious on their face.  As the Department explains, based on those estimates, "if just looking at the benefits and transfers to plan participants and to Retirement Investors investing in fixed index annuities, the rulemaking could result in estimated benefits and transfers ranging from $8.8 billion to $12.5 billion annually."  *Id.* at 32,196.  The lower end of that range is more than double the Department's benefits estimate for *the entirety of the 2016 Rule*, which the Department repeatedly describes as "broader" than the current Rule.  *Id.* at 32,237.  The Department never explains why this narrower Rule will cause substantially greater benefits to consumers.

154.    That aside, the Department's market-segment estimates do not reflect reasoned decisionmaking.  Two of the estimates are parroted without any scrutiny from a comment letter (which other stakeholders had no opportunity to respond to during the rulemaking process).  *See* 89 Fed. Reg. at 32,196.  The other two estimates are simple mathematical extrapolations that the Department made—one based on an academic article and the other based on a three-paragraph

hypothetical illustration provided in a blog post by the Council of Economic Advisers ("CEA"). *See id.* But neither the article authors nor the CEA were purporting to conduct analyses that could be relied upon for comprehensive market-wide projections. In fact, the CEA disclaimed any such use of its analysis—stating that its "illustrative example" is meant to "simply highlight[]" the "value of [one] contract at the outset," while conceding that "a fixed index annuity may still make sense for certain investors."[10]

155.    The threadbare nature of the Department's benefits analysis raises substantial doubts about whether the benefits outweigh the Rule's costs. The Department estimates that the Rule will cause regulated parties to incur approximately $537 million in costs during the first year the Rule is in effect, and over $2.5 billion in costs over the next decade. 89 Fed. Reg. at 32,222-32-223. And that estimate focuses narrowly on the costs of compliance paperwork, ignoring that the imposition of fiduciary status will itself impose substantial costs. *See id.* at 32,225 ("The Department believes that most costs incurred by entities … under this rulemaking are attributable to compliance with the PTEs."). The Department also makes no effort to quantify other costs, like legal costs, liability costs, and fiduciary insurance costs. *See id.*

156.    Nor did the Department adequately grapple with the documented evidence of the serious harms the final Rule will cause, both to regulated parties and to consumers. *See* ACLI Comments 20-22; Allianz Comments 7; Ameriprise Financial Comments 11. For example:

- A Deloitte analysis found, based on a survey of 43% of financial professionals in the United States serving 35 million retail retirement accounts holding $4.6 trillion in assets, that the 2016 rule caused 10 million American workers' accounts

---

[10] *The Retirement Security Rule – Strengthening Protections for Americans Saving for Retirement*, The White House (Oct. 31, 2023), https://www.whitehouse.gov/cea/written-materials/2023/10/31/retirement-rule/#_ftnref1.

to lose access to professional financial guidance because shifting to a fee-based service model caused 53 percent of financial professionals to limit or eliminate access to brokerage services.  Deloitte, *The DOL Fiduciary Rule: A Study in How Financial Institutions Have Responded and the Resulting Impacts on Retirement Investors* 4, 11 (Aug. 9, 2017) (cited by ACLI Comments 20; NAIFA Comments 8-9; IRI Comments 20; Finseca Comments 18).  Ninety-five percent of financial professionals eliminated or limited asset classes offered, including 48% changing or eliminating annuities offered.  *Id.* at 14.

- A separate Hispanic Leadership Fund study found that the 2016 rule would have reduced the projected accumulated retirement savings of 2.7 million individuals, comprised of American workers with incomes below $100,000, by approximately $140 billion over 10 years.  Hispanic Leadership Fund, *Analysis of the Effects of the 2016 Department of Labor Fiduciary Regulation on Retirement Savings and Estimate of the Effects of Reinstatement* iii (Nov. 8, 2021)  (cited by ACLI Comments 20; NAIFA Comments 9; IRI Comments 20; Finseca Comments 3).  It also found that the rule would have imposed the "most adverse" "effects on minority populations."  *Id.* at 2.  Overall, the study reported that the rule would have led to an approximately 20% increase in the wealth gap attributable to the loss of IRAs savings.  *Id.*

- A survey of more than 1,000 NAIFA members found that the proposed rule would cause changes in minimum-asset thresholds, leaving lower-balance retirement investors without access to financial information, investment advice, and products.  While 70 percent of respondents reported that they did not currently

have a minimum requirement for service, only 28 percent of respondents reported
that they would be able to continue without a minimum asset threshold for service
if the proposed rule were finalized.  And the percent of respondents who have a
minimum asset threshold of $50,000 or more would jump from 13 percent to 47
percent of respondents.  *See* NAIFA Comments 9-10.

- In 2017, the Financial Services Institute engaged Oxford Economics to analyze
the costs of implementing the 2016 to date, and the expected costs if the Rule
were to go into effect.  Oxford Economics, *How the Fiduciary Rule Increases
Costs and Decreases Choice* (2017).  The study of FSI's members found that the
*actual* costs of complying with the final 2016 Rule were 1.8 to 3.0 times greater
than the Department's latest estimates, and that many members would be forced
to direct low-balance accounts to web-based products without a financial
professional.

157.    The Department either does not respond to the findings of these studies or
dismisses them without reasonable explanation.  The Department never mentions, for example,
the Hispanic Leadership Fund study.  And the Department disparages the Deloitte study because
"the survey was commissioned by a party that sued to block the Department's 2016
Rulemaking," "did not account for customers' ability to move to different firms," and "was not
based on the current rulemaking, which is more narrow in scope."  89 Fed. Fed. Reg. at 32,219.
But none of these stated reasons are persuasive grounds for discarding the Deloitte study's
results in their entirety, especially the notion that the effects of the substantially similar 2016 rule
are not relevant to this rulemaking.

158.     In sum, the Department unreasonably attempts to ascertain the benefits of the Rule while vastly underestimating its costs.  For that reason, the Rule is arbitrary and capricious.

### D.     The Department Did Not Adequately Address Significant Comments

159.     In addition, a rule is arbitrary and capricious if it fails to adequately respond to "significant points … raised by the public comments."  *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023).  The Department violated that duty here.

160.     For one thing, the Department failed to adequately consider reasonable alternatives to the final Rule.  For example, one commenter suggested "clear disclosure requirement[s]" would be a "more narrowly tailored approach[]" to address the Department's concerns.  ACLI Comments 33.  Another, for example, proposed the addition of a "safe harbor for Reg BI compliance as a reasonable alternative to the approach taken in the 2020-02 Proposal," IRI Comments 53, which the Department declined to adopt in spite of the fact that it continues to insist the regulatory burdens imposed by the Rule are "consistent with the requirements of the SEC's Regulation Best Interest," 88 Fed. Reg. at  75,899, *see also* 89 Fed. Reg at 32,131.  The Department did not provide a persuasive or reasoned justification for rejecting these and other alternatives to the fiduciary-only regulatory model enacted by the Rule.

161.     Moreover, many commenters identified activities covered by the proposed definition of fiduciary, in which no party would understand the relationship to be fiduciary in nature, and for which there is no good reason to impose fiduciary obligations.  Examples included standard "hire me" conversations, such as in responses to requests for proposals; pension risk transfer transactions; and point-of-sale wholesaling.  As commenters explained, there is no reason to turn "hire me" conversations and responses into fiduciary transactions because the plan sponsor fiduciary (or an expert independent fiduciary engaged by the plan sponsor) for the plan would still need to "evaluate any proposal received."  ACLI Comments 5;

*see also* NAFA Comments 14, IRI Comments 34; Charles Schwab Comments 7-8.  The same is true for pension risk transfer transactions, "in which the pension fund already has a named fiduciary charged with and responsible for managing the fund," ACLI Comments 27, and certain wholesaling activities marketed to "intermediaries who may themselves be fiduciaries," NAFA Comments 15; *see also* Finseca Comments 15; IRI Comments 34.  The proposed rule's definition of fiduciary, commenters explained, created a second, "redundant," layer of fiduciary protection unnecessary to protect retirement investors and contrary to the understanding of all parties involved in the conversation or transaction.  ACLI Comments 27.

162.    The final Rule remains vastly overbroad.  The Department claims that it responded to commenters' concerns by revising the definition of "retirement investor" "to exclude plan and IRA fiduciaries that are investment advice fiduciaries," such that advice to those fiduciaries would not trigger fiduciary obligations.  89 Fed. Reg. at 32,163.  But as discussed (*supra* ¶106**)**, the Rule's definition of retirement investor expressly includes plan fiduciaries who exercise discretionary control or authority over plan assets.  Accordingly, recommendations to those independent fiduciaries trigger unnecessary, redundant fiduciary obligations—the precise problem that commenters warned the Department about.

163.    In addition, the Rule fails to address significant concerns raised by commenters concerning the ineligibility provisions in PTE 2020-02 and PTE 84-24.  When it was initially issued, PTE 2020-02's ineligibility provisions were limited to "a conviction of any crime described in ERISA Section 411 [29 U.S.C. § 1111] arising out of such person's provision of investment advice to Retirement Investors."  85 Fed. Reg. at 82,864.  In the proposed rule, though, the Department proposed to sweep in convictions for crimes "unrelated to investment advice," including in foreign jurisdictions, and by "affiliates" that the entity seeking to rely on

the exemption does not control. Finseca Comments 14; *see also* NAFA Comments 29; IRI Comments 43. Commenters pressed the Department to explain how these expansions were related to protecting retirement investors (or, with respect to foreign convictions, even within the Department's authority). As they explained, there is no reason ineligibility should attach where "neither the fiduciary investment advice provider nor its directors, officers, or employees participated in the misconduct," especially when the conduct occurred in a foreign jurisdiction and the crime is unrelated to investment advice. IRI Comments 43.

164.    Disregarding these comments, the final Rule largely retains the expanded ineligibility provisions as proposed. The Rule's ineligibility provisions include crimes lacking any connection to investment advice, and includes convictions in foreign jurisdictions. Rather than use the word "affiliate," the Rule provides for ineligibility when a person within the same "Controlled Group" has been convicted of a covered offense, but that change has no practical narrowing function. The critical point is that insurance agents, broker-dealers, and financial institutions remain at risk of ineligibility because of criminal convictions (possibly in foreign jurisdictions) for conduct (possibly in foreign jurisdictions) that they did not and could not directly control, and for conduct unrelated to investment advice. The Department has made no showing that PTE 2020-02's current eligibility provisions are insufficient or that an expansion of the ineligibility provisions is rationally related to protecting consumers.

165.    To take one final example, commenters explained that the Department's statutory authority to establish a prohibited transaction exemption is conditioned on making certain findings, including a finding that the exemption is "administratively feasible." IRI Comments 38-40; *see* 29 U.S.C. § 1108; 26 U.S.C. § 4975(c)(2); Reorganization Plan No. 4 of 1978, § 102, 92 Stat. 3790 (Aug. 10, 1978, as amended Sept. 20, 1978). According to commenters, the

proposed revisions to PTE 84-24 and PTE 2020-02 were not administratively feasible.  IRI
Comments 38-40.  In the final Rule, the Department did not provide a persuasive response to
those concerns, and ultimately failed to make a reasoned finding of feasibility.

166.     For those all of these reasons and as further reflected in the administrative record,
the Rule it not the product of reasoned decisionmaking, is not based on substantial evidence, and
is not reasonably explained in critical respects.  The Rule should thus be set aside.

**COUNT FOUR**
**(U.S. Const. amend. I; APA, 5 U.S.C. § 706)**

**THE RULE VIOLATES THE FIRST AMENDMENT AS APPLIED TO TRUTHFUL
COMMERCIAL SPEECH BY FINANCIAL SALESPERSONS**

167.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

168.     The Rule violates the First Amendment by placing unjustified burdens based on
the content of truthful, non-misleading commercial speech, and by unlawfully compelling other
commercial speech that is neither purely factual nor uncontroversial.  5 U.S.C. § 706(2)(B).

**A.     The Rule Imposes Unjustified Content-Based Burdens On Sales Speech**

169.     Under the First Amendment, a regulation is "presumptively unconstitutional" and
subject to strict scrutiny if it imposes a content-based restriction on speech.  *NIFLA v. Becerra*,
585 U.S. 755, 766 (2018).  A speech regulation "is content based" if it "applies … because of the
topic discussed" or "defin[es] regulated speech by a particular subject matter … [or] by its
function or purpose."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

170.     The Rule is plainly content-based.  For one thing, on its face, the Rule draws a
facial content-based distinction by regulating a particular subject matter of speech:
"recommendation[s]" to purchase a retirement product, including recommendations related to
"rolling over, transferring, or distributing assets from a plan or IRA."  89 Fed. Reg. at 32,256,
32,258.  Speech containing this content must be spoken by a fiduciary or not at all.  The

regulation thus subjects all speakers of this content to new burdens, including liability under ERISA and the Tax Code for violations of the prohibited-transaction rules.  *See id.* at 32,256.  In the Department's words, the Rule regulates any "communication that, *based on its content* … would reasonably be viewed as a suggestion that the retirement investor engage in or refrain from taking a particular course of action."  89 Fed. Reg. at 32,143 (emphasis added).

171.    In addition, the Rule draws content-based distinctions in order to "suppress a disfavored message"—namely the suggestions that consumers purchase annuities.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011).  That is evident from the Rule's preamble, where Department claims that the Rule "will be especially beneficial" because it extends fiduciary obligations to speakers who make "investment recommendations with respect to many commonly purchased retirement annuities, such as fixed index annuities."  89 Fed. Reg. at 32,123.  Truthful sales speech regarding annuities is in the Department's view a "problem" that it intends the Rule to address.  The Department claims "particular[] concern[]" about consumers who may "lack a basic understanding of … the complexities associated with indexed annuities."  *Id.* at 32,215.  And the Department worries that consumers are "reliant on advice" from brokers and insurance agents who may "conceal" the fees associated with their "notoriously complex" annuity products.  *Id.*  The Rule's burdens on speech are thus designed to target particular speech that the Department disfavors, making clear that the Rule is a content-based restriction.

172.    The Rule also cannot be "*justified* without reference to the content of the regulated speech" either.  *Sorrell*, 564 U.S. at 566.  The Department claims that the principal benefits of the Rule will flow from the "substantial influence" the Rule can be expected to have on annuity-related sales speech.  89 Fed. Reg. at 32,188.  To that end, the Department expects

benefits to accrue from a reduction in annuity sales, like the reduction in annuity sales that followed the promulgation of the vacated 2016 rule.  *See id.* at 32,210.

173.    Because the Rule imposes content-based restrictions on speech, it is presumptively unconstitutional and subject to strict scrutiny.  *NIFLA*, 585 U.S. at 766.  Under that standard, the Rule violates the First Amendment unless the Department can demonstrate that it is narrowly tailored to serve a compelling government interest.  *Id.*

174.    The Rule fails strict scrutiny because the Rule does not support a compelling interest.  To withstand strict scrutiny, the Department "must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (citations omitted).  The Department has not done so here.  And in any event, the Rule is not narrowly tailored.  Under strict scrutiny, the availability of a "less restrictive alternative" is fatal, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000), even when the alternative would require Congress to act rather than the Department, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 688-92 (2014).  Several less restrictive alternatives are readily available:  For example, Congress could have regulated commissions and sales compensation directly or it could have regulated retirement products themselves; each of those options would regulate commercial *transactions* rather than speech.  It could also enact clear and conspicuous disclosure requirements.

175.    Even if intermediate scrutiny applied, the Rule would still be invalid.  Under intermediate scrutiny, the Department has the burden of showing that the Rule "directly advances a substantial government interest," *Sorrell*, 564 U.S. at 572, and that it "is not more extensive than is necessary to serve that interest," *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).  The Rule's restrictions on speech do not advance a

substantial interest because they are premised on an assumption that the Constitution forbids: that consumers are better off with no information, as opposed to information they learn during a sales conversation.  The Department paternalistically purports to restrict access to information for their consumers' good, claiming that even if a salesperson discloses her potential conflicts when recommending the purchase of a retirement product, consumers may still be harmed by this sales speech because they "lack[] rudimentary financial knowledge," "may not fully understand disclosures," and even when made aware of potential conflicts, will not be able to "detect lapses in the quality of financial advice."  89 Fed. Reg. at 32,181, 32,238.  But "information is not in itself harmful," *Sorrell*, 564, and "the First Amendment presumes that some accurate information is better than no information at all," *Central Hudson*, 447 U.S. at 562. The Rule violates these bedrock constitutional tenets.

176.    The Department also fails to establish that the Rule directly advances a substantial interest because it cannot show that the Rule will alleviate harm to consumers in a direct and material way.  Non-fiduciary sales conversations are low-cost means by which many consumers obtain useful information about retirement products.  Evidence shows that consumers need truthful information and assistance to help them understand annuities and to make decisions about retirement products.  The benefits of sales speech are especially significant in the case of products like annuities whose features can be tailored to individual needs.  By raising the costs of providing this information, the Rule will impede access to the consumers who need it most.

177.    The Rule also is not narrowly tailored.  Again, the Department easily could have served its interest in protecting consumers without unduly burdening sales speech.  In addition to the less restrictive alternatives provided above, the Department could impose a tailored disclosure regime that would address its concerns about consumer comprehension and require

clear and conspicuous disclosures to address perceived conflicts of interest.  The Department could, moreover, utilize the robust enhanced standards adopted by the vast majority of States— by codifying them into national standards or relying on them to protect consumers.  Accordingly, the Rule does not withstand constitutional scrutiny and must be vacated.

  **B.**  **The Rule's Fiduciary Pledge Requirement Unlawfully Compels Speech**

  178. The Rule also violates the First Amendment because it compels speech by Plaintiffs' members by requiring them to pledge fiduciary status.  Under the Rule, insurance companies, agents, and broker-dealers must attest in writing that they are "are fiduciaries" and "are providing fiduciary investment advice … under Title I, the [Internal Revenue] Code, or both when making an investment recommendation."  89 Fed. Reg. at 32,296.  Under "model language," moreover, the Department expects salespeople not only to pledge fiduciary status but to inform consumers that "[t]he way we make money or otherwise are compensated creates some conflicts with your financial interests."  *See id.* at 32,271.  As the Department explained in its proposal, insurance companies and salespeople who "are unwilling" to comply with the pledge "must restructure their operations" to avoid commission-based sales.  88 Fed. Reg. at 75,984.

  179. Compelled commercial disclosures are content-based regulations that trigger heightened First Amendment scrutiny, *NIFLA*, 586 U.S. at 766, 773, unless they require only the disclosure of "factual and noncontroversial information" and they are not "unjustified or unduly burdensome," *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).  The Rule's fiduciary pledge triggers heightened scrutiny because it is not purely factual.  Fiduciary status is a contested legal conclusion determined by the context of a particular transaction.  The Rule's fiduciary pledge is also not uncontroversial.  The fiduciary status of the affected entities is a hotly disputed legal proposition, subject to good-faith disagreements, that

the Department is seeking to resolve in its favor by forcing insurance companies, agents, and brokers to concede the applicability of fiduciary obligations in writing.

180.    The Rule's fiduciary pledge is unjustified and unduly burdensome as well.  The rulemaking record indicates that the Department's intention in requiring the pledge is to expose insurance companies and salespeople to liability under state law—an unwarranted burden that will chill regulated parties from engaging in protected sales speech in the first place.  The Department claims that "[f]iduciary investment advice providers to IRAs have always been subject to suit in State courts on State-law theories of liability, and this rulemaking does not alter this reality."  89 Fed. Reg. at 32,271.  But it cannot credibly profess that the Rule "does not alter" exposure to liability.  *Id.*  In the proposed rulemaking the Department in fact described PTE 2020-02 (and the fiduciary pledge it requires) as "mirror[ing] the core of the BIC … requirements."  88 Fed. Reg. at 75,896.  The Department also acknowledges that the pledge is not necessary to create the fiduciary status that the Rule seeks to extend to salespeople, 89 Fed. Reg. at 32,311 n.18, and its model language providing consumers the best interest standard contains more than enough information to satisfy its goals without requiring a fiduciary pledge. *See id.* at 32,271.

181.    Compelled speech regulations also violate the First Amendment where they can be leveraged to regulate speech outside of the immediate context to which they apply.  *See Agency for Int'l Dev. v. Alliance for Open Society Int'l Inc.*, 570 U.S. 205, 216-219 (2013).  That danger is present here, where the fiduciary pledge could open the floodgates to state-law liability not contemplated by ERISA Title II's limited remedial regime for conflicted transactions.

182.    The Department cannot satisfy heightened scrutiny.  Even assuming that it has a substantial interest in protecting retirement savers, the Department has not established that the

fiduciary pledge could serve its asserted interest in materially protecting consumers, particularly given the agency itself claims that consumers are not sophisticated enough to "understand disclosures of advisers' conflicts, or the impacts that those conflicts could have on their investments." 89 Fed. Reg. at 32,238.  Nor does the Department explain why alternatives would not serve the Department's interests without burdening speech.  Obvious alternatives to the fiduciary pledge would include a public-information campaign informing retirement savers about the applicable best interests standards, or vigorous enforcement of existing laws governing sales interactions between insurance agents and consumers.  Thus, the fiduciary pledge requirement independently violates the First Amendment and requires the Rule to be vacated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)   Declare the Rule arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A); declare the Rule contrary to constitutional right under 5 U.S.C. § 706(2)(B); and declare the Rule promulgated in excess of statutory jurisdiction, authority, or limitations under 5 U.S.C. § 706(2)(C);

b)   Set aside and vacate all components of the Rule in its entirety as non-severable;

c)   Preliminarily and permanently enjoin the Department and all its officers, employees, and agents from implementing, applying, or enforcing the Rule;

d)   Stay the effective date of the Rule under 5 U.S.C. § 705;

e)   Award Plaintiffs their costs and reasonable attorney's fees as appropriate; and

f)   Grant such further and other relief as this Court deems just and proper.

Dated:  May 24, 2024                          Respectfully submitted,

/s/ Kelly P. Dunbar
David W. Ogden*
Kelly P. Dunbar*
Kevin M. Lamb*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6000
(202) 663-6363 (fax)
david.ogden@wilmerhale.com
kelly.dunbar@wilmerhale.com
kevin.lamb@wilmerhale.com

Andres C. Salinas*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
New York, NY 10007
(212) 230-8800
(212) 230-8888 (fax)
andres.salinas@wilmerhale.com

/s/ Michael A. Yanof
Michael A. Yanof, Texas Bar No. 24003215
NICOLAIDES FINK THORPE
   MICHAELIDES SULLIVAN LLP
2501 North Harwood Street
Suite 1210
Dallas, TX 75201
(469) 290-9047
(469) 290 9041 (fax)
myanof@nicolaidesllp.com

*Counsel for Plaintiffs*

\* *Pro hac vice* application forthcoming