# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICAN COUNCIL OF LIFE INSURERS, et al.<br><br>         Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF LABOR, and JULIE SU, in her official capacity as Acting Secretary, United States Department of Labor,<br><br>         Defendants. | Civil Action No. 4:24-cv-00482-O |

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
# AND STAY OF EFFECTIVE DATE

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES............................................................................... iii

INTRODUCTION ...............................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.................................................2

    A.    ERISA Statutory Framework................................................................2

    B.    ERISA Regulations...............................................................................4

    C.    The 2016 Rulemaking and the *Chamber* Decision .............................5

    D.    Subsequent Regulatory Developments.................................................7

    E.    The Department's 2020 PTE Exemption and Interpretive Rule ...................8

    F.    The Retirement Security Rule .............................................................8

STANDARD OF REVIEW ................................................................................12

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.....................12

    A.    The Retirement Security Rule Follows Logically From the Text of ERISA and is Consistent with Congressional Intent. ....................12

    B.    The Rule Is Consistent With the *Chamber* Decision. ........................15

    C.    Plaintiffs' Efforts to Find a Conflict With *Chambers*' Holding Must Be Rejected.................................................................................18

        1.    The Rule does not apply fiduciary standards to mere salespeople. .................18

        2.    The Rule applies the Department's decades-long recognition that commissions can be compensation for investment advice...............................25

        3.    The PTE requirement of a written acknowledgement does not exceed the Department's statutory authority...............................26

        4.    The Rule respects the statutory overlap and differences between Title I and Title II plans. .............................27

        5.    The Rule's disclaimer provision need not permit investment advisors to circumvent ERISA's protections. ...............................30

    D.    Plaintiffs' Remaining Merits Arguments Are Baseless....................31

1.      The Major Questions Doctrine is inapplicable because the
        Department has long regulated in this field pursuant to plain
        statutory authority. ................................................................................31

2.      The Rule regulates conduct, not speech, and therefore raises no
        viable First Amendment question. ..........................................................32

**II.     THE EQUITIES DISFAVOR INJUNCTIVE RELIEF** ............................................**34**

**III.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS
          BEFORE THE COURT.** ..................................................................................**35**

**CONCLUSION** ..................................................................................................**36**

# TABLE OF AUTHORITIES

**Cases**

*Am. Sec. Ass'n v. U.S. Dep't of Labor,*
  8:22-cv-330, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023) ..................................................8

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ........................................................................................................14

*Braidwood Mgmt., Inc. v. Becerra,*
  No. 23-10326, 2024 WL 3079340 (5th Cir. June 21, 2024) .............................................35

*Chamber of Com. of the U.S. v. Hugler,*
  231 F. Supp. 3d 152 (N.D. Tex. 2017) .......................................................................6, 17

*Chamber of Commerce of United States of America v. U.S. Dep't of Labor,*
  885 F.3d 360 (5th Cir. 2018) ....................................................................................*passim*

*Creme Mfg. Co. v. United States,*
  492 F.2d 515 (5th Cir. 1974) ...........................................................................................21

*Donovan v. Cunningham,*
  716 F.2d 1455 (5th Cir. 1983) .........................................................................................13

*Eaves v. Penn,*
  587 F.2d 453 (10th Cir. 1978) .........................................................................................26

*Ellis v. Rycenga Homes, Inc.,*
  484 F. Supp. 2d 694 (W.D. Mich. 2007) .........................................................................26

*Expressions Hair Design v. Schneiderman,*
  581 U.S. 37 (2017) ...........................................................................................................33

*Farm King Supply, Inc. v. Edward D. Jones & Co.,*
  884 F.2d 288 (7th Cir. 1989) ...........................................................................................26

*Herman v. S.C. Nat'l Bank,*
  140 F.3d 1413 (11th Cir. 1998) .......................................................................................35

*In re U.S. Off. Prod. Co. Sec. Litig.,*
  251 F. Supp. 2d 77 (D.D.C. 2003) ...................................................................................21

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,*
  510 U.S. 86 (1993) ...........................................................................................................13

*Johnson v. Buckley,*
  356 F.3d 1067 (9th Cir. 2004) .........................................................................................32

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ................................................................12

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) ........................................................................35

*Mem'l Hermann Hosp. v. Sebelius,*
    728 F.3d 400 (5th Cir. 2013) ................................................................21

*Mertens v. Hewitt Assocs.,*
    508 U.S. 248 (1993) ..........................................................................13

*Mkt. Synergy Grp, Inc. v. Dep't of Labor,*
    885 F.3d 676 (10th Cir. 2018) ..........................................................6, 17

*Mkt. Synergy Grp, Inc. v. Dep't of Labor,*
    No. 16-CV-4083-DDC-KGS, 2017 WL 661592 (D. Kan. Feb. 17, 2017) ...........6

*Fed'n of Americans for Consumer Choice v. U.S. Dep't of Labor,*
    No. 3:22-CV-00243-K-BT, 2023 WL 5682411 (N.D. Tex. June 30, 2023) ...........8, 17, 32

*Munaf v. Geren,*
    553 U.S. 674 (2008) ..........................................................................12

*Nat'l Ass'n. for Fixed Annuities v. Perez,*
    217 F. Supp. 3d 1 (D.D.C. 2016) ......................................................6, 17

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) ..........................................................................33

*Nken v. Holder,*
    556 U.S. 418 (2009) ..........................................................................34

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) ..........................................................................33

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ..........................................................................13

*Perez v. Bruister,*
    823 F.3d 250 (5th Cir. 2016) ........................................................13, 14

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ............................................................................34

*Sec'y of Labor v. Fitzsimmons,*
    805 F.2d 682 (7th Cir. 1986) ................................................................2

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................................................ 33, 34

*Su v. RiversEdge Advanced Ret. Sols., LLC*,
    No. 2:24-CV-00104, 2024 WL 1193858 (W.D. Pa. Feb. 20, 2024) ...................... 34

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) .............................................. 12, 35

*Tolbert v. RBC Cap. Mkts. Corp.*,
    758 F.3d 619 (5th Cir. 2014) ............................................................. 2

*United States v. Castleman*,
    572 U.S. 157 (2014) ........................................................................ 15

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ........................................................................ 13

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ........................................................................ 31

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 12

**Statutes**

5 U.S.C. § 705 ......................................................................... 12, 35

26 U.S.C. § 4975 ......................................................................... *passim*

29 U.S.C. § 1001 ......................................................................... 2, 35

29 U.S.C. § 1002 ......................................................................... *passim*

29 U.S.C. § 1104 ......................................................................... 2, 3

29 U.S.C. § 1106 ......................................................................... 3, 28, 29

29 U.S.C. § 1108 ......................................................................... 3, 12, 28

29 U.S.C. § 1132 ......................................................................... 28

29 U.S.C. § 1135 ......................................................................... 4, 12, 32

Pub. L. No. 93-406, 88 Stat. 829 (1974). .................................................. 2

Pub. L. No. 98-532, 98 Stat. 2705 (1984) ................................................. 4

**Regulations**

29 C.F.R. § 2510-3.21 ...................................................................................................*passim*

40 Fed. Reg. 50842 (Oct. 31, 1975) ...................................................................4, 5, 25

41 Fed. Reg. 56,760 (Dec. 29, 1976) .....................................................................5, 26

43 Fed. Reg. 47,713 (Oct. 17, 1978) ............................................................................4

49 Fed. Reg. 13,208 (Apr. 3, 1984) ..............................................................................5

81 Fed. Reg. 20,946 (Apr. 8, 2016) ..............................................................................6

81 Fed. Reg. 21,002 (Apr. 8, 2016) ..............................................................................6

81 Fed. Reg. 21,147 (Apr. 8, 2016) ..............................................................................6

84 Fed. Reg. 33,318 (July 12, 2019) .............................................................................7

85 Fed. Reg. 40,589 (July 7, 2020) ...............................................................................8

85 Fed. Reg. 82,798 (Dec. 18, 2020) ............................................................................8

88 Fed. Reg. 75,890 (Nov. 3, 2023) .........................................................................8, 9

89 Fed. Reg. 32,122 (Apr. 25, 2024) ..................................................................*passim*

89 Fed. Reg. 32,260 (Apr. 25, 2024) ...........................................................9, 12, 27, 29

89 Fed. Reg. 32,302 (Apr. 25, 2024) ...........................................................9, 12, 27, 34

89 Fed. Reg. 32,346 (Apr. 25, 2024) .............................................................................9

## INTRODUCTION

Through the Employee Retirement Income Security Act of 1974 (ERISA), Congress sought to create a uniform way to regulate employee benefit plans and protect Americans' retirement savings. In the process, Congress both borrowed from and departed from existing legal regimes, including common law principles. At issue in this case is the statutory declaration that a person is a "fiduciary" to an ERISA plan, *inter alia,* "to the extent" that they "render[] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan." 29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3). The Department of Labor (Department or DOL) published a Final Rule on April 25, 2024 (The Retirement Security Rule or Rule) that established an amended test for this statutory provision. Through this amended test the Department seeks to apply a consistent standard across the various financial settings in which people dispense compensated investment advice regarding ERISA plan assets.

Plaintiffs—national associations that represent life insurance companies, insurance agents, brokers, and distributors, and Texas-based affiliates of one of those associations—seek a preliminary injunction and stay of the effective date of the Rule. They do not dispute that insurance agents frequently provide investment advice, and they enthusiastically trumpet how important their advice and products are for retirement investors. Yet, they insist that the Fifth Circuit's decision in *Chamber of Commerce of United States of America v. United States Department of Labor* (*Chamber*), 885 F.3d 360 (5th Cir. 2018) means that insurance professionals are seldom, if ever, subject to the ERISA fiduciary standard. And they want the Department to be bound to provisions in its original 1975 regulation that have no basis in ERISA's text. Their arguments cannot be reconciled with ERISA's text, the Department's long history of regulating insurance professionals who provide advice to ERISA plans, or the reasonable expectations of retirement investors in the current insurance marketplace.

Instead, the Department has reasonably construed ERISA's text and crafted an objective facts-

1

and-circumstances test that treats insurance professionals as ERISA fiduciaries only under conditions where it is objectively clear that the professionals are holding themselves out as trusted advisors worthy of retirement investors' trust and confidence. The Rule applies a uniform standard to all compensated investment advice regarding ERISA plan assets, without favoring or disfavoring any particular investment product or type of advice provider. The Court should deny Plaintiffs' motion for a preliminary injunction and stay of the Rule's effective date.

**LEGAL AND PROCEDURAL BACKGROUND**

A.    **ERISA Statutory Framework**

Congress enacted ERISA in 1974 based on its determination that Americans' retirement savings were not adequately protected from fraud and abuse. Pub. L. No. 93-406, 88 Stat. 829, 898 (1974) (codified at 29 U.S.C. §§ 1001, *et seq.*). Prior to ERISA, "federal involvement in the monitoring of pension funds in this country was minimal." *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 689 (7th Cir. 1986). Congress thus enacted ERISA "after determining that the then present system of regulation was ineffective in monitoring and preventing fraud and other pension fund abuses." *Id.* The statutory framework included, *inter alia*, enhanced "disclosure and reporting" requirements, "standards of conduct, responsibility, and obligation for fiduciaries [to] employee benefit plans," and "appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b); *see also Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619, 621 (5th Cir. 2014) ("ERISA is designed to protect . . . the interests of participants in employee benefit plans and their beneficiaries[.]" (citation omitted)).

Title I of ERISA imposes stringent obligations on individuals who engage in important plan-related activities, *i.e.*, "fiduciar[ies]." 29 U.S.C. § 1104. Under ERISA, "a person is a fiduciary with respect to a plan to the extent," *inter alia*, "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." *Id.* § 1002(21)(A). A "fiduciary" under Title I of ERISA must

2

adhere to duties of loyalty and prudence. *Id.* § 1104. The former requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration. *Id.* § 1104(a)(1)(A). The latter requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Id.* § 1104(a)(1)(B).

As an additional protective measure, Congress prohibited fiduciaries from engaging in transactions Congress deemed inherently fraught with conflicts of interest. *Id.* § 1106. In particular, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1), (3). Given the breadth of the prohibited transaction provisions, Congress enumerated statutory exemptions from some of them. *Id.* § 1108(b). In addition, Congress delegated to the Secretary of Labor (Secretary) broad authority to grant "conditional or unconditional" administrative exemptions on a class-wide or individual basis upon finding the exemption: "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." *Id.* § 1108(a) (prohibited transaction exemptions or PTEs).

In Title II of ERISA, Congress amended the Code to adopt a "fiduciary" definition parallel to that in Title I. 26 U.S.C. § 4975(e)(3). Title II covers many employee benefit plans covered by Title I, as well as other tax-favored retirement and savings plans. These additional plans are referred to as individual retirement accounts (IRAs) for purposes of this Rule. *See* 89 Fed. Reg. at 32,123 n.7 (including "any account or annuity described in Code section 4975(e)(1)(B)-(F)," such as "individual retirement accounts, individual retirement annuities, health savings accounts"). While the Code provisions do not specifically include duties of loyalty and prudence, they do prohibit engaging in

specified conflicted transactions. 26 U.S.C. § 4975(c). The Code also allows for administrative exemptions, subject to the same terms as in Title I. *Id.* § 4975(c)(2). Those who violate the Code's prohibited transaction provisions are subject to excise taxes collected by the IRS. *Id.* § 4975(a)-(b).

ERISA also delegated to the Secretary broad authority to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [Title I of ERISA]." 29 U.S.C. § 1135. "Among other things, such regulations may define accounting, technical and trade terms used in such provisions." *Id.* The parallel provisions of Title I of ERISA and § 4975 of the Code (Title II of ERISA) led to redundancy. To harmonize their administration and interpretation, President Carter issued the Reorganization Plan No. 4 of 1978, *see* 43 Fed. Reg. 47,713 (Oct. 17, 1978) (Reorg. Plan), which Congress ratified in 1984. *See* Pub. L. No. 98-532, 98 Stat. 2705 (1984) (codified at 29 U.S.C. § 1001 note). Among other things, the Reorg. Plan transferred to the Department the interpretive, rulemaking, and exemptive authority for the fiduciary definition and, with some exceptions, the prohibited transaction provisions that apply to Title II plans. *See* Defs.' App. 399, Reorg. Plan § 102; *see also id.* at 402 (President Carter's Reorg. Plan transmittal message, emphatically stating "Labor will have statutory authority for fiduciary obligations" under ERISA Title I *and* ERISA Title II plans).

### B.    ERISA Regulations

In 1975, pursuant to the broad interpretive authority delegated to it by Congress, the Department issued regulations interpreting when a person "renders investment advice for a fee or other compensation" for purposes of ERISA's "fiduciary" definition. 40 Fed. Reg. 50,842 (Oct. 31, 1975) (1975 Rule). The regulations set forth a five-part test, applying when a person: (1) renders advice as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; (2) on a regular basis to the plan; (3) pursuant to a mutual agreement, arrangement or understanding, with the plan or a plan fiduciary; (4) that the advice will serve as a primary basis for investment decisions with respect to plan assets; and

(5) that the advice will be individualized based on the particular needs of the plan. *See id.*; *see also* 40 Fed. Reg. 50,840 (Oct. 31, 1975) (corresponding rule for Title II plans).

Pursuant to its authority to craft exemptions for fiduciary conflicts, the Department adopted numerous class exemptions to permit fiduciaries to engage in conduct that would otherwise have been prohibited. As early as 1976, insurance companies and associations, including Plaintiff ACLI, requested a rule that "the normal sales presentation and recommendations made by an insurance agent or broker to a plan or plan fiduciary will not be considered to constitute the rendering of investment advice for a fee so as to classify such agent or broker as a fiduciary." *See* 41 Fed. Reg. 56,760, 56,761 (Dec. 29, 1976). The Department did not adopt that request, observing that the "advice and recommendations made to plan and plan fiduciaries by insurance agents and brokers . . . regarding plan purchases of insurance contracts or annuities . . . come within the type of advice described in [the 1975 Rule]" and concluding that "whether such advice constitutes 'investment advice' under these regulations and [ERISA] can be made only on a case-by-case basis." *Id.* at 56,762. Instead, the Department proposed and adopted PTE 77-9 to permit an ERISA fiduciary to receive commissions in connection with their recommendation of annuity purchases under certain conditions. *See id.* at 56,763-65 (later known as PTE 84-24 after amendment, *see* 49 Fed. Reg. 13,208 (Apr. 3, 1984)).

C.     **The 2016 Rulemaking and the *Chamber* Decision**

The 1975 Rule was promulgated before 401(k) plans existed and IRAs were common; since then, the market for retirement savings has undergone a dramatic shift both in the degree to which retirement investors are responsible for investing their retirement savings and the role played by IRAs and rollovers from ERISA-covered plans. In 2016, in an effort to account for these changes, the Department finalized a new regulation that replaced the 1975 Rule, granted two new prohibited transaction exemptions, and amended five existing exemptions (collective, the 2016 Rule).

*First,* the Department revised the definition of "fiduciary" under ERISA and the Code, and

eliminated several of the requirements of the 1975 Rule. *See* 81 Fed. Reg. 20,946 (Apr. 8, 2016). The Rule defined "investment advice" in terms of specified "recommendations," which were further defined as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." *Id.* at 20,997. Because the new definition reached some advice that the Department believed Congress did not intend to include, the Department also created certain carveouts. *See id.* at 20,948.

*Second*, the Department promulgated two new exemptions, including the Best Interest Contract Exemption (BICE), which allowed fiduciaries to receive conflicted income only if they adhered to certain conditions, including signing a written contract with customers that were IRA holders or a plan that is not covered by Title I of ERISA. The contract was required to contain enumerated provisions, and exposed financial institutions and advisers to suits for breach of contract if those provisions were violated. *See* 81 Fed. Reg. 21,002 (Apr. 8, 2016). The contract required under the exemption could not include provisions that commonly are used to limit liability, such as a liquidated damages clause or waiver of the ability to participate in class actions. *Id.*

*Third,* the Department amended existing exemptions, including PTE 84-24. *See* 81 Fed. Reg. 21,147 (Apr. 8, 2016). The Department limited PTE 84-24 to recommendations regarding traditional fixed annuities, excluded variable annuities (which are regulated as securities) and fixed indexed annuities (which are more complex than traditional fixed annuities). *See* 81 Fed. Reg. 21,176-77.

While several federal courts rejected challenges to the 2016 Rule, *see Mkt. Synergy Grp, Inc. v. Dep't of Labor,* 885 F.3d 676 (10th Cir. 2018); *Mkt. Synergy Grp, Inc. v. Dep't of Labor*, No. 16-CV-4083-DDC-KGS, 2017 WL 661592 (D. Kan. Feb. 17, 2017); *Chamber of Com. of the U.S. v. Hugler*, 231 F. Supp. 3d 152 (N.D. Tex. 2017), *rev'd Chamber*, 885 F.3d 360; *Nat'l Assoc. for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 23 (D.D.C. 2016); the Fifth Circuit vacated the 2016 Rule, including the new exemptions. *Chamber*, 885 F.3d at 360. Specifically, the court found that the 2016 Rule was inconsistent

with ERISA in several ways, including that the 2016 Rule was overinclusive and did not consider whether the relationships encompassed by the regulatory definition involved "trust and confidence" like common law fiduciary relationships. *See id.* at 381–82.

### D.   Subsequent Regulatory Developments

The market conditions that motivated the 2016 Rule have only accelerated. For example, rollovers from ERISA-covered plans to IRAs are expected to approach $4.5 trillion cumulatively from 2022 through 2027. *See* 89 Fed. Reg. at 32,179. These market conditions and associated concern about harm to investors from recommendations tainted by conflicts of interest have spurred other regulators into action, and as a result the regulatory environment for investment professionals has changed significantly since the vacatur of the 2016 Rule. In June 2019, the Securities and Exchange Commission (SEC) finalized a regulatory package relating to conduct standards for broker-dealers and investment advisers, addressing the same kinds of market realities in the SEC's regulatory context. Included in the package were (1) Regulation Best Interest (Reg BI), which establishes a best interest standard applicable to broker-dealers when making a recommendation of any securities transaction or investment strategy involving securities to retail customers, *see* Defs.' App. 500-501, (2) an interpretation of the fiduciary conduct standards applicable to investment advisers, and (3) a new form, which requires broker-dealers and SEC-registered investment advisers to provide retail investors with a short relationship summary with specified information. *See* 89 Fed. Reg. at 32,125 & nn.18-20.

Similarly, in 2020, the National Association of Insurance Commissioners (NAIC), a nonprofit governed by state chief insurance regulators, updated its Suitability in Annuity Transactions Model Regulation (NAIC Model Regulation 275), which has now been adopted by almost all states. *See id.* at 32,125. This model regulation requires that agents and insurers "when making a recommendation of an annuity, shall act in the best interest of the consumer under the circumstances known at the time the recommendation is made, without placing the producer's or the insurer's financial interest ahead

of the consumer's interest." Defs.' App. 534, NAIC Model Regulation 275, Section 6.A. "Best interest" is measured by "satisf[ying] . . . obligations regarding care, disclosure, conflict of interest and documentation." *Id.* Section 6.A. However, all "cash" and "noncash" compensation are excluded from the definition of material conflicts that have to be identified and managed. *See* Defs.' App. 533, Section 5.I.2; Defs.' App. 534 Section 6.A.3.

### E.     The Department's 2020 PTE Exemption and Interpretive Rule

In December 2020, the Department formally reinserted the 1975 Rule's text into 29 C.F.R. § 2510-3.21. *See* 85 Fed. Reg. 40,589. The Department also finalized a new class exemption, PTE 2020-02, which is broadly available to ERISA investment advice fiduciaries. *See* 85 Fed. Reg. 82,798 (Dec. 18, 2020). In the preamble to PTE 2020-02, the Department also provided "the Department's final interpretation" of the 1975 Rule as applied to "advice to roll over Title I Plan assets to an IRA." *Id.* at 82,799 (2020 Interpretive Rule). In two lawsuits challenging the 2020 Interpretive Rule, courts concluded that the Department's interpretation should largely remain intact, but that its interpretation of how the "regular basis" of the 1975 Rule applied to rollovers should be vacated because the 1975 Rule did not permit considering future recommendations to Title II plans when determining Title I fiduciary status. *See Am. Sec. Ass'n v. U.S. Dep't of Labor* (*ASA*), No. 8:22-cv-330, 2023 WL 1967573, at *14-*19 (M.D. Fla. Feb. 13, 2023), *appeal dismissed*, No. 23-11266-F, 2023 WL 4503923 (11th Cir. May 17, 2023); M.J. R. & R., *Fed'n of Americans for Consumer Choice v. U.S. Dep't of Labor* (*FACC I*), No. 3:22-CV-00243-K-BT, 2023 WL 5682411, at *18 (N.D. Tex. June 30, 2023) (plaintiffs' objections to magistrate judge recommendations remain pending, ECF No. 73, No. 3:22-CV-00243-K-BT).

### F.     The Retirement Security Rule

On November 3, 2023, the Department published a Notice of Proposed Rulemaking (NPRM) and proposed amendments to prohibited transaction exemptions. *See* 88 Fed. Reg. 75,890-76,045 (Nov. 3, 2023). The NPRM explained that the proposal was "designed to ensure that ERISA's

fiduciary standards uniformly apply . . . in a way that ensures that retirement investors' reasonable expectations are honored when receiving advice from financial professionals who hold themselves out as trusted advice providers." *Id.* at 75,890. The NPRM and proposed PTE amendments were followed by a 60-day comment period, as well as a public hearing held on December 12-13, 2023. Five of the named Plaintiffs submitted comments and also appeared at the hearings to offer testimony regarding the proposed rule and exemptions. *See* Pls.' App. 053-281, ECF No. 13 (including comments submitted by Plaintiffs ACLI, IRI, Finseca, NAFA, and NAIFA); Defs.' App. 235, Public Hr'g Agenda, Dec. 12-13, 2023. On April 25, 2024, after consideration of the more than 400 individual comments, almost 20,000 petition submissions, and the testimony provided at the hearing, the Department published a Final Rule adopting a new regulatory definition and amendments to existing PTEs. *See* 89 Fed. Reg. 32,122-32,359.[1]

The Rule is "designed to ensure that retirement investors' reasonable expectations are honored when they receive advice from financial professionals who hold themselves out as trusted advice providers." *Id.* at 32,122. The Department concluded that "[a]s compared to the previous regulatory definition, which was finalized in 1975, the final rule better reflects the text and the purposes of ERISA and better protects the interests of retirement investors, consistent with the Department's mission to ensure the security of the retirement, health, and other workplace-related benefits of America's workers and their families." *Id.* Among other topics, the Department discussed the need for the Rule's protections in the annuity market, in particular given some commenters' concerns about the complexity of these products, abusive sales tactics, and conflicts of interest. *Id.* at 32,133-35, 32,139-40, 32,188, 32,213-16. The Department adopted the Rule after examining ERISA's text and the operational effect of the 1975 Rule, *see id.* at 32,123-25; considering prior Department actions and

---

[1] The Department uses Federal Register citations throughout this brief but has also included the final rulemaking documents in Defendants' Appendix for the Court's convenience.

judicial actions, *id.* at 32,125-27; close analysis of recent regulatory changes by the SEC and state legislative and regulatory actions, *id.* at 32,128-31; coordination with relevant agencies and regulators, *id.* at 32,131; and engagement with the public comments and testimony, *id.* at 32,132-62. The Department also prepared final regulatory impact and regulatory flexibility analyses. *Id.* at 32,176-256.

The Rule "fills an important gap" where compensated advice regarding ERISA plan assets "is not currently treated as fiduciary advice under the 1975 Rule's approach to ERISA's functional fiduciary definition." *Id.* at 32,122. The Rule thus seeks "to better ensure that advice providers compete on a level playing field where recommendations are made pursuant to a common best interest standard." *Id.* at 32,139. Illustrations of these gaps include investment recommendations: (a) to roll over assets from an ERISA plan to an IRA where the adviser had not previously advised the customer about the same plan's assets on a regular basis; (b) regarding many commonly purchased retirement annuities; (c) regarding investments not subject to securities or insurance laws such as real estate, certain bank products, commodities, and precious metals; and (d) to workplace retirement plans or other plan fiduciaries with authority or control with respect to the plan, who are not "retail investors" subject to the SEC's Reg BI. *Id.* at 32,122-23.

The Rule provides two ways that an investment professional "renders 'investment advice' with respect to moneys or other property" of a plan or IRA—and thus is a fiduciary under ERISA. First, this definition applies if, in making recommendations regarding plan assets that result in compensation, the investment professional "represents or acknowledges that [he or she is] acting as a fiduciary under Title I of ERISA, Title II of ERISA, or both, with respect to the recommendation." 29 C.F.R. § 2510.3-21(c)(1)(ii) (*see* 89 Fed. Reg. at 32,256). Alternatively, an investment professional who "either directly or indirectly . . . makes professional investment recommendations to investors on a regular basis as part of their business" is a fiduciary when making recommendations regarding plan assets that result in compensation where "the recommendation is made under circumstances that

would indicate to a reasonable investor in like circumstances" that three conditions are met:

> the recommendation is [a] based on review of the retirement investor's particular needs or individual circumstances, [b] reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances, and [c] may be relied upon by the retirement investor as intended to advance the retirement investor's best interest.

*Id.* § 2510.3-21(c)(1)(i). The Rule also reiterates that where there is no investment recommendation, or no recommendation that satisfies either of these provisions, ERISA's fiduciary standard is not triggered. *Id.* § 2510.3-21(c)(1)(iii). The Department also restates its long-standing position that "advice for a fee or other compensation, direct or indirect" encompasses "any explicit fee or compensation, from any source, for the investment advice" or "any other fee or other compensation, from any source, in connection with or as the result of the recommended [transaction], including, though not limited to, commissions[.]" *Id.* § 2510.3-21(e).

The Department also issued amendments to several PTEs, including PTE 84-24 and PTE 2020-02. *See* 89 Fed. Reg. at 32,176. "These amendments extend the same or similar requirements for the provision of advice to Retirement Investors, regardless of the market and investment product." *Id.* Thus, "rather than look to an assortment of different exemptions with different conditions for different transactions, investment advice fiduciaries . . . will generally be expected to rely solely on the amended PTE 2020–02." *Id.* PTE 84-24 is amended to apply similar requirements exclusively "for independent insurance producers that recommend annuities from multiple unaffiliated insurance companies." *Id.* Both PTE 84-24 and PTE 2020-02 allow investment professionals to receive otherwise prohibited compensation provided they (i) acknowledge their fiduciary status in writing; (ii) disclose their services and material conflicts of interest; (iii) adhere to impartial conduct standards requiring them to provide advice and exercise sound judgment in the same way that knowledgeable and impartial professionals would in similar circumstances, never place their own interests ahead of the retirement investor's interest or subordinate the retirement investor's interests to their own, charge

no more than reasonable compensation, and avoid misleading statements; and (iv) meet certain other conditions designed to ensure compliance. *See* 89 Fed. Reg. at 32,261, 32,304.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), of (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted). Courts also apply the traditional four-part test for preliminary injunctions when evaluating stay requests under 5 U.S.C. § 705, *see Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022).[2]

## ARGUMENT

## I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.     The Retirement Security Rule Follows Logically From the Text of ERISA and is Consistent with Congressional Intent.

Plaintiffs argue they are likely to succeed on the merits of their claims because, they contend, the Rule "exceeds DOL's statutory authority" and is thus "contrary to law." Pls.' Mem. in Supp. of Mot. for Prelim. Inj. (Pls.' Mem.) at 12-13, ECF No. 12. In fact, it is undisputed that the Department has express authority to issue regulations interpreting ERISA's fiduciary provisions and to issue administrative exemptions from ERISA's prohibited transaction provisions. *See* 29 U.S.C. §§ 1108(a), 1135; Reorg. Plan. Plaintiffs' claims should fail because the Department's actions are well

---

[2] For purposes of this Motion, Defendants do not challenge Plaintiffs' standing to sue on behalf of their members or their members' ability to establish irreparable harm as regulated entities.

within the scope and intent of ERISA's fiduciary provisions.

The statutory text is expansive: "a person is a fiduciary with respect to a plan to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan." 29 U.S.C. § 1002(21)(A)(ii). The Supreme Court has long recognized that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms . . . thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *see also Chamber*, 885 F.3d at 371 ("[Congress] addressed fiduciary status for ERISA purposes in terms of enumerated functions.").[3] Here, the relevant function is providing compensated "investment advice" regarding ERISA plan assets. 29 U.S.C. § 1002(21)(A)(ii).

"ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996); *see also John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993) ("To help fulfill ERISA's broadly protective purposes, Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive."). Thus, "some common-law 'nonfiduciaries' are made subject to [ERISA], namely, those who fall within ERISA's artificial definition of 'fiduciary.'" *Mertens*, 508 U.S. at 255 n.5. In sum, Congress did not limit fiduciary status to those already recognized as a fiduciary under the common law or another statute; instead, Congress designed ERISA's new functional definition of fiduciary to address deficiencies in the previous protections for Americans' retirement savings.

Here, the Rule elaborates on "render[ing] investment advice" by identifying two paths that

---

[3] *See also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("threshold question" to determine "whether [a] person was acting as a fiduciary" under ERISA is whether that person "was performing a fiduciary function"); *Perez v. Bruister*, 823 F.3d 250, 259 (5th Cir. 2016) ("[T]he fiduciary is subject to fiduciary duties under ERISA only 'to the extent' that he performs fiduciary functions as identified by Congress." (cleaned up)); *Donovan v. Cunningham*, 716 F.2d 1455, 1464 n.15 (5th Cir. 1983) ("ERISA's modifications of existing trust law include imposition of duties upon a broader class of fiduciaries.").

satisfy the statutory language: (1) "represent[ing] or acknowledg[ing] . . . acting as [an ERISA] fiduciary . . . with respect to the recommendation," or (2) for an investment professional who "makes professional investment recommendations to investors on a regular basis as part of their business," making a recommendation "under circumstances that" objectively indicate that the recommendation "may be relied upon by the retirement investor as intended to advance the retirement investor's best interest" where it is "based on review of the retirement investor's particular needs or individual circumstances" and "professional or expert judgment" has been applied. *See* 29 C.F.R. § 2510.3-21(c)(1)(i)-(ii), 89 Fed. Reg. at 32,256. These alternatives follow logically from the statutory text's use of "render investment advice." The statutory text does not distinguish among different types of advice providers or mention the differing background regulations to which an advice provider might be subject. Instead, ERISA directs that those who provide compensated investment advice regarding ERISA plan assets are fiduciaries of the plan "to the extent" of that recommendation and transaction. The Rule thus recognizes investment professionals as fiduciaries only with regard to the transactions for which they provided investment advice that results in compensation. *See* 89 Fed. Reg. at 32,137; *cf.* 29 U.S.C. § 1002(21)(A)(ii) (making a person a fiduciary to a plan only "to the extent" there is advice regarding plan assets and compensation); *Perez*, 823 F.3d at 259 (professional is "subject to fiduciary duties under ERISA only 'to the extent' that he performs fiduciary functions as identified by Congress" (cleaned up)). Moreover, unlike the 2016 Rule, the Retirement Security Rule targets circumstances where the retirement investor could objectively be expected to rely upon the investment professional's advice. Thus, the Rule easily comes within the plain text of the statute.

Because the Rule is consistent with the text of ERISA, the text controls and the Court ordinarily need go no further. *See Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual

14

consideration."). Moreover, as discussed below, the Rule is consistent with *Chamber*'s holdings.

**B.      The Rule Is Consistent With the *Chamber* Decision.**

Relying on the presumption that "absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses," 885 F.3d at 369 (quoting *United States v. Castleman*, 572 U.S. 157, 162 (2014)), the Fifth Circuit concluded that ERISA's use of the term "fiduciary" narrowed the statutory phrase "renders investment advice" to only apply where the advice relationship was one of "trust and confidence." *See id.* (concluding that "all relevant sources indicate that Congress codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence"). The Department "has been careful to craft a definition that is consistent with both the statutory text and with the Fifth Circuit's focus on relationships of trust and confidence." 89 Fed. Reg. at 32,141. The Rule "is intended to define, objectively, when a retirement investor would reasonably place their trust and confidence in the advice provider," in other words, circumstances where the "financial professional has held themselves out as a trusted advice provider and invited the retirement investor's reliance on them." *Id.* at 32,152; *see also id.* at 32,147 ("In those circumstances in which the person recommending the investment meets the final rule's terms, they occupy a position of trust and confidence with respect to the recommendation[.]")

The Department has crafted the definition to apply only to those who hold themselves out as trusted advice providers. One path encompasses those who acknowledge that they are serving as an ERISA fiduciary for purposes of the recommendation. 89 Fed. Reg. at 32,141. The other path requires meeting all of the following terms:

> (1) The person "makes professional investment recommendations to investors on a regular basis as part of their business";
>
> (2) The person makes a recommendation and objectively satisfies a facts-and-circumstances standard applicable to "a reasonable investor in like circumstances" that
>
> (i) The recommendation "is based on review of the retirement investor's particular needs or individual circumstances";

(ii) The recommendation "reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances";

(iii) The circumstances indicate that the recommendation "may be relied upon by the retirement investor as intended to advance the retirement investor's best interest."

*Id.* In addition, the ERISA fiduciary status only attaches where there is compensated advice regarding ERISA plan assets, and only "to the extent" of the recommendation and transaction. *See id.* at 32,136-37. These provisions "are aimed at ensuring that the advice goes beyond a mere 'sales pitch,' and instead reflects the sort of relationship of trust and confidence that should be afforded fiduciary status and protection" under ERISA. *Id.* at 32,138. Failing to apply ERISA's fiduciary standard in this scenario "would dishonor the investor's reasonable expectations" that the advice "can be relied upon as rendered by a financial professional who occupied a position of trust and confidence." *Id.* at 32,141.

Accordingly, the Rule is consistent with *Chamber*. The Rule is far narrower than the 2016 Rule, which treated "all investment recommendations directed to a specific retirement investor or investors regarding the advisability of a particular investment or management decision as fiduciary in nature, subject to a few carveouts." *Id.* at 32,141. It was this overbreadth that led the Fifth Circuit to conclude that the 2016 Rule conflicted with ERISA as it would have treated relationships that did not involve "trust and confidence" as fiduciary in nature. *See* 885 F.3d at 379 n.13 ("[T]he [2016] Rule's overbreadth flows from DOL's concession that any financial services or insurance salesman who lacks a relationship of trust and confidence with his client can nonetheless be deemed a fiduciary."). The Department has remedied that defect here by adopting a reasonable and objective facts-and-circumstances test to identify when, based on the interactions between the advice provider and the retirement investor, the retirement investor would reasonably place their trust and confidence in the advice provider as acting to advance the retirement investor's best interest.

While Plaintiffs imply that the 1975 Rule is the only way to satisfy *Chamber*'s analysis, that is not what the Fifth Circuit held. The Department agrees that investment professionals who "meet all

of [the 1975 Rule's] conditions clearly occupy a position of trust and confidence, and are appropriately treated as fiduciaries under ERISA." 89 Fed. Reg. 32,179; *cf. Chamber*, 885 F.3d at 365 (observing that the 1975 Rule "captured the essence of . . . a special relationship of trust and confidence"). But *Chamber* did not—and could not—prohibit reexamination of whether alternatives to the original regulation could better serve the statutory purposes and identify investment advice provided in circumstances that ERISA intends to protect. Accordingly, in crafting the Retirement Security Rule, the Department "specifically focuse[d] on whether the investment recommendation can be appropriately treated as trust and confidence advice," 89 Fed. Reg. at 32,141, accepting *Chamber*'s invitation that "[t]o the extent . . . that some brokers and agents hold themselves out as advisors to induce a fiduciary-like trust and confidence, the solution is for an appropriately authorized agency to craft a rule addressing that circumstance[.]" 885 F.3d at 379 n.13; *see also id.* (stating that *Chamber*'s holding "does not mean that any regulation of such transactions, or of IRA plans, is proscribed").

After all, the "discrete components of the five-part test are not found in the text of the statute," and the Department has found no "common law cases predating enactment of ERISA that limited the application of fiduciary status and obligations to those persons that meet all five" of the 1975 Rule's requirements. 89 Fed. Reg. at 32,136, 32,141.[4] The Department also explained numerous ways that the 1975 Rule is underinclusive regarding relationships of trust and confidence. For example, a

---

[4] Moreover, several courts have concluded that the text of ERISA is broader than that of the 1975 Rule and rejected efforts by litigants to treat them as one and the same. *See* M.J. R. & R., *FACC I*, 2023 WL 5682411, at *17 n. 10 ("The Court emphasizes that the five-part test requires a 'regular basis' but that ERISA itself does not."); *id.* at 18 & n. 11 (finding that "[f]irst-time advice may be sufficient to confer fiduciary status and is consistent with ERISA" because "the analysis for consistency with ERISA and consistency with the DOL's regulations is distinct."); *Nat'l Ass'n for Fixed Annuities*, 217 F. Supp. 3d at 23 ("Indeed, if anything, it is the five-part test . . . that is difficult to reconcile with the statutory text. Nothing in the phrase 'renders investment advice' suggests that the statute applies only to advice provided 'on a regular basis.'"); *Mkt. Synergy Grp.*, 885 F.3d at 680 (noting that ERISA itself "broadly defines a fiduciary as someone who 'renders investment advice for a fee'" (citation omitted)); *Chamber of Com.*, 231 F. Supp. 3d at 171 ("Nothing in ERISA suggests 'investment advice' was intended only to apply to advice provided on a regular basis.").

financial professional could provide recommendations on a regular basis regarding the investor's non-retirement accounts and have a relationship in which the investor completely relies on the financial professional, "and yet still not be considered an investment advice fiduciary with respect to a recommendation to roll over all their retirement savings from the investor's workplace retirement plan to an IRA if that is the first instance of advice with respect to *that* plan account." 89 Fed. Reg. at 32,136; *id.* at 32,184. Similarly, the circumstances might give rise to a relationship of trust and confidence in a series of conversations regarding a "discrete instance of advice [that is] of critical importance to the plan," *id.* at 32,136, even if there was ultimately only one transaction. Because "the 1975 rule's technical requirements often defeat legitimate expectations of trust and confidence by failing to treat advice providers as fiduciaries, even though they hold themselves out as providing individualized and expert recommendations . . . in the [r]etirement [i]nvestor's best interest," 89 Fed. Reg. at 32,179, the Department crafted the Rule to better capture circumstances in which an investor would reasonably expect they can place their trust and confidence in the advice provider.

### C.   Plaintiffs' Efforts to Find a Conflict With *Chambers*' Holding Must Be Rejected.

Plaintiffs' motion attempts to use the *Chamber* opinion to attack the Rule in numerous ways, frequently with little explanation or development. All of these attacks should be rejected.

#### 1.   *The Rule does not apply fiduciary standards to mere salespeople.*

Plaintiffs' "most fundamental[]" argument is that the Rule somehow "redefines all sales speech as fiduciary speech," Pls.' Mem. at 14, and will impose the ERISA fiduciary standard "on effectively every insurance agent or broker (among others) who sells retirement products to retirement savers," *id.* at 1. This is simply untrue, for reasons the Department has repeatedly explained.

First, the Rule is limited to *advice* relationships "and does not cover transactions that are executed pursuant to specific direction in which no advice is provided." 89 Fed. Reg. 32,170. Thus, the Department left unchanged 29 C.F.R. § 2510.3-21(d), which provides that the mere execution of

a securities transaction at the direction of a plan or IRA owner would not be deemed to be fiduciary activity. An investor who is not seeking advice but simply wants professional help completing a transaction does not trigger this Rule.[5]

Second, the Rule does not treat sales pitches, investor education, or "hire me" presentations as instances of investment advice giving rise to ERISA fiduciary obligations so long as they do not involve a recommendation made under the contexts identified in the Rule. *See* 89 Fed. Reg. at 32,154-55; *id.* at 32,163-65; *id.* at 32,167-68. The Department agrees that, without more, the sales pitch highlighted in *Chamber* would not qualify as investment advice under the Rule—where an investment professional simply said "You'll love the return on X stock in your retirement plan, let me tell you about it" and the IRA owner purchases the stock and the professional receives a commission. *See* 885 F.3d at 369; 89 Fed. Reg. at 32,155 (explaining that scenario where salesperson merely "touts the stock" meets none of the three objective criteria under the Rule). ERISA's fiduciary standard is only triggered when the professional goes beyond a general sales pitch to hold themselves out as making a specific recommendation that is individualized and may be relied upon as intended to advance the customer's best interest, upon application of expert judgment to the investor's needs. Where the Rule's criteria are met, "it denigrates the work of the advice provider and the reasonable expectations of the investor to characterize the recommendation as a mere sales pitch." 89 Fed. Reg. at 32,155.

Third, the Rule provides an objective facts-and-circumstances approach that depends on whether the facts indicate to a "reasonable investor *in like circumstances*" that the professional is reviewing the investor's individual needs, applying professional or expert judgment to those needs, and making a recommendation that may be relied on to advance the investor's best interest. *See* 89

---

[5] Plaintiffs do not support their assertion that a "recommendation . . . to purchase the product" is "the *sine qua non* of selling an insurance product." Pls.' Mem. at 14. Indeed, NAIC Model Regulation 275 sets requirements "when making a recommendation of an annuity," *see* Defs.' App. 531, Section 1.A, but does not require an insurance agent to make such recommendations.

Fed. Reg. 32,141 (emphasis added). Thus, even where a recommendation is made, the circumstances might show that there is no reasonable expectation that the recommendation would be relied on "as intended to advance the investor's best interest." *See id.* at 32,160 (addressing "when a financially sophisticated retirement investor engages in an arm's length transaction with a counterparty who makes an investment recommendation"). Also, in examining objectively what would be expected in "like circumstances," any disclaimers that are permitted by law and consistent with the professional's behavior are "relevant." *See* 89 Fed. Reg. at 32,156.[6]

Nevertheless, even with those clarifications, Plaintiffs appear to demand something different—an exemption or carveout that makes clear that, no matter how insurance agents and brokers present themselves, including as "trusted advice providers," they are merely "salespeople" engaged in "sales activity," Pls.' Mem. at 2, that does not give rise to a relationship of trust and confidence with investors. *See id.* at 14-16; *id.* at 15 (suggesting that "providing consumers trustworthy, valuable, and accurate information" are simply "hallmarks of many sales relationships"). In the Rule, the Department developed two strains of evidence that refute Plaintiffs' contention:

First, regulatory changes since the *Chamber* decision have made abundantly clear that insurance agents and brokers are not mere salespeople engaged in arms-length transactions. Instead, both the SEC and state insurance regulators have heightened their own regulations precisely because insurance agents and brokers make recommendations upon which people reasonably rely. *See supra* Background § D; 89 Fed. Reg. at 32,125 ("These regulatory efforts reflect the widespread understanding that broker-dealers and insurance agents commonly make recommendations to their customers for which

---

[6] The Department has not created a "presumption" to avoid factfinding required by Congress, *see* Pls.' Mem. at 18, any more than the 1975 Rule created a "presumption" that failing any of its five prongs meant there was no investment advice or relationship of trust and confidence. Instead, both are facts-and-circumstances tests that fall within the ambit of the expansive statutory definition. The Department has shown that this Rule comports with ERISA and *Chamber*'s "trust and confidence" standard by assessing what a reasonable investor would understand from the facts and circumstances.

they are compensated as a regular part of their business; that investors rely upon these recommendations; and that regulatory protections are important to ensure that the recommendations are in the best interest of" the investor); *see also id.* at 32,128-30, 32,142. These regulatory regimes are now far different from any regulation of department store clerks, car salespeople, and other sales professions. The Department's discussion of these regulations are not a "category error" or "bootstrap[ping] of non-fiduciary standards," Pls.' Mem. at 15 & n.3, but instead a reasonable application of ERISA's unique statutory regime to these market realities.[7] Because ERISA assigns fiduciary obligation based on the "function" of "render[ing] investment advice" regarding plan assets and receiving compensation for the advice, neither ERISA nor *Chamber* limit this fiduciary status only to those labelled as fiduciaries under another regulatory regime.

For example, the SEC reserves its "fiduciary" label for those who must provide ongoing monitoring and advice, *see* 89 Fed. Reg. 32,186 n.391, but ERISA does not require such ongoing monitoring and advice for investment advice fiduciaries, *id.* at 32,169. Further, ERISA's "to the extent" language makes clear that it only applies to advice leading to a compensated transaction. *See* 29 U.S.C. § 1002(21)(A). Reg BI assigns to brokers obligations rooted in fiduciary duties, *see* 89 Fed.

---

[7] The cases Plaintiffs cite for the proposition that insurance sales were considered "arm's length commercial transaction[s]" not common law fiduciary relationships, Pls.' Mem. at 14, pre-date the regulatory developments discussed *supra,* Background § D. In the current regulatory context, it is unlikely that insurance recommendations can uniformly be considered truly "arm's length transactions." *See, e.g., Mem'l Hermann Hosp. v. Sebelius*, 728 F.3d 400, 403 (5th Cir. 2013) ("An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest." (quoting Medicare Provider Reimbursement Manual § 104.24)); *Creme Mfg. Co. v. United States*, 492 F.2d 515, 520 (5th Cir. 1974) (Wisdom, J.) (interpreting "arm's length transaction" under IRS provision to mean that "[e]ach party to the transaction must be in a position to distinguish his economic interest from that of the other party and, where they conflict, always choose that to his individual benefit"); *In re U.S. Off. Prod. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 98 (D.D.C. 2003) ("An arm's-length transaction is a transaction negotiated by unrelated parties who have roughly equal bargaining power and act in their own self interest. Black's Law Dictionary (7th ed.1999). Some jurisdictions have determined that no duty can exist between parties to an arm's-length business transaction."). Such "self interest" requirements appear to be in tension with the NAIC's "best interest" standard, such that determining whether there is an "arm's length transaction" likely depends on the facts and circumstances.

Reg. 32,128; Defs.' App. 419, 502, 519; and Plaintiffs identify no meaningful difference between those Reg BI obligations and ERISA's Title I requirements for fiduciary investment advice—both are transactional and involve obligations of prudence, loyalty, and avoidance of conflicts of interest. *See* Defs.' App. 502, 519. Thus, brokers who satisfy the ERISA fiduciary standard when they do business with ERISA plans may be subject to similar obligations from both sources, regardless of the label. And while there are important differences between ERISA's obligations and those adopted by NAIC Model Regulation 275,[8] the NAIC's approach appears to lead to insurance professionals holding themselves out as providing individualized advice in the investor's best interest when they make recommendations about ERISA plan assets and receive compensation for that advice. Thus, the NAIC standard informs the expectations of both financial professionals and retirement investors about the relationships being formed. And insurance agents may meet the terms of ERISA's investment advice fiduciary standard even if the NAIC would not label the agents "fiduciaries" for state law purposes. *See also* 89 Fed. Reg. 32,140 ("Congress imposed a uniquely protective regime on tax-preferred retirement investments" and "[t]he Department's final rule, which covers compensated retirement recommendations under conditions where it is reasonable to place trust and confidence in the advice, falls well within ERISA's broad fiduciary definition, even if it is more protective of federally-protected retirement investments than State insurance regulations.").

　　Second, there is plentiful evidence that insurance agents and brokers do not behave like, or even see themselves as, mere salespeople. For example, last year, the then-president of Plaintiff

---

[8] ERISA, for example, takes a much more protective approach to conflicts of interest than the NAIC Model Regulation, which excludes all compensation, cash and noncash, from the definition of material conflicts of interest that must be managed. *See* Defs.' App. 533, Section 5.I.2; Defs.' App. 534, Section 6.A.3. Similarly, while the NAIC Model Regulation states that agents may not put their own financial interests ahead of their customers, it treats this best interest obligation as satisfied as long as the four component obligations are met, none of which appear to require the agent to avoid placing their own financial interests ahead of their client (for example, the care obligation requires only that the agent have "a reasonable basis to believe the recommendation effectively addresses the consumer's financial situation, insurance needs, and financial objectives"). *See* Defs.' App. 534, Section 6.A.

NAIFA testified about how he builds relationships with clients and rejects the salesperson role. *See* 89 Fed. Reg. at 32,135; Defs.' App. 290, Public Hr'g Tr. 174:7-11 (Dec. 12, 2023) ("[B]asically, we have a long term relationship where I get to know the client . . . and try to figure out what the best products and services are to meet their needs."); *id.* at 176:6-9 ("I am absolutely not a salesperson. An advisor and somebody who helps and serves my clients, that's my highest ethic and creed."); *id.* at 180:17-22 (Q: "[D]o you think you have a sort of relationship of trust and confidence with your customer?" A: "Absolutely. I don't think my clients would stick with me for decades if they didn't.").[9] The Department received many comments further illustrating how financial professionals hold themselves out as trusted advisers,[10] and how retirement investors often do not understand that such professionals

---

[9] Plaintiffs' declarations similarly demonstrate much more than a sales role. They emphasize their long-term relationships with clients, including multi-generational relationships. *See, e.g.,* Pls.' App. 8, 12, Massey Decl. ¶¶ 2, 11 (noting that new business "comes primarily from existing client referrals and children of my existing clients," and that "many of my clients started off with small portfolios that I have helped grow"); Pls.' App. 16, Cadin Decl. ¶ 7 (reporting that member offers "services to our clients' adult children"); Pls.' App. 38, 41, Fisher Decl. ¶¶ 3, 9 (explaining that he "create[ed] a community of clients who have worked with me for many years" and describing instance of providing advice to daughter of "a long-time client"). They also describe how much their clients need guidance. *See, e.g.*, Pls.' App. 2, Mayeux Decl. ¶ 3 (noting that "NAIFA members are Main Street financial professionals" and are sometimes "the only financial professionals across multiple counties"); Pls.' App. 21, Hudspeth Decl. ¶ 10 ("Many of these clients have no financial professional providing any retirement assistance or guidance to them."); Pls.' App. 34, Pinckard Decl. ¶ 10 (noting that "potential clients with smaller accounts" are "often the ones who need financial guidance the most"). Pls.' App. 41, Fisher Decl. ¶ 9 (stating that his clients with low asset accounts "are often the ones who need investment advice the most"). Finally, they highlight how much individualized work and expertise is involved in making recommendations. *See, e.g.*, Pls.' App. 9, Massey Decl. ¶¶ 4-5 (noting that annuities "can be very complicated products" and that accounting for the unique needs of each client "often requires several hours of research and comparisons for each recommendation"); Pls.' App. 22, Hudspeth Decl. ¶ 10 ("My agency provides all of our clients—no matter how small their net worth—with a comprehensive process uniquely built to address their retirement savings and income needs.").

[10] *See, e.g.,* 89 Fed. Reg. at 32,135; Defs.' App. 321-24, Cmt. 336, Consumer Federation of America at 7-10 (collecting examples of the "myriad ways in which firms and investment professionals seek to persuade the investing public that they are in relationships of trust and confidence with investors and provide advice in investors' best interests that should be relied upon"); Defs.' App. 350, Cmt. 358, XY Planning Network at 8 (providing charts show how "the past 30 years have seen a massive shift in how . . . agents of insurance companies and registered representatives of broker-dealers hold themselves out to the public, by adopting advisor-like titles and marketing advisory services"); Defs.'

*(footnote continued on next page)*

are not uniformly required to act in their best interest.[11]

These facts strongly support the Department's conclusion that recommendations by insurance agents and brokers can rise to the level of "render[ing] investment advice" under ERISA. Plaintiffs overstate and mischaracterize the Fifth Circuit's observation that the 2016 Rule was overbroad because it "includes one-time IRA rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Chamber*, 885 F.3d at 380; *see* Pls.' Mem. at 2, 15, 16, 18, 19. This *dicta* in *Chamber* did not conclude that insurance agent relationships with retirement investors cannot be relationships of "trust and confidence." Instead, that observation was focused on "one-time" transactions and had the benefit of neither (i) a developed factual record showing that even one-time rollover transactions often occur in the context of a long-term advice relationship, nor (ii) the subsequent regulatory developments that significantly changed the landscape for financial professionals. And here, unlike in 2016, the Rule takes account of the facts and circumstances under which "a retirement investor would be entitled to treat their relationship with the person making the recommendation as one of trust and confidence." 89 Fed. Reg. at 32,137.[12]

---

App. 372, Cmt. 390, CFP Board at 10 ("[T]he marketing materials that accompany sales recommendations often imply a relationship of trust and confidence . . . and financial professionals often portray themselves as knowledgeable experts.").

[11] *See, e.g.,* 89 Fed. Reg. at 32,135; Defs.' App. 302, Cmt 305, AARP at 2 (polling results "make it clear that people use the advice from financial professionals to make important financial decisions and expect it to be in their best interest, but do not understand the legal obligations of their advisers."); Defs.' App. 313, Cmt. 309, Pub. Investors Advocate Bar Ass'n at 2 ("Changing the rule to eliminate firms' purported legal defenses that different investment recommendations are subject to different legal rules, moves the industry towards what public investors already reasonably believe is true."); Defs.' App. 378, Cmt 397, Financial Planning Association at 1 ("[W]e share the Department's concern that many consumers lack understanding of how the financial industry is regulated and therefore may be challenged to discern among professionals who are legally required to act in their best interest[.]").

[12] For these reasons, Plaintiffs are also mistaken to claim that ERISA's functional fiduciary standard should categorically not apply to "one-time" transactions. Pls.' Mem. at 16. Here, the Department merely updated its test to not automatically exclude the first instance of advice regarding a specific

*(footnote continued on next page)*

2.     *The Rule applies the Department's decades-long recognition that commissions can be compensation for investment advice.*

Plaintiffs argue that *Chamber* announced an ironclad distinction between investment professionals that receive sales commissions for their investment advice and those that receive regular retainer fees, *see* Pls.' Mem. at 19, arguing that sales commissions are categorically exempt from ERISA's functional fiduciary definition. That badly misreads the text of the statute: under ERISA, anyone who renders investment advice regarding plan assets "for a fee *or other compensation, direct or indirect*," is a fiduciary. 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). This statutory language necessarily captures advisers who are paid by commission in part for recommending certain products to their clients. *See* 89 Fed. Reg. 32,138 (rejecting an argument that "commission-based recommendations are properly viewed as mere sales pitches" because it is "neither supported by the text of the statute nor the Department's consistent views starting in 1975 that advice can be compensated through commissions"). Indeed, both the SEC and NAIC regulations contemplate that commissions compensate financial professionals for their advice. *See* 89 Fed. Reg. at 32,158.

And far from endorsing Plaintiffs' extreme and categorical position, the Fifth Circuit in *Chamber* approvingly quoted the statement from the 1975 Rule's preamble that the term "fee or other compensation, direct or indirect" "should be deemed to include all fees or other compensation incident to the transaction in which the investment advice to the plan has been rendered or will be rendered" and "'may include' brokerage commissions" where the 1975 five-part test is met. *See* 885

---

ERISA plan. While some common law standards may only apply fiduciary duties to a "preexisting" relationship, ERISA expressly defines someone as a fiduciary "to the extent" they provide compensated investment advice regarding plan assets. The *Chamber* decision did not conclude that every aspect of common law fiduciary standards was imported into ERISA (rendering the ERISA provision redundant), just that a relationship of trust and confidence was required. *See* 885 F.3d at 379 & n.13. The Department explained in numerous ways why a rollover from an ERISA plan, even if a single transaction, may occur in the context of a relationship of trust and confidence, *see, e.g.*, 89 Fed. Reg. at 32,136, 32,184; and assesses a rollover recommendation under its objective facts-and-circumstances test. *See id.* at 32,146.

F.3d at 373 (quoting 40 Fed. Reg. at 50,842); *see also* 40 Fed. Reg. at 50,842 ("brokerage commissions, mutual fund sales commissions, and insurance sales commissions"). In 1976, the Department rejected a request from Plaintiff ACLI and others for a rule that "the normal sales presentation and recommendations made by an insurance agent or broker to a plan or plan fiduciary" would not trigger the ERISA fiduciary standard, *see* 41 Fed. Reg. at 56761, instead concluding that insurance agent and broker advice would be analyzed "on a case-by-case basis" under the 1975 Rule. *Id.* at 56762. Not least, the Department specifically rejected Plaintiffs' proposed approach in a 1983 advisory opinion responding to a request that broker-dealers not be deemed an investment advice fiduciary "unless the broker-dealer provides investment advice for distinct, non-transactional compensation." Defs.' App. 404, Advisory Opinion 83-60A at 1 (1983). The Department concluded that where the 1975 five-part test is met "under the particular facts and circumstances," then "it may reasonably be expected that, even in the absence of a distinct and identifiable fee for such advice, a portion of the commissions paid to the broker-dealer would represent compensation for the provision of such investment advice." *Id.* at 3. The Fifth Circuit approvingly quoted this language, too, *see* 885 F.3d at 373-74,[13] and while the Department has updated the 1975 test, the Retirement Security Rule works no change to this longstanding, reasonable interpretation of compensation triggering ERISA fiduciary status.

> 3. *The PTE requirement of a written acknowledgement does not exceed the Department's statutory authority.*

Plaintiffs argue that by requiring insurance agents to acknowledge their fiduciary status in writing to the retirement investor in order to avail themselves of the relief provided in PTE 84-24 or

---

[13] Other courts have also endorsed this conclusion. *See, e.g., Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 293 (7th Cir. 1989) (ERISA investment advice includes "stock brokers or dealers who recommend certain securities and then participate in the acquisition . . . of those securities and receive a commission for their services." (citation omitted)); *Eaves v. Penn*, 587 F.2d 453, 458 (10th Cir. 1978) (same); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 710 (W.D. Mich. 2007) (rejecting as "untenable" broker's argument that it was paid only "commissions for sales, not a fee for investment advice" and that "the advice . . . was free").

PTE 2020-02, the Department is exposing them to "state-law liability under breach-of-fiduciary or breach-of-contract theories." Pls.' Mem. at 22. While "investment advice providers to IRAs have always been subject to suit in State courts on State-law theories of liability," the Department explains that Plaintiffs are mistaken because the PTEs "do[] not alter the existing framework for bringing suits under State law against IRA fiduciaries and do[] not aim to do so." 89 Fed. Reg. at 32,271, 32,302. Indeed, the PTEs make clear that financial professionals "could expressly disclaim any enforcement rights other than those specifically provided by Title I of ERISA or the Code, without violating any of the exemption's conditions." *Id.* Thus, the Department has been categorical that the acknowledgement does not create a private right of action; instead, it "simply ensures up-front clarity about the nature of the relationship and services being provided" and does "not impose any contract or warranty requirement." *Id.*; *see also id.* (noting that the acknowledgement requirement "stands in marked contrast to the Department's 2016 rulemaking on fiduciary advice" because "the Department has imposed no obligation on fiduciary advice providers to enter into enforceable contracts with or to provide enforceable warranties to their customers"). Moreover, such acknowledgements are not novel in PTEs. *See, e.g.*, 26 U.S.C. § 4975(f)(12)(B)(i) (statutory exemption requiring fiduciary acknowledgement). Plaintiffs identify no instances where an ERISA fiduciary acknowledgement led to a viable state-law claim. Thus, Plaintiffs' speculation about any new state-law liability is meritless.[14]

       4.     *The Rule respects the statutory overlap and differences between Title I and Title II plans.*

Congress created substantial overlap between Title I and Title II of ERISA, with many benefit plans subject to both titles. *See* 89 Fed. Reg. at 32,123. Congress adopted substantively identical

---

[14] While some of Plaintiffs' declarants profess confusion about how to gather information to compare existing investments to potential annuities, the Department addressed this question in detail in both PTEs. *See* 89 Fed. Reg. at 32,273, 32,314. Similarly, while some of Plaintiffs' declarants expressed fear that educational conferences sponsored by insurance companies would no longer be permitted, the Department "stresse[d] that this provision does not prohibit them" but "merely requires reasonable guardrails." *Id.* at 32,275; *see also id.* at 32,317.

fiduciary definitions in Title I and Title II, 29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3); adopted identical authority to issue administrative exemptions, 29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2); prohibited fiduciaries from engaging in prohibited transactions on many of the same terms, *compare* 29 U.S.C. § 1106 *with* 26 U.S.C. § 4975(c)(1); and provided statutory exemptions with the same terms and conditions for both. *See, e.g.*, 29 U.S.C. § 1108(b)(14), (b)(19), (g); *compare* 26 U.S.C. § 4975(d)(17), (d)(22), (f)(8). The Department has the same interpretive, rulemaking, and exemptive authority for the fiduciary definition and most of the prohibited transaction provisions that apply to Title II plans. *See supra* Background § A; Reorg. Plan § 102. Given these extensive commonalities, it was appropriate for the Department to apply the same fiduciary definition and the same exemptions to both.

The primary difference between Title I and Title II concerns the penalties for violations; under Title I, the Department and certain private stakeholders may bring civil actions, *see* 29 U.S.C. § 1132(a), while under Title II, those who violate the Code's prohibited transaction provisions are subject to excise taxes assessed by the IRS. 26 U.S.C. § 4975(a)-(b). Fiduciaries to Title II plans are also not expressly subject to duties of loyalty and prudence, but the prohibited transaction provisions in the Code set much the same expectation. *See, e.g.*, 26 U.S.C. § 4975(f)(5) (defining "correction" of a prohibited transaction as "placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards"). The Department respected these differences—unlike the 2016 Rule—by imposing no obligation to enter into enforceable contracts or providing enforceable warranties. *See supra* Arg. § I.C.3.

Plaintiffs argue that it is "inconsistent with statutory design," Pls.' Mem. at 22, for the Department to treat a recommendation to make a rollover from a Title I plan as fiduciary advice to the Title I plan. To the contrary, this approach closely follows ERISA's plain language, which says that a person is a "fiduciary" to an ERISA plan "to the extent" that they "render[] investment advice . . . with respect to any moneys or other property of such plan." 29 U.S.C. § 1002(21)(A)(ii). As the

Department has explained, because the rollover concerns "moneys or other property" of a Title I plan, a rollover recommendation is advice to the Title I plan. *See* 89 Fed. Reg. at 32,144-46, 32,171. This interpretation also aligns with how the SEC treats rollover recommendations. *See id.* at 32,146.

Plaintiffs also argue that *Chamber* prohibits the Department from "subject[ing] Title II fiduciaries to the same [PTE] standards as Title I fiduciaries" because they are "reflections of the fiduciary duties of prudence and loyalty that Title II omits." Pls.' Mem. at 21-22.[15] *Chamber* is not dispositive because the Fifth Circuit's critique was focused on two defects not present here: (1) that "DOL had to create exemptions . . . to blunt the overinclusiveness" of the 2016 Rule, and (2) that the BICE exemption "expose[d] [Title II fiduciaries] to potential liability beyond the tax penalties provided for in ERISA Title II." *See Chamber*, 885 F.3d at 381-82. The Retirement Security Rule and amended PTEs have avoided those defects. Moreover, as required by Congress, the Department can grant an exemption only if the exemption is in the interest of plans and their participants and beneficiaries and protective of the rights of participants and beneficiaries. 29 U.S.C. § 1106(a); 26 U.S.C. § 4975(c)(2). Congress did not require the Department to invent novel provisions that Congress did not include anywhere else in ERISA's text or ignore common law standards of prudence and loyalty that have been used in analogous contexts for hundreds of years. *See* 89 Fed. Reg. at 32,267. Additionally, while Title I imposes a duty of care and a duty of loyalty on fiduciaries in all situations, the concepts of care and loyalty are not unique to Title I or even to ERISA but are rather foundational principles of trust and agency law. The SEC imposes duties of care and loyalty on investment advisers and broker-

---

[15] Citing the Dodd-Frank Act, Plaintiffs also contend that the Rule "arrogates to DOL authority Congress delegated to the SEC or reserved to the States." Pls.' Mem. at 21. But the Department explained why the Rule does not conflict with either the provision of the Dodd-Frank Act calling for the SEC to study potential regulation or the provision prohibiting the SEC from regulating fixed indexed annuities as securities. *See* 89 Fed. Reg. 32,138 & nn.146-147. Moreover, unlike in 2016, where the SEC had not yet issued Reg BI, the Department's action harmonizes with other regulatory regimes and does not "outflank" or "infring[e] on SEC turf." *Chamber*, 885 F.3d at 385-86.

dealers. NAIC Model Regulation 275 also relies on underlying principles of care and loyalty. These core requirements are not singularly reserved for Title I of ERISA and the Department has appropriately applied these principles to investment advice fiduciaries to Title II plans who want to engage in otherwise statutorily prohibited transactions.

  5. *The Rule's disclaimer provision need not permit investment advisors to circumvent ERISA's protections.*

  The Rule permits disclaimers of fiduciary status, but provides that "[w]ritten statements by a person disclaiming status as a fiduciary . . . or disclaiming the conditions set forth in paragraph (c)(1)(i) of this section, will not control *to the extent they are inconsistent with* the person's oral or other written communications, marketing materials, applicable State or Federal law, or other interactions with the retirement investor." 29 C.F.R. § 2510.3-21(c)(1)(iv) (emphasis added), 89 Fed. Reg. at 32,257. This provision is rooted in the Department's observation that the prior "mutual agreement" prong of the 1975 Rule was used as boilerplate that could be contradicted by the adviser's behavior. *See* 89 Fed. Reg. at 32,179 (explaining that the prior language "unwittingly encouraged investment advisers, who presented themselves to investors as making a recommendation that considered an individual's personal circumstances and was in their best interest, to use fine print disclaimers stating that no such agreement or understanding exists, as potential means of avoiding ERISA fiduciary status").

  Plaintiffs argue that this is a "regulatory straitjacket" that conflicts with common law flexibility. Pls.' Mem. at 16-17. But this is the wrong reference point. ERISA contains no statutory language permitting financial professionals to render investment advice to ERISA plans but disclaim fiduciary status. Similarly, brokers subject to Reg BI cannot generally waive their obligations under that standard (which are also rooted in fiduciary principles). *See* 89 Fed. Reg. at 32,156. And the Department has concluded that satisfaction of the Rule's facts-and-circumstances test gives rise to a reasonable expectation of a relationship of trust and confidence, *see id.* at 32,141, while acknowledging that the sophistication of the parties is relevant to "whether a reasonable investor *in like circumstances* would rely

on the recommendation as intended to advance the investor's best interest." *Id.* at 32,160.[16] Regardless, it is sensible that a disclaimer would not be dispositive to the extent it is inconsistent with the adviser's interactions with the retirement investor or its legal obligations under state or federal law. To provide otherwise would merely invite abuse and permit another version of the same ineffective "fine print disclaimers" that can all too easily defeat reasonable investor expectations of trust and confidence.

In sum, parties may reach a mutual agreement to define their relationship so long as it is consistent with the circumstances. 89 Fed. Reg. at 32,155 ("The Department's intent . . . is to permit parties to define the nature of their relationship, but also to ensure that to be given weight under the final rule, any disclaimer is consistent with oral or other written communications or actions," and other relevant facts and circumstances.).

### D.   Plaintiffs' Remaining Merits Arguments Are Baseless.

#### 1.   *The Major Questions Doctrine is inapplicable because the Department has long regulated in this field pursuant to plain statutory authority.*

In an effort to put a thumb on the scale against the plain text, Plaintiffs invoke the Supreme Court's "Major Questions" Doctrine. *See* Pls.' Mem. at 19. But that doctrine has no application here, for the Department relies on no "newfound power" in an "ancillary provision" of ERISA. *See West Virginia v. EPA,* 597 U.S. 697, 724 (2022); *see also id.* at 710, 730 (concluding that EPA had identified for its Clean Power Plan regulation a statutory "backwater" that had been "used . . . only a handful of times since the enactment of the statute"). To the contrary, Congress expressly granted the Department of Labor the wide authority to grant exemptions and to interpret the term "fiduciary" in

---

[16] Despite Plaintiffs' assertion that it is "entirely implausible" that some (undefined) category of sophisticated parties could have a "trust and confidence" relationship with an investment advisor, Pls.' Mem. at 17, the Department discussed various circumstances in which sophisticated parties like plan fiduciaries may rely on fiduciary advice, and explained that consistent application of the facts-and-circumstances test to all retirement investors "will avoid an artificial limitation . . . that may not have bearing on the parties' relationships and could undermine application of the ERISA fiduciary protections under Title I to plan sponsors that many commenters supported." *Id.* at 32,160.

ERISA and the Code. *See* 29 U.S.C. § 1135; Reorg. Plan § 102 (codified at 29 U.S.C. § 1001 note); *Johnson v. Buckley*, 356 F.3d 1067, 1073 (9th Cir. 2004) ("not[ing] the broad authority of . . . the Secretary of Labor . . . to promulgate regulations governing ERISA").

Consistent with this longstanding regulatory authority, the Department has regulated extensively in the realm of retirement advice services, which has always included the insurance industry. For example, in addition to the 1975 Rule, "[t]he Department has issued numerous class PTEs regarding the provision of investment advice (e.g., 75–1, 80–03, 81–8, 84–24, 86–128, 2020–02)" and issued a variety of interpretive bulletins and advisory opinions." 89 Fed. Reg. 32,175. The Department's regulation of "commission-earning insurance agents and brokers bears an equally extensive regulatory history, dating back to 1976 with the issuance of a proposal for what would become PTE 77–9." *Id.* Having been clearly vested with regulatory authority over fiduciary status with respect to Title I and Title II plans by Congress, and having consistently regulated in this same space since ERISA's enactment, the Department is not—*contra* Plaintiffs' arguments— "reinterpret[ing]" a "long-extant statute." *See* Pls.' Mem. at 19 (quoting *Chamber*, 885 F. 3d at 387).[17]

2. *The Rule regulates conduct, not speech, and therefore raises no viable First Amendment question.*

Plaintiffs suggest that the Rule may violate the First Amendment. Pls.' Mem. at 20–21. It does

---

[17] In *FACC I*, the Magistrate Judge found the Major Questions Doctrine inapplicable to the 2020 Interpretive Rule for four reasons that equally apply here. First, she concluded that "Congress granted the DOL broad authority to issue technical terms relating to fiduciary status," 2023 WL 5682411, at *14, and that "[t]he DOL's actions fall within the broad grant of Congressional authorization, and it is similar to previous actions such as the DOL's initial 1975 regulation[.]" *Id.* Second, she rejected the argument that the amount of assets subject to potential rollovers was sufficient to trigger application of the Major Questions Doctrine because "[i]f absolute asset values that are regulated were the dispositive factor for the application of the Major Questions Doctrine, the doctrine would likely apply to *any* DOL regulation under ERISA solely due to the nature of the retirement industry." *Id.* at *15. Third, the Magistrate Judge concluded that the 2020 Interpretive Rule was "directly within the core competencies of the DOL," adding that "[s]ince ERISA's enactment, the DOL has been expressly granted the authority to issue PTEs for Title I plans; and, in 1984, the President and Congress granted the DOL the ability to issue PTEs for Title II plans." *Id.* Fourth, the Magistrate Judge concluded that "the issue is not one of vast political significance," as the 2020 Interpretive Rule "neither endeavors to transform constitutional rights nor does it involve an entirely new statutory scheme." *Id.*

not. Not every restriction on "conduct . . . initiated, evidenced, or carried out by means of language" implicates the First Amendment. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). A regulation restricting commerce or conduct that imposes only "incidental burdens on speech" does not violate the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *see also Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (First Amendment does not preclude conduct regulations, even if effectuated "by means of language, either spoken, written, or printed" (citation omitted)).

The Rule is primarily "a regulation restricting commerce or conduct" and therefore does not implicate the First Amendment. *See Ohralik*, 436 U.S. at 456. The Rule requires only that covered parties who provide certain investment advice ensure that their advice "is in the client's best interest, is not conflicted, and accords with the reasonable expectations of client-investors." 89 Fed. Reg. 32,176. It does not require fiduciaries to communicate recommendations in a particular manner, give particular recommendations, or avoid particular content in their recommendations. In short, the regulation's "primary effect" is to regulate how fiduciaries may perform the act of giving compensated investment advice. *See Expressions Hair Design*, 581 U.S. at 47.

Plaintiffs argue that the rule is a content-based restriction because it regulates "recommendations." Pls.' Mem. at 20 (citing *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018)). But *National Institute* confirms that any "burden" on speech the Rule imposes is merely incidental and that the regulation is fundamentally one "of professional conduct." 585 U.S. at 769. The Rule here does not require regulated entities to "provide a government-drafted script" about state-provided services. *Id.* at 766. And here, unlike in *National Institute*, the requirements at issue are "tied" to the regulated entities' services. *Id.* at 770. The Rule merely gives financial professionals the responsibility to ensure their advice is in the best interest of their clients and that there is no impermissible conflict of interest. *See* 89 Fed. Reg. at 32,176. At bottom, what matters is not what triggers a regulation but what the regulation does once it is triggered, and the Rule is a quintessential

regulation of conduct, rather than of speech. *See Sorrell*, 564 U.S. at 770 (listing cases in which the Court has drawn "the line between speech and conduct"). Accordingly, Plaintiffs' First Amendment arguments have no merit.

## II.   THE EQUITIES DISFAVOR INJUNCTIVE RELIEF

For all of these reasons, Plaintiffs fail to demonstrate a likelihood of success on the merits, and, in any event, two of the remaining requirements for issuance of a preliminary injunction—the balance of harms and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)— tilt sharply against the issuance of the injunctive relief they seek. First, during the period for which a preliminary injunction would apply, any harm to Plaintiffs is very limited. The Rule's fiduciary definition is not applicable until September 23, 2024, *see* 89 Fed. Reg. at 32,171, and for a year after that both PTE 84-24 and PTE 2020-02 have a "phase-in" period. *See* 89 Fed. Reg. 32,344. Thus, until September 23, 2025, an ERISA fiduciary can receive compensation under the exemptions so long as they comply with the impartial conduct standards and provide a fiduciary acknowledgment. By contrast, Plaintiffs' requested injunction would harm Defendants in executing their statutory responsibilities and disserve the public interest. First, the injunction would directly interfere with the Department's ability "to advise the public of [its] construction of the statutes and rules which it administers," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted). Second, there is a public interest in protecting retirement investors from conflicted advice, which "can expose savers to higher costs, lower returns, and greater risk." 89 Fed. Reg. at 32,133 (noting a comment predicting the rule would save participants in workplace retirement plans "over $55 billion in the first 10 years" and investors who roll over their retirement funds into fixed indexed annuities more than "$32.5 billion in the first 10 years"); *see Su v. RiversEdge Advanced Ret. Sols., LLC*, No. 2:24-CV-00104, 2024 WL 1193858, at *1 (W.D. Pa. Feb. 20, 2024) ("In passing ERISA, Congress declared a national public interest in protecting 'the continued well-being and security of millions of employees

and their dependents . . . directly affected by these plans.'" (quoting 29 U.S.C. § 1001(a))); *Herman v. S.C. Nat. Bank*, 140 F.3d 1413, 1423 (11th Cir. 1998). Returning to the *status quo ante* of the 1975 Rule would produce the very harms the Department identified in the preamble of the Rule, because that test is "underinclusive in assigning fiduciary status," "fails to capture many circumstances in which an investor would reasonably expect that they can place their trust and confidence in the advice provider as acting in their best interest," and "too often works to defeat legitimate retirement investor expectations of impartial advice." 89 Fed. Reg. at 32,132. Moreover, an injunction would reopen the gaps in the protections that retirement investors receive, including types of investment advice not covered by the SEC's Reg BI or state insurance regulations. *See id.* at 32,123. Accordingly, any delay in implementing the Rule and amended PTEs will harm retirement investors and the public interest.

## III.   ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS BEFORE THE COURT.

Should the Court disagree with the Department, any preliminary injunction or stay should be limited in scope to the parties to the instant motion. *See Braidwood Mgmt., Inc. v. Becerra*, No. 23-10326, 2024 WL 3079340, at *15 (5th Cir. June 21, 2024) ("[Nationwide] injunctions are not required or even the norm[.]" (cleaned up)); *id.* (noting that "several justices on the Supreme Court have viewed [nationwide injunctions] with conspicuous skepticism"); *Labrador v. Poe*, 144 S. Ct. 921, 928 (2024) (Gorsuch, J., concurring) ("Lower courts would be wise to take heed" that "any equitable remedy they issue must not be 'more burdensome to the defendant than necessary to redress' the plaintiff's injuries."); *see also* 5 U.S.C. § 705 (instructing courts to consider relief that "preserve[s] status or rights pending conclusion of the review proceedings" tailored only "to the extent necessary to prevent irreparable injury"); *Texas*, 646 F. Supp. 3d at 769 ("Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief."); *Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) (indicating that relief under § 705 should "normally, if not always, be limited to the parties complainant").

## CONCLUSION

For the foregoing reasons, Defendants are entitled to dismissal or summary judgment on all claims, and the Court should deny Plaintiffs' Motion for Preliminary Injunction and Stay of the Effective Date of the Rule.

Dated: June 28, 2024                          Respectfully submitted,

                                              BRIAN M. BOYNTON
                                              Principal Deputy Assistant Attorney General

                                              JULIE STRAUS HARRIS
                                              Assistant Branch Director

                                              *s/ Galen N. Thorp*
                                              GALEN N. THORP
                                              Senior Trial Counsel
                                              ALEXANDER N. ELY
                                              GARRETT MANNCHEN
                                              Trial Attorneys
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street NW, Washington, DC 20005
                                              Tel: (202) 514-4781; Fax: (202) 616-8470
                                              galen.thorp@usdoj.gov

                                              *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 28, 2024, I electronically filed the foregoing with the Clerk of Court using

the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

*/s/ Galen N. Thorp*
Galen N. Thorp

*Counsel for Defendants*