**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN COUNCIL OF LIFE INSURERS, et al., <br><br>            Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, <br><br>            Defendants. | Civil Action No. 4:24-cv-00482-O |

**PLAINTIFFS-INTERVENORS' COMPLAINT**

Plaintiffs-Intervenors Financial Services Institute ("FSI") and Securities Industry and Financial Markets Association ("SIFMA") allege as follows:

**INTRODUCTION**

1. The United States Department of Labor ("Department") has overstepped again. In 2016, the Department attempted "to transform the trillion-dollar market for IRA investments, annuities and insurance products, and to regulate in a new way the thousands of people and organizations working in that market." *Chamber of Com. of U.S.A. v. DOL*, 885 F.3d 360, 387 (5th Cir. 2018). That radical regulatory overhaul, the "2016 Rule," dramatically expanded the definition of who is a "fiduciary" under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code ("Tax Code"). The result of the 2016 Rule was to presumptively forbid the payment of any transaction-based compensation to financial services providers, such as broker-dealers, for transactions connected to a retirement account. This prohibition extended, for the first time, to transactions involving private, tax-preferred retirements

accounts (such as IRAs) that—in contrast to the plans covered under ERISA—are *not* sponsored by employers and therefore are not subject to regulation by the Department.  Having outlawed the long-prevailing compensation practices of the industry, the Department then dangled a lifeline to broker-dealers and other professionals that could enable them to receive pay:  They could qualify for a new exemption from the payment prohibition.  But qualifying for the exemption came with a catch:  Broker-dealers would have to agree to be deemed fiduciaries and adhere to a host of other conduct regulations that the Department had no authority to impose directly.  In effect, the 2016 Rule forced broker-dealers to choose between forgoing their traditional compensation sources for transactions involving Individual Retirement Accounts (or "IRAs"), or declaring themselves fiduciaries and opting into a new regulatory regime crafted by an agency that had no power to regulate them.

2. The Fifth Circuit vacated the 2016 Rule.  *Chamber*, 885 F.3d at 388.  The court held (among other things) that the Rule unlawfully extended the definition of "fiduciary" beyond its common-law meaning of a special relationship of trust and confidence that generally excludes sales transactions; contravened the carefully drawn text of the statutes; and adopted this expansive definition for the impermissible purpose of imposing ERISA's stringent standards on interactions with tax-favored plans that are not governed by ERISA.

3. Undeterred, the Department has promulgated a new rule that again amends the fiduciary definition ("the 2024 Rule") and is materially indistinguishable from the 2016 Rule.  *See* 89 Fed. Reg. 32,122 (Apr. 25, 2024).  If the 2024 Rule goes into effect, recommendations by a broker-dealer or other financial professional regarding assets in a retirement account, including sales recommendations, will once again be considered "fiduciary" advice even in the absence of an ongoing, mutually recognized advice relationship.  Once again, transaction-based compensation

in connection with such transactions will be presumptively unlawful.  And once again, broker-dealers will be forced to choose between subjecting themselves to ERISA-based standards and the Department's regulatory power or forgoing traditional compensation.

4.     The 2024 Rule is unlawful for the same reasons articulated in the Fifth Circuit's *Chamber of Commerce* decision.  Like the 2016 Rule, the 2024 Rule is inconsistent with the common law, contravenes the statutory text, and impermissibly attempts to regulate the provision of services to accounts over which the Labor Department has no regulatory authority.  Indeed, the illegality of the 2024 Rule is even clearer today, for two reasons.  First, in 2019 the Securities and Exchange Commission ("SEC")—the federal agency Congress actually created to regulate broker-dealers—adopted "Regulation Best Interest" ("Reg BI"), 84 Fed. Reg. 33,318, 33,491 (July 12, 2019), which the Department itself admits largely instituted the standards for broker-dealers that the Department's 2016 Rule had (illegally) sought to impose.  With Reg BI, the needs case for the Department's unlawful regulation of broker-dealers vanished.  In Reg BI, moreover, the SEC rejected the very thing that the Department—which is an employment regulator, not a broker-dealer regulator—boasts of having imposed here:  promulgation of "a uniform standard of conduct [for] all financial professionals regardless of how they engage with their retail customers." 84 Fed. Reg. at 33,462.

5.     Since the 2018 vacatur of the Labor Department's 2016 Rule, the Supreme Court has expressly adopted and applied the "major questions doctrine," preventing agencies from using a sliver of authority to bootstrap their way into regulating vast swaths of the American economy over which Congress gave them no power.  *See West Virginia v. EPA*, 597 U.S. 697 (2022); *NFIB*

*v. Dep't of Lab.*, 595 U.S. 109 (2022) (per curiam).  Like its 2016 Rule, the 2024 Rule is an archetype of such regulatory overreach.[1]

## PARTIES

6.     Plaintiff-Intervenor FSI is a trade association that advocates on behalf of the independent financial services industry.  Over 30,000 independent financial advisers and over 80 independent financial services firms are members of FSI.  Since 2004, through advocacy, education, and public awareness, FSI has been working to create a healthier regulatory environment for these members so they can provide affordable, objective financial advice to hard-working Americans.  FSI's mission is to ensure that all Americans have access to competent and affordable financial advice, products, and services, delivered by a growing network of independent financial advisers and independent financial services firms.  The 2024 Rule at issue here will impede these efforts by restricting the advice, products, and services that FSI members may provide, thereby harming their ability to serve their customers and making it harder for their customers to obtain investment assistance and achieve a dignified retirement.  The 2024 Rule will also impose unnecessary, burdensome, and direct compliance costs on FSI members, including its members located in and doing business in this District.  FSI brings this complaint on behalf of its members.

7.     SIFMA is the leading trade association for broker-dealers, investment banks, and asset managers operating in the U.S. and global capital markets.  On behalf of its industry's one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed income markets, and related products and services.  SIFMA serves as an industry coordinating body to promote fair and orderly markets,

---

[1]    Plaintiffs-Intervenors challenge the 2024 Rule only, and not the various amendments to prohibited transaction exemptions the Department promulgated along with the 2024 Rule.

informed regulatory compliance as well as efficient market operations and resiliency. SIFMA also provides a forum for industry policy and professional development. SIFMA is the U.S. regional member of the Global Financial Markets Association. SIFMA's members, including its members located in and doing business in this District, will be affected by the 2024 Rule's expansion of fiduciary status, including through the significant compliance costs imposed by the 2024 Rule. As a result, SIFMA's members' efforts to provide competent and affordable financial products and services to consumers will be harmed, and some of these clients may no longer be able to obtain this investment assistance. SIFMA brings this complaint on behalf of its members.

8.    Defendant United States Department of Labor is a U.S. governmental agency headquartered in Washington, D.C. The Department is subject to the Administrative Procedure Act. 5 U.S.C. § 551(1).

9.    Defendant Julie Su is the Acting Secretary of Labor and is subject to the Administrative Procedure Act. 5 U.S.C. § 551(1). Plaintiffs-Intervenors are suing Acting Secretary Su in her official capacity as head of the Department.

## JURISDICTION AND VENUE

10.    This action arises under the APA, 5 U.S.C. § 500 *et seq.*, ERISA, 29 U.S.C. § 1001 *et seq.*, and the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* This Court therefore has jurisdiction under 28 U.S.C. § 1331.

11.    Plaintiffs-Intervenors' associational standing to bring this suit on behalf of their various members is "self-evident." *Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827, 835 (5th Cir. 2023). Their members are directly and adversely affected by the 2024 Rule and accordingly have standing to sue in their own right. Specifically, Plaintiffs-Intervenors' members will face additional regulatory burdens as a result of being classified as "investment-advice

fiduciaries" under the 2024 Rule's new expansive definition of the term.  Those members will also incur significant compliance costs and will be forced to immediately change their business practices to avoid violating the 2024 Rule.  The interests Plaintiffs-Intervenors seek to protect are germane to their purposes.  Each Plaintiff-Intervenor organization is committed to protecting the interests of its members, as well as the broader business community, and regularly advocates for reforms that reduce the regulatory burdens on its members.  Finally, neither the claims asserted nor the declaratory and injunctive relief requested requires an individual member to participate in the suit.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

12.     Venue is proper in this district under 28 U.S.C. § 1391(e) because this is an action against an officer and an agency of the United States, Plaintiffs NAIFA-Fort Worth and NAIFA-Dallas reside in this district, and no real property is involved in this action.

## BACKGROUND

### A.     The Financial-Services Market for Investors Planning for Retirement

13.     A wide variety of financial professionals provide services to Americans looking to save and invest for retirement, including broker-dealers, insurance agents, and investment advisers. Each type of financial professional provides distinct services to investors.

14.     Broker-dealers buy and sell investment products, such as stocks, bonds, and mutual funds, trading both for their customers' accounts (the broker side of their business) and with their customers in their own accounts (the dealer side of their business).  Broker-dealers generally charge their customers on a "transaction-based" model, under which the customer pays the broker a commission, mark-up, or similar charge for each transaction the broker-dealer executes on the customer's behalf, but do not have discretion over the customer's assets and have no duty to monitor the customer's brokerage account.  This broker-dealer compensation model is beneficial

for customers who trade comparatively infrequently and do not require—nor wish to pay for—ongoing investment advice.  It is also beneficial for customers whose account balances do not meet the minimum amounts that investment advisers often require for managing advisory accounts.

15.     Insurance agents sell financial products like life insurance policies or annuities, which can provide customers a guaranteed lifetime income stream.  Like broker-dealers, many insurance agents employ a transaction-based compensation model in which the agent is paid a commission or similar fee for the sale of the policy or annuity.  Some broker-dealers are also licensed insurance agents.

16.     In contrast to broker-dealers and insurance agents, investment advisers provide ongoing investment advice to clients, and clients pay for their advice.  Unlike broker-dealers, investment advisers often exercise discretion over the customer's investment portfolio.  Because investment advisers provide ongoing investment advice rather than making episodic recommendations of a security, they employ a different compensation model than broker-dealers and insurance agents.  Instead of charging their customers per transaction, investment advisers typically use a fee-based model; the adviser charges a fee that may take the form of a percentage of assets in the customer's account, a flat fee, or an hourly charge.

17.     Although broker-dealers and investment advisers offer fundamentally distinct services and are typically compensated differently, many financial-services firms offer both brokerage and advisory services, either by dually registering as both a broker-dealer and an investment adviser, or by offering investment advice through an affiliated entity.

18.     Broker-dealers, insurance agents, and investment advisers have long been subject to distinct federal and state regulatory regimes.

19.     Congress directed the SEC to regulate investment advisers under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("Advisers Act").  The Advisers Act reflects "a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."  *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92 (1963).

20.     Meanwhile, Congress directed the SEC to regulate broker-dealers under the Securities Exchange Act of 1934.  15 U.S.C. § 78a *et seq.*  The Dodd-Frank Act reaffirmed the scope—and limits—of the SEC's authority over broker-dealers, directing the SEC not to prohibit "commission[s] or other standard compensation."  Dodd-Frank Act § 913(g), 124 Stat. at 1828 (2010).  Broker-dealers are also regulated by FINRA, a self-regulatory organization overseen by the SEC and whose rules are subject to the SEC's approval.  *See* 15 U.S.C. § 78*o*-3(b)(6).

21.     The oversight of broker-dealers' conduct with respect to IRAs has been entrusted to the SEC since Congress enacted the Securities Exchange Act of 1934.  "Congress does not ordinarily specifically delegate power to one agency while knowing that another federal agency stands poised to assert the very same power."  *Chamber*, 885 F.3d at 386.

22.     Although investment advisers owe a statutorily-recognized fiduciary duty to their clients, broker-dealers are held to a different—though high—standard to their clients under Reg BI.  Reg BI requires broker-dealers to make recommendations "in the best interest of [a] retail customer at the time the recommendation is made."  84 Fed. Reg. at 33,319.  Importantly, the SEC specifically refused to "apply the existing fiduciary standard under the Advisers Act to broker-dealers in part because of concerns that such a shift would result in fewer broker-dealers offering transaction-based services to retail customers, which would in turn reduce choice and may raise

costs for certain retail customers."  84 Fed. Reg. at 33,330.  The SEC also rejected the suggestion that broker-dealers and investment advisers should be held to a "new uniform standard" of conduct, explaining that imposing a fiduciary standard would "discard decades of regulatory and judicial precedent and experience with the fiduciary duty for investment advisers" and "a 'one size fits all' approach would not appropriately reflect the fact that broker-dealers and investment advisers play distinct roles in providing recommendations or advice and services to investors, and may ultimately harm retail investors."  *Id.*

23.     Insurance agents are largely subject to state regulation.  Virtually every state has adopted some version of the National Association of Insurance Commissioners' Suitability in Annuity Transaction Model Regulation (the "NAIC Model"), which does not impose fiduciary obligations but, instead, requires an insurance agent, "when making a recommendation of an annuity," to "act in the best interest of the consumer under the circumstances known at the time the recommendation is made, without placing the producer's or the insurer's financial interest ahead of the consumer's interest."  NAIC Model § 6(A) (Nat'l Ass'n of Ins. Comm'rs 2020).

24.     Therefore, while the SEC, FINRA, and the states have long established standards of conduct for broker-dealers and insurance agents, broker-dealers and insurance agents have historically never been held to the fiduciary standard applicable to investment advisers, even when broker-dealers or insurance agents make a recommendation in connection with a transaction.

**B.     ERISA's Regulation of Fiduciaries of Employee Benefit Plans and Retirement Accounts**

25.     The Department—which is responsible for enforcing federal occupational safety and health laws, wage and overtime requirements, and a range of other employment laws—also is responsible for administering ERISA, which was enacted in 1974 to protect participants and beneficiaries of employee benefit plans.  Title I of ERISA defines who is a "fiduciary" to those

plans and imposes heightened standards of conduct, responsibility, and obligation on plan fiduciaries, including a duty of prudence, in addition to establishing civil enforcement remedies and sanctions against them. *See* 29 U.S.C. §§ 1002(21)(A), 1104, 1132. Among other things, the Department is authorized to "define accounting, technical and trade terms used in" Title I. 29 U.S.C. § 1135.

26. Under Title I, "[a] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of [an ERISA-covered employee benefit] plan or exercises any authority or control respecting management or disposition of its assets, (ii) *he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so*, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A) (emphases added). The regulations that are the subject of this case center on the italicized, second subpart of ERISA's fiduciary definition, which defines a category of financial service professionals that are commonly referred to as "investment advice fiduciaries."

27. Congress adopted this definition of "fiduciary" in light of well-established legal principles developed through trust law and codified in the Advisers Act. *See Chamber*, 885 F.3d at 370-72. Under these principles, a fiduciary relationship is established only where a heightened relationship of trust and confidence exists between the parties as reflected, among other things, through ongoing, personalized contact.

28. A Title I fiduciary is prohibited from engaging in a broad range of transactions involving an employee benefit plan, specifically: (1) transactions involving self-dealing; (2) transactions in which the fiduciary represents someone whose interests are adverse to the

interests of the plan; or (3) transactions in which the fiduciary receives compensation from a third party with respect to a plan transaction.  29 U.S.C. § 1106(b).  These prohibitions preclude Title I fiduciaries from using the transaction-based compensation model on which broker-dealers and insurance agents rely.

29.     Title I, however, permits the Department to exempt "any fiduciary or transaction, or class of fiduciaries or transactions," from these prohibitions on certain transactions so long as an exemption is (1) "administratively feasible"; (2) "in the interests of the plan and of its participants and beneficiaries"; and (3) "protective of the rights of participants and beneficiaries of such plan."  29 U.S.C. § 1108.  These are called prohibited transaction exemptions, or "PTEs."

30.     In Title II of ERISA, Congress included in the Tax Code a parallel "fiduciary" definition applicable to tax-favored saving plans like IRAs that are not sponsored by employers. *See* 26 U.S.C. § 4975(e)(3)(B).  Under Title II's definition of "fiduciary," financial-services professionals who provide services to Title II plans would be deemed fiduciaries in the same circumstances that Title I would deem them fiduciaries with respect to employer-sponsored plans.

31.     The consequences of fiduciary status under Title I and Title II are different, however.  While both Title I and Title II fiduciaries are prohibited from engaging in certain transactions, such as those paying a commission, Congress did not impose Title I's heightened standards of conduct on fiduciaries under the Tax Code, and it did not establish a private right of action against Title II fiduciaries as it did for fiduciaries under Title I.  Instead, the limitations in the Tax Code are enforced solely through excise taxes administered by the Department of the Treasury.  26 U.S.C. § 4975(a), (f)(8)(E).

32.     The Labor Department has no enforcement authority with respect to IRAs, which are governed by Title II.  It has no power to regulate IRAs directly, and it has no power to regulate

firms or individuals for services they provide in connection with IRAs. Rather, the Department was given only limited authority over IRAs: to interpret the statutory definition of "fiduciary" and to issue prohibited transaction exemptions under section 4975 of the Tax Code. *See* Reorganization Plan No. 4 of 1978, § 102, 43 Fed. Reg. 47,713 (Aug. 10, 1978), *reprinted in* 5 U.S.C. app. 1 (2016), *and in* 92 Stat. 3790 (1978).

33.     In 1975, one year after ERISA's enactment, the Department issued a regulation interpreting the "investment advice" prong of ERISA's fiduciary definition. 29 C.F.R. § 2510.3-21(c). This regulation established a five-part test for determining when a person is an investment advice fiduciary by reason of rendering investment advice for a fee. To be an investment-advice fiduciary under the 1975 regulation, a person must (1) "render[] advice to the plan as to the value of securities or other property, or make[] recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property" (2) "on a regular basis" (3) "pursuant to a mutual agreement, arrangement or understanding" with the plan or plan fiduciary that (4) the advice "will serve as a primary basis for investment decisions with respect to plan assets," and (5) the advice will be individualized "based on the particular needs of the plan." 29 C.F.R. § 2510.3-21(c).

34.     The Department's 1975 regulation recognized that financial service professionals may recommend a range of financial services and products to retirement savers without being deemed a fiduciary. For instance, selling an investment product in circumstances where advice was merely incidental to the sale, or where the seller was not paid for the advice, did not make one a fiduciary—on the contrary, a fiduciary generally was *barred* from selling a financial product to a plan. Nor was marketing activity, such as promoting a company's own proprietary products, considered fiduciary activity. Instead, the 1975 regulation—consistent with well-established trust

law and the Advisers Act—recognized that fiduciary status arises from a mutually agreed-upon, ongoing, individualized relationship of heightened trust and confidence.  For decades, therefore, broker-dealers, registered representatives, insurance agents, and other financial professionals could engage in many different types of interactions with people seeking to save for retirement without being considered "fiduciaries" under ERISA or the Tax Code.

**C.     The Labor Department's 2016 Fiduciary Rule**

35.     In 2010, the Department embarked on a campaign to jettison the common-law fiduciary definition Congress incorporated in ERISA, publishing a proposed rule amending its 1975 regulation defining "fiduciary."  75 Fed. Reg. 65,263 (Oct. 22, 2010).  After a contentious, 104-day comment period, followed by a public hearing and an additional post-hearing comment period, the Department announced it would withdraw the proposed rule.

36.     In 2015, the Department published a new rule proposal.  After another contentious, 92-day comment period, and another public hearing and post-hearing comment period, the Department in 2016 published a final rule which dispensed with the five-factor test for fiduciary status under the 1975 regulation and vastly expanded the category of people who would be deemed to be investment advice fiduciaries.

37.     The 2016 Rule would have deemed virtually every financial professional that provides services to either employer-sponsored plans or non-employer-sponsored IRAs to be a fiduciary.  Offering a one-off recommendation to buy a particular stock or annuity, or recommending a rollover from a 401(k) to an IRA, automatically would have made a broker-dealer or insurance agent a fiduciary, and prohibited those professionals from accepting compensation on a transaction basis, absent an exemption issued by the Department.

38.     Having effectively outlawed the predominant compensation model for broker-dealers and insurance agents in connection with IRAs, the Department simultaneously promulgated a PTE, known as the "Best Interest Contract Exemption" or "BICE," that would allow these professionals to continue being compensated on a transaction basis.  81 Fed. Reg. 21,002 (Apr. 8, 2016).  But to qualify for the BICE, a broker-dealer or insurance agent was required to satisfy several requirements.  Among other things, the BICE required financial professionals to "acknowledge their fiduciary status" in writing, "adhere to enforceable standards of fiduciary conduct and fair dealing with respect to their advice," "avoid misleading statements, … receive no more than reasonable compensation," "adopt policies and procedures reasonably designed to mitigate any harmful impact of conflicts of interest, and disclose basic information about their conflicts of interest and the cost of their advice."  81 Fed. Reg. at 21,003.  In other words, financial professionals who had never been understood to be fiduciaries were suddenly compelled to declare themselves fiduciaries to receive compensation for their services.

39.     The 2016 Rule had immediately disruptive and negative impacts on the financial-services markets, even though it was never fully enforced and was subsequently vacated by the Fifth Circuit.  As the SEC later noted, the Department's promulgation of the Rule caused "a significant reduction in retail investor access to brokerage services" and "the available alternative services were higher priced in many circumstances."  84 Fed. Reg. at 33,322.  A survey of 21 of SIFMA's members revealed that "53% eliminated or reduced access to brokerage advice services and 67% migrated away from open choice to fee-based or limited brokerage services."  *Id.* at 33,322 n.33.  And "[i]t was widely reported that a number of firms responded to the [2016] DOL Fiduciary Rule by either requiring customers to enter into more expensive advice relationships or by passing through higher compliance costs to customers, which altered many retail customer

relationships with their financial professionals." *Id.* at 33,322 n.34.  For example, several broker-dealer firms announced that they would no longer offer commission-based products to IRAs and ERISA plans, or that they would require their professionals to provide services to advisory accounts only on a flat-fee basis.

40.     In 2018, the Fifth Circuit forcefully vacated the 2016 Rule and related exemptions, holding that the Department's expansion of the definition of fiduciary violated the plain text and structure of ERISA.  *Chamber*, 885 F.3d at 388.  The Fifth Circuit explained that "all relevant sources indicate that Congress codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence" and that "[t]he 1975 regulation captured the essence of a fiduciary relationship [as] known to the common law." *Id.* at 365, 369.  The Fifth Circuit emphasized that "a special relationship of trust and confidence" exists only where investment advice is provided by the professional to the client "'regularly'" and the advice is "the 'primary basis' for the client's investment decisions." *Id.* at 365 (quoting 1975 regulation).  The court further explained "that financial salespeople are not fiduciaries absent that special relationship." *Id.* at 376.  "When enacting ERISA, Congress was well aware of the distinction … between investment advisers, who were considered fiduciaries, and stockbrokers and insurance agents, who generally assumed no such status in selling products to their clients." *Id.* at 372.  The 2016 Rule unlawfully discarded that "dichotomy," "abrogate[d]" the common-law fiduciary definition, and contravened ERISA's plain language.  *See id.* at 373-74, 376.

41.     In vacating the 2016 Rule, the Fifth Circuit also held that the Department had acted unlawfully with respect to IRAs specifically.  By leveraging its overbroad "fiduciary" definition to impose affirmative regulatory requirements on "IRA financial services providers," it had "impermissibly conflat[ed] the basic division drawn by ERISA" between IRAs and employer-

sponsored plans. The 2016 Rule had illegally "circumvent[ed] Congress's withholding from DOL of regulatory authority over IRA plans." *Id.* at 381, 384.

**D.      Aftermath of the 2016 Rule**

42.    Following the Fifth Circuit's sweeping rejection of the 2016 Rule, the Department formally amended its regulations to reinstate the 1975 five-part test.  85 Fed. Reg. 40,589 (July 7, 2020).  Later that year, the Department issued a new exemption—PTE 2020-02—that contained some conditions that were similar to the BICE, such as acknowledging fiduciary status and abiding by impartial conduct standards.  *See* 85 Fed. Reg. 82,798, 82,863 (Dec. 18, 2020). However, these exemptive conditions only applied to financial professionals who were fiduciaries under the 1975 rule.

43.    In the meantime, the SEC adopted Reg BI, which established seminal new requirements regulating broker-dealers.  The product of a lengthy rulemaking process, Reg BI was proposed in April 2018, finalized on June 5, 2019, and compliance was required by June 30, 2020. 84 Fed. Reg. 33,318, 33,400.  Reg BI addressed the very concerns with broker-dealers the Department claimed necessitated the 2016 Rule.  It established a new standard of conduct for broker-dealers that ensured that "regardless of whether a retail investor chooses a broker-dealer or an investment adviser (or both), the retail investor will be entitled to a recommendation … that is in the best interest of the retail investor." *Id.* at 33,321.  The SEC, which is the agency authorized by Congress to regulate broker-dealers, explicitly *declined* to impose fiduciary status on broker-dealers because "it is not appropriately tailored to the structure and characteristics of the broker-dealer business model (*i.e.,* transaction-specific recommendations and compensation)," and would reduce investor access to investment services and products, reduce choice in payment forms, and increase investor costs for obtaining investment recommendations.  *Id.* at 33,322.

**E.      The Labor Department's 2024 Fiduciary Rule**

44.      Despite the Fifth Circuit's decision and the SEC's adoption of Reg BI, in November 2023 the Department again proposed to revise the "fiduciary" definition.  *See* 88 Fed. Reg. 75,890 (Nov. 3, 2023) (proposed "fiduciary" definition").  As a result of the vastly expanded fiduciary definition, more financial professionals would need to rely on PTE 2020-02.[2]  The Department provided a truncated, 60-day comment period that included four federal holidays, and held its public hearing in the middle of the comment period, depriving participants of the benefit of both time and the ability to review and understand others' comments and views.  In denying a request to extend the comment period, the Department stated that a longer comment period was unnecessary in light of the "significant input [the Department] has received from public engagement with this project since 2010."  Ltr. From Assistant Sec'y Gomez to L. Bleier (Nov. 14, 2023), https://tinyurl.com/msbsv9h3.

45.      The Department hastily published a final rule on April 23, 2024, again dramatically expanding the definition of "fiduciary," and amending PTE 2020-02 and six other exemptions.  89 Fed. Reg. 32,122 ("fiduciary" definition); 89 Fed. Reg. 32,260 (Apr. 25, 2024) (PTE 2020-02 amendments); 89 Fed. Reg. 32,302 (PTE 84-24 amendments); 89 Fed. Reg. 32,346 (amendments to five other exemptions).

46.      The Department's new definition of an investment-advice fiduciary is functionally identical to the vacated 2016 Rule.  Under the 2024 Rule, a person is an investment-advice fiduciary if he, "for a fee or other compensation, direct or indirect," makes a "recommendation" "through or together with any affiliate" to a "plan, plan participant or beneficiary, IRA, IRA owner

---

[2]      The Department also proposed to amend PTE 2020-02, among several other exemptions.  *See, e.g.*, 88 Fed. Reg. 75,979 (proposed PTE 2020-02 amendments).

or beneficiary, plan fiduciary … , or IRA fiduciary" regarding any "investment property," including recommendations to rollover assets into an IRA.  This language is indistinguishable from the 2016 Rule.  89 Fed. Reg. at 32,256, 32,258.  Just as in the 2016 Rule, "for a fee or other compensation, direct or indirect" is defined as "*any* … compensation, from *any* source, *in connection with* or as a result of the recommended purchase, sale, or holding of a security or other investment property *or* the provision of investment advice." *Id.* at 32,257 (emphases added).

47.     The Department claims the 2024 Rule includes purported limitations that distinguish the new definition from its 2016 predecessor.  For example, the 2024 Rule deems a person an investment-advice fiduciary if (1) he or any "affiliate" "makes professional investment recommendations to investors on a regular basis as part of [his] business" and (2) "the recommendation is made under circumstances that would indicate to a reasonable investor in like circumstances that the recommendation is based on review of the retirement investor's particular needs or individual circumstances, reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances, and may be relied upon by the retirement investor as intended to advance the retirement investor's best interest." *Id.* at 32,256.

48.     The first prong is no limitation at all.  Any financial professional who works for a company that has an affiliate that provides any investment advice to anyone or otherwise sells investment products is covered, even if there is no relationship with the person receiving the recommendation at issue.  But the Fifth Circuit made clear a fiduciary relationship arises where a particular adviser provides regular—i.e., ongoing—advice to a specific client. *Chamber*, 885 F.3d at 375.

49.     The second prong is effectively indistinguishable from the 2016 Rule, which covered recommendations made by a person who makes the recommendation pursuant to an "understanding that the advice is based on the particular investments needs of the advice recipient" and defined "recommendation" as "a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action."  81 Fed. Reg. at 20,997.[3]  The Department has rearranged the wording, but the meaning is functionally the same.  Moreover, this prong jettisons the requirement that the advice be the primary basis for the investment decision.

50.     The 2024 Rule also thus covers sales recommendations.  Broker-dealers regularly tailor their recommendation to the client's "particular needs or individual circumstances."  89 Fed. Reg. at 32,256.  They would be poor salespersons if they made identical recommendations to every customer without regard to the customer's financial needs and circumstances, investment objectives, risk tolerance, and other preferences.   As financial professionals, broker-dealers' recommendations inherently reflect an "application of [their] professional or expert judgment" to the customer's "particular needs or individual circumstances."  *Id.*  Indeed, broker-dealers who "portray[] themselves as knowledgeable experts" have by that act alone "invited the investor's trust," the Department maintains; likewise, a "recommendation is individualized when it follows the collection of information on the investor's personal financial needs or circumstances."  89 Fed. Reg. at 32,152.  This departs sharply from the Advisers Act, which explicitly excludes from its definition of "investment adviser"—and, thus, from fiduciary status—any broker-dealer whose

---

[3]     Moreover, like the 2016 Rule, the 2024 Rule provides that an acknowledgment of fiduciary status suffices, even if the two prongs described above are not satisfied.  89 Fed. Reg. at 32,256-57; 81 Fed. Reg. at 20,997. And, as described above, that acknowledgement of fiduciary status is required to qualify for PTE 2020-02.

recommendations are "solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C).

51.      Moreover, retail investors will *always* be able to rely on a broker-dealer's recommendation as intended to advance their best interest, because Reg BI *requires* broker-dealers to "act in the best interest of [a] retail customer" when making a recommendation of "any securities transaction or investment strategy involving securities." 17 C.F.R. § 240.15*l*-1(a)(1). Simply put, by operation of the 2024 Rule, *if* you are a broker-dealer *then* you are an ERISA fiduciary in connection with recommendations to retail investors. *Chamber of Commerce* emphatically held that ERISA fiduciaries and SEC-regulated broker-dealers are distinct, but the Department has gone beyond its authority and ordained them one and the same.[4]

52.      As a result of the 2024 Rule, many broker-dealers will need to comply with PTE 2020-02 or else change their business model to limit brokerage-only services. The consequences will be higher costs for retirement savers and a reduction in the availability of affordable investment assistance and education.

53.      The new "fiduciary" definition and exemption amendments take effect on September 23, 2024.

## COUNT ONE

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A), (C)
### (NO STATUTORY AUTHORITY)

54.      The allegations of the preceding paragraphs are incorporated herein by reference.

---

[4]   The Department says that the 2024 Rule text "confirm[s] that sales recommendations that do not satisfy the specific contexts for fiduciary advice [in the 2024 Rule] will not lead to ERISA fiduciary status." 89 Fed. Reg. at 32,149; *see id.* at 32,257. But as explained above, that's meaningless, given that broker-dealers' compliance with Reg BI will make a sales recommendation *ipso facto* fiduciary advice under the 2024 Rule.

55.    "A regulator's authority is constrained by the authority that Congress delegated it by statute." *Chamber*, 885 F.3d at 369.  Reviewing courts "shall" "set aside agency action" made "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or that is otherwise arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).

56.    For multiple reasons, the Department's renewed attempt to "include stockbrokers and insurance agents" within the definition of investment advice fiduciary has once again taken the Department "far afield from its enabling legislation."  *Chamber*, 885 F.3d at 372, 376.

   a.    First, the new definition "dispenses with the 'regular basis' and 'primary basis' criteria used in the regulation for the past [fifty] years," as well as with the mutual agreement or understanding requirement, which are integral to the common law understanding of fiduciary.  *Id.* at 366, 369.

   b.    Second, just as in the 2016 Rule, the Department's new definition "conjoins 'advice' with a 'fee or other compensation, direct or indirect,'" "ignor[ing] the preposition '*for*'" in the text, which indicates that the purpose of the fee must be to compensate the investment adviser for his advice, not his sales or other transactions.  *Id.* at 373 (emphasis added); *see also id.* at 383 (explaining that the statutory prohibited-transaction provisions confirm the difference between fees for advice and fees for sales).  Indeed, in *Chamber* the Fifth Circuit took the Department to task for reading the statutory language as if it defined an "investment-advice fiduciary" as a person who "receives a fee, in whole or in part, in connection with any investment advice," rather than "*for*" such advice.  *Id.* at 373 (emphasis added).  In adopting the 2024 Rule, the Department used the very same "in connection with" language that the Fifth Circuit expressly said was an improper reading of the statute.  *See* 89 Fed. Reg. at 32,257.

c.     And third, the new definition departs from an 80-year-old understanding in the law and industry practice that has "distinguished salespeople from investment advisers," and which "Congress is presumed to have" respected in the enactment of ERISA. *Chamber*, 885 F.3d at 373.  Although the Department purports to exclude sales from the 2024 Rule's coverage, that carve-out is illusory.  In fact, in initiating the rulemaking the Department expressly "reject[ed] the purported dichotomy between a mere 'sales' recommendation … and advice."  88 Fed. Reg. at 75,907.

57.     Moreover, because the 2024 Rule deems a person to be a fiduciary when he gives personalized investment advice under circumstances indicating that the advice "may be relied upon by the retirement investor as intended to advance the retirement investor's *best interest*," 89 Fed. Reg. at 32,256 (emphasis added), the 2024 Rule will turn broker-dealers and insurance agents into ERISA fiduciaries whenever they make a recommendation in compliance with their best-interest obligations established by the SEC in Reg BI and by the vast majority of states that have adopted the NAIC Model.  17 C.F.R. § 240.15*l*-1(a)(1) (broker-dealers "shall act in the best interest of the retail customer at the time the recommendation is made"); NAIC Model § 6(A) (insurance agents, "when making a recommendation of an annuity, shall act in the best interest of the consumer").  That is, the Department treats being a broker-dealer as proof positive that someone is a fiduciary; what Congress, the SEC, the common law, and the Fifth Circuit all say are distinct, the Department treats as functionally identical.

58.     In promulgating the 2024 Rule, the Department also impermissibly attempts to seize extensive regulatory authority over financial professionals doing business with IRA owners, an authority it has never lawfully exercised in the fifty-year history of ERISA.  The oversight of broker-dealers' conduct with respect to IRAs has been entrusted to the *SEC* since Congress enacted

the Securities Exchange Act of 1934.  The SEC's authority over broker-dealers was recently reaffirmed by Congress in the Dodd-Frank Act, which directed the Commission to refrain "from eliminating … 'commission[s] or other standard compensation.'"  *Chamber*, 885 F.3d at 385 (quoting Dodd-Frank Act § 913(g)).  "Congress does not ordinarily specifically delegate power to one agency while knowing that another federal agency stands poised to assert the very same power."  *Id.* at 386.  The Department's dissatisfaction with the requirements administered by agencies expressly empowered to regulate the underlying commercial dealings implicated by the 2024 Rule—the IRS and SEC—only confirms that the Department has exceeded its sphere of authority and is invading those of other agencies.

59.     In doing so, the Department has also once again acted with the purpose of "impermissibly bootstrapp[ing] what should [be] safe harbor criteria into 'backdoor regulation.'" *Chamber*, 885 F.3d at 388.  As with the 2016 Rule, the Department has over defined "fiduciary" to force non-fiduciary financial professionals—including broker-dealers—to adhere to "exemptive" rules that contain conditions the Department could not impose directly.  This tactic of thrusting "novel and extensive duties and liabilities" onto parties otherwise immune from Department regulation is as unlawful today as it was six years ago.  *Chamber*, 885 F.3d at 384.

60.     The illegality of the 2024 Rule is even clearer now than it was six years ago, in light of the Supreme Court's express invocation of the major-questions doctrine to invalidate similar agency efforts to regulate vast swaths of the economy without clear statutory authority.  The 2024 Rule, like its 2016 antecedent, will "transform the trillion-dollar market for IRA investments, annuities and insurance products, and … regulate in a new way the thousands of people and organizations working in that market."  *Chamber*, 885 F.3d at 387.  By the Department's own estimate, it will cost over half a billion dollars in the first year of implementation and over $300

million annually thereafter, 89 Fed. Reg. at 32,196; in all likelihood, the costs will be far greater. And, in professing to displace the "patchwork" of standards for financial professionals established by Congress with a "uniform" standard that it deems better, the Department has improperly assumed for itself the roles of Congress, the SEC, and the States—all in defiance of an on-point ruling by the Fifth Circuit. There is no "historical precedent" for the Department's attempt to engage in "regulation of this kind"—beyond, of course, the Department's failed 2016 venture. *NFIB*, 595 U.S. at 119.

61.     The 2024 Rule exceeds the authority provided to the Department by ERISA and is arbitrary and capricious. It must be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (C).

## COUNT TWO

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS—NO RATIONAL JUSTIFICATION)

62.     The allegations of the preceding paragraphs are incorporated herein by reference.

63.     In rulemaking under the APA, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department has utterly failed in this task. Its justifications for the 2024 Rule contravene Congress's regulatory framework for the financial services industry; are contradictory, illogical, and inconsistent with the 2024 Rule's effects; and are unsupported by record evidence.

64.     First, the Department is unabashed that a principal purpose of this rule is to regulate conduct as to IRAs. *See, e.g.*, 89 Fed. Reg. at 32,131, 32,170. It has no such authority, and it is therefore arbitrary, capricious, and unlawful to adopt a rule with that purpose. *See Chamber*, 885 F.3d at 384.

65.     Second, the Department claims that its 2024 Rule is necessary to fill "significant gaps" in "the current patchwork regulatory structure," which "is neither uniform nor sufficiently protective of retirement investors."  89 Fed. Reg. at 32,139.  That claim rests on a fundamental misconception of the Department's role.  And the 2024 Rule does not create a uniform standard in any event.

66.     Congress did not empower the Department to impose fiduciary duties of prudence and loyalty on broker-dealers and insurance agents that do not have a heightened relationship of trust and confidence with their customers.  Rather, Congress—in Dodd-Frank—empowered the SEC to establish the "standard of conduct" for a broker-dealer "providing personalized investment advice about securities."  15 U.S.C. § 78*o*(k)(1).  And, in adopting Reg BI—which the Department repeatedly admits was a watershed rulemaking that fundamentally altered the industry and its practices, *see, e.g.*, 89 Fed. Reg. at 32,128-29, 32,174—the SEC explicitly rejected the imposition of "a uniform standard of conduct [for] all financial professionals regardless of how they engage with their retail customers."  84 Fed. Reg. at 33,462.  "Such uniformity," the SEC explained, "would be difficult to implement and disruptive to pursue as a result of various factors, including the key differences in the ways broker-dealers and investment advisers engage with retail clients," "could require narrowing the type and scope of services permitted to be provided by various types of financial professionals," and "could result in a standard of conduct for broker-dealers that is not appropriately tailored to the structure and characteristics of the broker-dealer model (*i.e.*, transaction specific recommendations and compensation), and might not properly take into account, or build upon, existing obligations that apply to broker-dealers, including under FINRA rules."  *Id.*

67.     Congress likewise explicitly left the regulation of insurance agents to the States, prohibiting the SEC from regulating "[a]ny insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."  15 U.S.C. § 77c(a)(8).  And in the Dodd-Frank Act, Congress forbade the SEC from regulating fixed-indexed annuities in states that have adopted the NAIC Model.  Pub. L. No. 111-203, § 989J, 124 Stat. 1376, 1949-1950 (2010).

68.     In short, it is not the Department's role to deplore as a "patchwork" the regulatory framework established by Congress, and it is not the Department's role to set about correcting what it perceives as Congress's errors.

69.     On top of that, the 2024 Rule does not achieve the Department's professed goal in any event.  The Rule does not extend to every investment vehicle that a person might use for retirement, but only to employee benefit plans, 29 U.S.C. § 1003, and certain enumerated trusts, accounts, or annuities, such as IRAs, 26 U.S.C. § 4975(e)(1).  The Department's supposedly "uniform" standard will not apply to any retirement savings vehicles outside the scope of ERISA and the Tax Code.

70.     To the extent it does apply, the 2024 Rule will subject broker-dealers and insurance agents to overlapping and inconsistent standards of conduct.  Many broker-dealers will have to comply with both Reg BI and the amended PTE 2020-02, and many insurance agents will likewise have to comply with both state insurance regulations and the amended PTE 2020-02.  Being subjected to multiple regulators with differing standards, interpretations, and practices is not "uniformity," and in failing to consider the difficulties of being subject to multiple regulators and

conflicting mandates, the Department failed "to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

71.     The problem of being subject to multiple regulators is compounded by the fact that the standard in the 2024 Rule depends on the speculative assessment of how a reasonable investor would perceive the interaction with a financial representative, an inquiry that—as the Rule is implemented and enforced over time—will be applied through the filter of how the *Department* believes that an investor would perceive the matter.  And the application of the Rule is so uncertain the Department was unable to address the "myriad different factual patterns that could arise under the final rule."  *Id.* at 32,163.  This uncertainty will produce inconsistent applications, not uniformity.

72.     Because the 2024 Rule "will undermine [DOL's] own objective"—uniformity—it is arbitrary and capricious.  *In re FCC 11-161*, 753 F.3d 1015, 1143 (10th Cir. 2014).

73.     Third, in attempting to justify the 2024 Rule, the Department relied on the fact that "other regulators have recognized the need for change in the regulation of investment recommendations and have imposed enhanced conduct standards on financial professionals who make investment recommendations, including broker-dealers and insurance agents."  89 Fed. Reg. at 32,124.

74.     However, other regulators' adoption of new standards weighs *against* the Department adopting new overlapping and inconsistent standards; when a regulator has done what it considers necessary, that is not justification for another regulator to do more.  That is particularly so here, where the other regulators consciously declined to go as far as the Department now does, in the belief that a fiduciary standard was *not* appropriate for the professionals they regulate.  When it adopted Reg BI to govern broker-dealers, the SEC said it did "not believe that applying the

existing fiduciary standard under the Advisers Act to broker-dealers or adopting a new uniform fiduciary standard of conduct applicable to both broker-dealers and investment advisers, would provide any greater investor protection (or, in any case, that any benefits would justify the costs imposed on retail investors in terms of reduced access to services, products, and payment options, and increased costs for such services and products)." 84 Fed. Reg. at 33,322, 33,466-67.  Instead, the SEC adopted a "best interest" standard for broker-dealers.  Yet under the Department's backwards logic, circumstances where an investor may "believe" that a broker-dealer is acting in the investor's "best interest"—to be understood "colloquially" to mean where the broker-dealer "is looking out for [the investor] and working to promote [her] interests"—become a basis for conferring fiduciary status.  89 Fed. Reg. at 32,153.  When an "agency's rationales contradict themselves," its action is "'illogical on its own terms' and therefore cannot stand." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1030 (5th Cir. 2019).

75.     Fourth, the Department fails to justify applying the 2024 Rule to cover broker-dealers.  In fact, the Department repeatedly concedes that the new standards under Reg BI leave little need for further regulation of broker-dealers by the Department. 89 Fed. Reg. at 32,174.  And in its rush to subject broker-dealers to an unnecessary, duplicative, and inevitably conflicting regime, the Department relies in large part on studies that predate Reg BI's substantial reworking of the regulatory framework applicable to broker-dealers. *See infra* ¶ 79.

76.     In its attempt to fill that yawning gap in justification for its huge regulatory leap, the Department points to the supposed benefits to smaller employer pension plans and their participants.  In doing so, the Department relies heavily on a single comment letter that claimed the 2024 Rule will save small plans $55 billion over 10 years. *See, e.g.*, 89 Fed. Reg. at 32,160/3; Morningstar Cmt., https://tinyurl.com/mr3z7y9v.  That comment is not sufficient basis for the

Department to anoint itself the regulator of tens of thousands professionals already regulated by the SEC, particularly given the comment's flaws—it assumed without any basis that small employer plans are not *already* receiving fiduciary advice; acknowledged that smaller plans pay higher fees for reasons completely unrelated to whether they receive fiduciary advice; and failed to account for the decline in fees paid by smaller plans that already is occurring.  *Id.* at 2; Lia Mitchell, *Morningstar*, "2023 Retirement Plan Landscape Report," at 2, 17, 19, https://tinyurl.com/485n5da3.[5]  The report is ultimately evidence of nothing.  "Professing that [a rule] ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking."  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.).

## COUNT THREE

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS—UNREASONABLE COST-BENEFIT ANALYSIS)

77.     The allegations of the preceding paragraphs are incorporated herein by reference.

78.     The 2024 Rule is "arbitrary" and "capricious" because the Department failed to reasonably "consider[] the costs and benefits associated" with the 2024 Rule in multiple ways. *Mex. Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023), including but not limited to the following:

79.     First, the Department supports its analysis with an outdated regulatory impact analysis performed for the 2016 Rule and primarily cites studies that predate even the 2016 Rule. *See, e.g.*, 89 Fed. Reg. at 32,181 (citing sources from 1983, 2008, 2009, 2011, 2014, and 2015); *id.* at 32,184 (citing sources from 2005, 2009, 2011, and 2016); *id.* at 32,204 (citing 2016 analysis

---

[5]     Morningstar similarly fails to justify its assumption that data regarding plans with more than 100 participants and limited assets can be applied to plans with fewer than 100 participants and more robust assets.

to estimate impact of rule on insurance companies).  Even the later-published sources rely substantially on data that predate at least Reg BI.[6]  Relying on stale analysis is not reasonable, especially given the significant intervening changes that have occurred in the regulatory landscape, such as the promulgation of Reg BI and changes to the NAIC Model.  Indeed, the Department admits that there is only "preliminary evidence" of the effects of Reg BI and cannot "calculate a comprehensive estimate" of the 2024 Rule's purported benefits due to the "changing regulatory environment."  *Id.* at 32195, 32198.  The Department's incomplete and half-hearted cost-benefit analysis reflects its rush to promulgate the 2024 Rule.

80.     Second, the Department entirely failed to account for the adverse effects the 2024 Rule will have on the myriad broker-dealer and insurance firms providing investment education, resulting in fewer jobs and less helpful information for investors.  One of the studies the Department itself relies on found that imposition of fiduciary duties "was accompanied by a 16 percent decline in the entry of affected firms."  89 Fed. Reg. at 32,214.  And the SEC found that when the Department imposed similar fiduciary duties in the 2016 Rule, there was "a significant reduction in retail investor access to brokerage services" and "the available alternative services were higher priced in many circumstances."  84 Fed. Reg. at 33,322.  Financial institutions "eliminated or reduced access to brokerage advice services" and "migrated away from open choice to fee-based or limited brokerage services."  *Id.* at 33,322 n.33.  Several firms "requir[ed] customers to enter into more expensive advice relationships" or "pass[ed] through higher compliance costs to customers."  *Id.* at 33,322 n.34.  In failing to fully consider and address these

---

[6]     *See, e.g.*, Veronika K. Pool et al., *Mutual Fund Revenue Sharing in 401(k) Plans*, Vanderbilt Owen Graduate School of Management Research Paper (November 8, 2022) (2009-2013 data); Ben Charoenwong, et al., *Does Regulatory Jurisdiction Affect the Quality of Investment-Adviser Regulation*, 109 Am. Econ. Rev. (October 2019) (2009-2014 data).

adverse consequences of its Rule, the Department arbitrarily ignored an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

81.     Worse, instead of engaging with this evidence—which the SEC found credible when promulgating Reg BI—the Department dismissed a survey showing that its 2016 Rule had reduced access to professional financial advice for small investors by stating, "the survey was commissioned by a party that sued to block the Department's 2016 Rulemaking." 89 Fed. Reg. at 32,219. That is a frivolous ground for dismissing record evidence.

82.     Third, the Department "inconsistently and opportunistically framed the costs and benefits of the rule." *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). The Department counted its Rule's "gains to investors" as "benefits." 89 Fed. Reg. at 32,208. But it counted the Rule's *costs* as benefits too, stating that "[o]ther improvements may take the form of 'transfers' of social welfare to Retirement Investors from other entities in society." *Id.* "[I]t is possible that the financial industry would forgo profits," the Department said, yet it touted that cost as a benefit on the dubious and unsupported assertion that lost profits necessarily result in a "transfer from investment advisers and associated service providers to Retirement Investors." *Id.* Moreover, the Department applied discount rates to its *cost* estimates without applying discount rates to its *benefits* estimates, thereby inflating the 2024 Rule's purported benefits. *Compare id.* at 32,195 (Table 3) & 32,197 (Table 5), *with id.* at 32,196 (Table 4).

83.     Fourth, the Department cannot count the effects of the 2024 Rule on IRAs as a "benefit," because it has no authority to regulate conduct with respect to IRAs. *See supra* ¶ 32. An agency exceeding its authority is a cost—and a serious one—not a benefit. Because the Department's assessment of the benefits of adopting the Rule is improperly and heavily weighted toward the Rule's impact in a sphere where the Department has no authority to regulate, its

assessment of the value of proceeding with the Rule is irretrievably flawed, arbitrary, and capricious.

84.     Fifth, the Department failed to consider the cost of "increased legal liability" its Rule will impose, dismissing commenters' concerns on the ground that "this rulemaking does not," the Department claims, "create a new private right of action."  89 Fed. Reg. at 32,225.  That is no answer to the fact that the Department has created by regulatory fiat fiduciary relationships—and an attendant increased risk of liability—in circumstances where a fiduciary relationship has never been understood to exist.  By the Department's own estimate, "30 percent of broker-dealers, registered investment advisers, and insurance companies would be newly reliant on PTE 2020-02," *id.*, which in turn requires a financial professional to "acknowledge fiduciary status under Title I and/or the Tax Code, and provide Retirement Investors with a written statement of the Care Obligation and Loyalty Obligation" imposed by the Department, *id.* at 32,295.  Yet the Department refused to consider the increased liability risk under ERISA, 29 U.S.C. §§ 1109, 1132(a), and under state tort law, *see, e.g.*, *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 19, 26 (N.Y. 2005).

85.     Similarly, the Department failed to address commenters' concern that this increased liability is *on top of* existing enforcement and remedies available against broker-dealers under the securities laws.  *See* FSI Cmt. at 32-35, https://tinyurl.com/22ts4btv.  The Department acknowledged these comments in passing but provided no response or justification for refusing to weigh this cost in its Regulatory Impact Analysis.  *See* 89 Fed. Reg. at 32,211-12.  The Department cannot ignore these "important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, particularly when claiming elsewhere that ERISA's "enforcement measures will help to ensure

the rulemaking is implemented effectively." 89 Fed. Reg. at 32,218. Such "internal inconsistency [is] characteristic of arbitrary and unreasonable agency action." *Chamber*, 885 F.3d at 382.

86.     Sixth, the Department improperly failed to consider the costs of significantly expanding its definition of investment advice fiduciary to include financial professionals who do not have an ongoing relationship of trust and confidence with their customers and cannot reasonably comply with the PTE. Indeed, the Department made no attempt to estimate costs of this expansion.

87.     Seventh, the Department understated the costs of the 2024 Rule in multiple other ways. It uses a supposedly "averaged, blended, or typical rate" for "the cost of legal support," that is weighed down by the inclusion of "legal support staff." 89 Fed. Reg. at 32,224. The result is an hourly estimate of $165.71. *Id.* But the Department made no real effort to respond to comments explaining that the actual cost of legal services is multiples higher. *See* Inv. Co. Inst. Cmt. at 24-25, https://tinyurl.com/yckb6kxb (citing inflation-adjusted SEC estimates of $517.85/hour and $438.98/hour for legal counsel). The Department also understated at least one commenter's cost estimates by reporting it as an all-in estimate, when in reality the commenter quantified only a *portion* of the compliance costs financial professionals will incur as a result of the Department's expanded definition of "investment-advice fiduciary." *See id.* at 23 ("emphasiz[ing]" that $2.9 billion estimate "covers only first-year costs related to some cost components"); 89 Fed. Reg. at 32,197 (Table 5) (reporting the $2.9 billion estimate as an all-in figure).

88.     The Department's underestimation of these costs is made worse by its mischaracterization of its "reasonable investor" standard as an "objective test." *See supra* ¶ 71. The Department itself could not explain how the Rule will apply in the "myriad of different factual

patterns" it expects to arise under the Rule, 89 Fed. Reg. 32,163, yet it expects regulated parties to implement this subjective test with no significant compliance burden.

**PRAYER FOR RELIEF**

89.     For these reasons, Plaintiffs-Intervenors respectfully request entry of an order and judgment:

a.     Vacating and setting aside the 2024 Rule;

b.     Declaring that the 2024 Rule was promulgated by DOL in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C); and is arbitrary, capricious, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

c.     Enjoining the Department and all its officers, employees, and agents, including Defendant Su, from enforcing, implementing, applying, or taking any action whatsoever under the 2024 Rule anywhere within the Department's jurisdiction;

d.     Issuing all process necessary and appropriate to suspend the effective date of the 2024 Rule, including preliminary injunctive relief, to maintain the status quo pending the conclusion of this case;

e.     Awarding Plaintiffs-Intervenors their reasonable costs, including attorneys' fees, incurred in bringing this action; and

f.     Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: June 28, 2024

/s/ *Russ Falconer*

Russ Falconer (TX Bar No. 24069695)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Phone: (214) 698-3170
Fax: (214) 571-2958
RFalconer@gibsondunn.com

Charles W. Fillmore (TX Bar No. 00785861)
H. Dustin Fillmore III (TX Bar No. 06996010)
THE FILLMORE LAW FIRM, LLP
201 Main Street, Suite 700
Fort Worth, Texas 76102
Phone: (817) 332-2351
Fax: (817) 870-1859
Chad@fillmorefirm.com
Dusty@fillmorefirm.com

Eugene Scalia* (D.C. Bar No. 447524)
Jason J. Mendro* (D.C. Bar No. 482040)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539
EScalia@gibsondunn.com
JMendro@gibsondunn.com

* *Pro hac vice* forthcoming

*Counsel for Plaintiffs-Intervenors FSI and SIFMA*